UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(WORCESTER DIVISION)

_____
                                                    )
G, a 12-year-old minor suing by a fictitious name   )
for privacy reasons, MOTHER, and FATHER,            )
suing under fictitious names to protect the         )
the identity and privacy of G, their minor child,   )
                                                    )
              Plaintiffs,                            )
                                                    )        Case No. 15-cv-40116-TSH
v.                                                  )
                                                    )
THE FAY SCHOOL (by and through its                  )
Board of Trustees) and ROBERT GUSTAVSON,            )
                                                    )
              Defendants.                            )
_____)

**PLAINTIFFS' COUNTER-STATEMENT OF FACTS IN
RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS
PURSUANT TO LOCAL RULE 56.1 IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Plaintiffs hereby submit the following Counter-Statement of Facts in Response to

Defendants' "Statement of Undisputed Material Facts" filed in support of their Motion for

Summary Judgment (at ECF 97).  All referenced "Plaintiffs' Exhibits" are attached hereto and

otherwise reference is made to documents already in the record.

**A.      The School's Computer Based Curriculum**

1.       The School is a nonprofit, independent day and boarding school for children from

pre-kindergarten through ninth grade.  See Declaration of Joseph Adu, IT Director at the School

(attached at Exhibit 1A) at ¶ 2; Declaration of Paul Abeln, Department Chair of the English

Department in the Upper School (Grades 7-9) (attached at Exhibit 1B) at ¶ 2.  Founded in 1866,

the School is located in Southborough, Massachusetts and currently enrolls approximately 475

students, including students from throughout the United States and twenty foreign countries.  See Exhibit 1A at ¶ 2; Exhibit 1B at ¶ 2.

**RESPONSE:  Admit.**

2.      The School provides a challenging and supportive learning environment aimed at preparing its students for secondary school.  See Exhibit 1A at ¶ 3; Exhibit 1B at ¶ 3.  As a result, the School has integrated technology into the classroom, widely using the technology in teaching and learning at the School.  See Exhibit 1A at ¶ 3; Exhibit 1B at ¶ 3.  Technology in the School's classrooms includes, but is not limited to, projectors, video displays, Apple TV, tablets, and laptops.  See Exhibit 1A at ¶ 5; Exhibit 1B at ¶ 5.

**RESPONSE:  Admit to the extent the School provides a "challenging" learning environment and admit that the School integrates technology into the classroom. Deny that these Declarations, drafted to support Defendants' motion, establish that wireless technology is necessary for teaching and learning at the School. (*See, e.g.*, Plaintiffs' Exhibit 1, Deposition of Fay Teacher Paul Abeln, p. 9, stating "I make use of computer resources, the internet on occasion. It's not essential to the teaching of writing.")**

**And deny that the School provided a "supportive learning environment" as to Plaintiffs. G's parents have come to learn that Fay is anything but supportive and in fact Fay was hostile from the first time Plaintiffs raised concerns about the possible impact of Wi-Fi on students and on G.  The parents' first letter to the school about this matter was written on April 14, 2014 to the President of Fay's Board of Trustees (Jim Shay) who had been a personal friend of G's parents. (ECF 97-8[1]; *see also,* Plaintiffs' Exhibit 2, Deposition**

---

[1]      **In accordance with Rule O(3) of this Court's Administrative Procedures concerning CM/ECF Filings, Plaintiffs are referring to all documents previously filed with this Court using their ECF docket number. All referenced page numbers are the ECF page numbers.**

of Mother, p. 27)  G's mother sent Mr. Shay various reports about Wi-Fi exposure, praised Jim Shay's "professional perspective," which she wrote that she would "value . . . after you review the enclosed materials." (ECF 97-8)  The enclosed materials were discussions by scientists about long-term exposure to Wi-Fi. Her letter also indicated that "I see your dedication to our children . . . . I am confident that you will give this topic the attention it deserves and be able to offer guidance with the best approach for this information to be subjectively reviewed…" and ended "Thank you . . . I look forward to discussing your thoughts." (*Id.*)

Despite the Fay Handbook assurances that Fay was "respectful of individual differences," and "supportive," (ECF 62-4, Fay Parent/Student Handbook 2014-2015, at pp. 4-7, 46), after Parents first raised their concerns with the Board of Trustees, defendant Gustavson instructed his staff that G's Parents "should not be rewarded for going around me." (ECF 62-5, Robert Gustavson Email, 4/28/2014) He also instructed that the G's Parents' concerns "should not be added to the agenda" of the upcoming Board meeting. (*Id.*)

Fay's Director of Finance & Operations, Alan Clarance, emailed Fay staff instructing that "we should avoid meeting with her [Mother] and cut this off at the pass." (*Id.*, Alan Clarance Email, 4/29/2014)  In response to G's mother's email stating "…we are around all summer and would like to set a time to come in and, at the very least, get a better understanding of the current wireless infrastructure and its locations" (ECF 62-9), Fay's technology director stated to Mr. Clarance: "I see no reason why we should walk her around and show her our WAP [access point] locations." to which Mr. Clarance replied:

"Perhaps it is time to ignore her requests." (Ex. 62-9, Alan Clarance and Peter Fearey Emails, 6/5-6/6/2014)

After Mother sent an email, on August 1, 2014, again requesting a meeting and indicating "We have some very serious information which relates to our youngest child whose school health records and symptoms indicate increasing sensitivity upon exposure to Wi-Fi at school," (ECF 78-1, p. 40), Gustavson's response stated to other Fay administrators was "We should probably spend some time at the Executive Committee meeting tomorrow discussing next steps regarding [Mother]. I think it may be time for us to seek legal advice, and I want to make sure the Board is informed and involved." He also stated: "I don't think we should respond. At this point, she is not playing by the rules and is distorting whatever we say, so we should not take the bait. She needs to see that she can't get what she wants by going around us and trying to create political pressure."  (Plaintiffs' Exhibit 3, Gustavson emails, 8/6/2014.)  The "political pressure" as Gustavson described it was Mother's communication as a concerned parent to other parents to whom she wrote "I am available to talk if you share concern over this information."  (*See*, ECF 78-11, pp. 2-3, Mother's Email, 8/5/2014 (which was forwarded to Gustavson the same day.))

Thereafter, Fay's technology director wrote that a meeting with another parent expressing concerns about Wi-Fi after Plaintiffs had done so would "open a can of worms." (ECF 62-6, Peter Fearey Email, 10/23/2014) The Head of Lower School circulated an email about the Parents' concerns, entitled "Aluminum Foil and Rabbit Ears," and instructed her staff not to respond to any concerns expressed by G's Parents to which a teacher responded "Blahahahahahahahaha!" (ECF 62-7, Lainie Schuster Email, 11/3/2014) The Assistant Head of School emailed that he was involved in Fay's effort to keep "at bay" the

Plaintiffs and other parents who expressed concerns about the effect of Wi-Fi on their children. (ECF 62-8, David Liebmann Email, 11/10/2014)

During this time, the School wrongfully accused Mother of using Fay's name to arrange a local open forum on the subject of Wi-Fi. She never suggested involving Fay school. When Marie Nagode, the Chair of the Lower/Middle School PIN Board at that time, suggested involving Fay in the forum, the Mother responded by specifically stating her belief that the Fay administration would not be interested in such an event. (*See,* ECF 78-16)  Despite this, Defendants sought to blame Mother for the inaccurate email invitation which was distributed by PIN indicating that the Wi-Fi discussion organized to be held at the Southborough Library was sponsored by Fay. (ECF 78-17) President of the Fay Parents' Association, Melissa D. Bois, after discovering the mistake, blamed the Mother, claiming that "Marie [Nagode] expressed that she was strongly lead to believe by you [Mother] that both Fay School and the Fay Parents' Association were aware and in support of this event." (*Id.*) That was false. In Marie Nagode's email of September 16, 2014, sent just *the day before* to defendant Gustavson and Ms. Bois, Nagode herself explains it was her own mistake: "My error in approving this flyer was in assuming that [Mother] was working together with the Fay Parents' Association (and therefore the Fay Administration) on this event. I accept full responsibility for this mistake." (ECF 81-1, p. 3)  But not only does Ms. Bois send the email[2] to plaintiff Mother accusing her of wrongdoing, but James

---

[2]    Ms. Bois was apparently working closely with Defendant Gustavson against the efforts of Plaintiffs to help their son in the school. (*See*, ECF 81-2, Email from Gustavson to Ms. Bois, thanking her for the email sent to Plaintiff Mother and for her "steadfast support" during this "ongoing ordeal.") Additionally, Plaintiff Mother promptly responded in defense against the false allegation made by Ms. Bois against her (*See*, ECF 81-3, emails from Mother to both Ms. Bois and to PIN), as Plaintiff Mother not only made no such misrepresentations but specifically stated she was not "currently active" in Fay's Parent Independent School Network. (ECF 81-4)

Shay of the Fay Board of Trustees sends another email thereafter to the rest of the Trustees claiming that

> Mr. and Mrs. [plaintiffs Father and Mother] continue to harass and openly criticize Fay administrators, contact other parents and trustees about their concerns, and mislead members of our school community by reporting inaccurate information about the School's position. Most recently, it was revealed that Mrs. [Mother] misrepresented herself to the Parents' Independent School Network (PIN), a regional group of independent school parent association representatives, by using her position on the Arts and Enrichment Committee of our Parents' Association. In this regard, she succeeded in persuading PIN to send out an email announcement to all its member schools inviting them to "A Discussion of Health Risks and Solutions for the Safer Use of Technology" at the Southborough Library sponsored by Fay School.

(ECF 81-5) Defendant Gustavson was copied on Mr. Shay's email and apparently made no effort to inform the Trustees of the truth – that Ms. Nagode made the mistake about Fay sponsoring the event and Ms. Bois then falsely blamed Mother in support of Fay. (*Id.*)[3] As a result of their false claim that the Mother had misused the school name, Fay ally Ms. Bois removed the Mother from the Parents' Association committee on which she had served and instructed Mother to not volunteer for future Parents' Association volunteer opportunities. (ECF 78-17)

Thereafter, Fay sent a letter to Mother and Father (at ECF 97-24, Letter from Gustavson, 9/15/2014), in which Gustavson wrongfully accused Mother and Father of cultivating "a campaign against the School" (at p. 3) among other things and threatened to

---

[3]     Additionally, prior to the Bois email and the Shay email being sent, Gustavson was also informed that the head librarian at the Southborough Library stated:  "I have not heard anything about Fay being involved with the Wi-Fi presentation. The library is simply hosting the space. It was coordinated with a Southborough resident named [Mother]." (ECF 81-6)  This further supports the fact that the distributed notice identifying Fay's involvement was an error by Ms. Nagode (as she admitted) and not the result of pressure and lies by plaintiff Mother as part of this alleged advocacy campaign by the Mother targeting the Fay School.

**"promptly terminate your sons' enrollment at the School"** (at p. 4), citing as one of the problems the false allegation that Mother made misrepresentations about Fay to PIN. (*Id.*, p. 3; *see also*, Ex. 2, Mother Dep., pp. 22, 24, in response to letter:

> It was quite a distressing letter because we received it after the school received medical documentation about G's symptoms and the concern about EHS. And then we received this letter threatening both of our children's placement at the school. It was very upsetting. …
>
> *      *      *
>
> We were accused of a lot of things in this letter that were not true.

3.      Most fifth to ninth grade academic teachers utilize a program known as "Google Docs" to teach their classes.  See Exhibit 1A at ¶ 6; Exhibit 1B at ¶ 4; Deposition of Joseph Adu (relevant portions of which are attached at Exhibit 2) at 36-48.  Google Docs is a program that allows students to create and edit documents online while collaborating with teachers and other students in real time.  See Exhibit 1A at ¶ 6; Exhibit 2 at 37-39.  It is a cloud-based program, so all of its functions (including word processing) require an internet connection to utilize the program.  See Exhibit 1A at ¶ 6.

**RESPONSE: Admit except deny that wireless internet is required to use Google Docs. (*See*, Ex. 1, Abeln Dep., p. 10 where teacher states that connecting via ethernet cable or via Wi-Fi is "roughly equivalent."; ECF 59-26, Robert Bowdoin Report, p. 2 re availability of ethernet jacks in Fay classrooms to wire the rooms.)**

4.      The School provides Chromebooks for its students to use during certain classes. See id. at ¶ 7.  The Chromebooks are laptop computers designed to be used primarily while connected to the internet.  Id.  Most of the applications and documents on the Chromebook are "cloud-based programs," meaning that they are accessed and used through the internet and not through software installed directly onto the device.  Id.

**RESPONSE:  Admit except deny that wireless internet is required to access internet with Chromebooks which is not so stated in the declarations relied on (because it is not the case).**

5.      In the seventh, eighth, and ninth grades, students bring in their own laptop or tablet to use during all computer-based learning that takes place in their classes.  See id. at ¶ 8.

**RESPONSE:  Admit.**

6.      The School installed wireless internet ("Wi-Fi") on its campus in or around 2009 to provide internet access for its students, faculty, and staff.  See id. at ¶ 9.  The School's Wi-Fi initially operated on the 2.4 GHz frequency band.  Id.

**RESPONSE:  Admit.**

7.      In the summer and fall of 2012, the School upgraded its wireless network so that the School's Wi-Fi could operate on both the 2.4 GHz and 5.0 GHz frequency bands (the "Upgrade").  See id. at 10.

**RESPONSE:  Admit.**

8.      As part of both the original installation and the Upgrade of the School's Wi-Fi, the School installed wireless access points in many buildings throughout the School campus, including in the School's academic buildings.  See id. at ¶ 11; Map of the School's campus with access points identified (attached at Exhibit 3).

**RESPONSE:  Admit.**

9.      A wireless access point is a networking hardware device that allows Wi-Fi compliant devices (such as laptops, tablets, projectors, Apple TV, etc.) to connect to the School's internet network without the use of a wired connection.  See Exhibit 1A at ¶ 11.

**RESPONSE:  Admit.**

10.    The academic building at the School where the majority of academic classes are held for students in the fifth through ninth grades is called the Root Building.  See id. at ¶ 12.

**RESPONSE:  Admit.**

11.    As part of the Upgrade, the School installed eight access points on the first floor of the Root Building and eight access points on the second floor of the Root Building in order to provide Wi-Fi to all the classrooms in the Root Building.  See id. at ¶ 13; Exhibit 3 at 4-5.

**RESPONSE:  Admit.**

12.    Each of these access points serves a different area of the Root Building, such that, each access point typically provides Wi-Fi to between five and eight (5-8) classrooms.  See Exhibit 1A at ¶ 14.  If a single access point is deactivated at the School, 5-8 classrooms would likely be affected, as those 5-8 classrooms would have no Wi-Fi connection to the internet.  See id.

**RESPONSE: Admit except deny that if a single access point is deactivated at the School, then the nearby 5-8 classrooms would have no connection to the internet because the classrooms could be wired to the internet (*see*, ECF 59-26, Bowdoin Report on wiring the classrooms) and Mr. Adu (whose declaration is relied on here) also said that if one access point at Fay is deactivated, laptops seeking a wireless connection may still connect to other nearby access points. (*See,* Plaintiffs' Exhibit 4, Deposition of Joseph Adu, pp. 41-42)**

13.    The School's use of Wi-Fi, instead of hardwired devices, allows for increased mobility and flexibility within the classrooms and throughout the School's campus.  See id. at ¶ 15; Exhibit 1B at ¶ 7; Exhibit 2 at 37-48; Expert Report of Defendants' Expert, David Maxson ("Mr. Maxson"), previously filed with the Court at ECF No. 59-27 at 20-24.

**RESPONSE:  Deny that Wi-Fi necessarily "allows for increased mobility and flexibility" in classrooms and on campus as whether wiring the classrooms could meet the mobility and flexibility needs of any particular Fay classroom is in dispute. (*See*, ECF 59-26, Bowdoin Report providing alternative ways to wire a classroom to address needs of each particular teacher in using or arranging his/her room as testified to at the *Daubert* Hearing, ECF 106.)**

14.     For example, the use of Wi-Fi allows the School's teachers to easily move the students' desks in their classrooms to allow students to work in groups on various projects or to accommodate the needs of a particular day's lesson plan.  See Exhibit 1A at ¶ 15; Exhibit 1B at ¶ 8(a); ECF No. 59-27 at 21.

**RESPONSE:  Admit that Wi-Fi may be used in this way but deny that Wi-Fi necessarily allows for teachers "to easily move the students' desks" or "work in groups" in contrast to wiring the classrooms which could also be install in a manner to meet those same needs. (*See*, Plaintiffs' Exhibit 5, Testimony of Robert Bowdoin at Daubert Motion Hearing, pp. 22-23; 39 to 40)**

15.     The Wi-Fi also allows students and teachers to move wherever needed within a classroom, or even outside of the classroom (like into the School's hallways or other parts of the School), depending on the particular lesson planned for the students.  See Exhibit 1A at ¶ 16; Exhibit 1B at ¶ 8(b); ECF No. 59-27 at 21.

**RESPONSE:  Admit that Wi-Fi may be used in this way but deny that it has been established that such movement is required for all classes and that such movement requires taking laptops with the students out in the hallway or outside the building in order to teach class as neither declaration relied on establishes this nor that wired connections cannot**

**meet the needs of the teacher and/or students in a particular classroom.** *See***, Response to Fact No. 14 above.**

16.     Students can quickly move into groups while using the Wi-Fi network and can collaborate on class projects with other students in those groups, or even while they are outside the classroom.  See Exhibit 1A at ¶ 17; Exhibit 1B at ¶ 8(c); ECF No. 59-27 at 21.

**RESPONSE:  Admit that Wi-Fi may be used in this way but deny that Wi-Fi necessarily allows students to "quickly move into groups" and deny that wired connections cannot meet the needs of the class projects or group work.** *See***, Response to Fact No. 14 above. (Additionally note that Defendants have not established that the need to go outside the classroom with all students on their laptops is an essential part of teaching and learning.)**

17.     The portability offered by the School's Wi-Fi enhances collaboration between students and communication between students and teachers.  See Exhibit 1A at ¶ 18; Exhibit 1B at ¶ 8(d).

**RESPONSE:   Deny that Wi-Fi "enhances collaboration" and "communication" anymore than a wired classroom.  (*See***, Ex. 1, Abeln Dep., p. 10, where teacher states that connecting via ethernet cable or via Wi-Fi is "roughly equivalent."; ECF 59-26, Robert Bowdoin Report, p. 2, describing wired connection alternatives to meet needs of students and teachers.)**

18.     The School's Wi-Fi allows instructional aids, such as projectors, video displays, Apple TV, tablets, and laptops to seamlessly interact with one another. See Exhibit 1A at ¶ 19; Exhibit 1B at ¶ 8(e); ECF No. 59-27 at 21.

**RESPONSE:   Admit that Wi-Fi is used with instructional aids but deny that Wi-Fi allows instructional aids to "seemlessly interact" in contrast to a wired connection and that these**

instructional aids cannot be just as effective with a wired connection. (*See*, Ex. 1, Abeln

Dep., p. 10; Ex. 5, Bowdoin Testimony, pp. 40-41)

**B.**     **The Parents Advocate Against Wi-Fi**

         **\*\*Plaintiffs Object to this Subtitle as Argument**

    19.    Plaintiffs Mother and Father (the "Parents") are the parents of Plaintiff G ("G").

See Plaintiffs' Second Amended Complaint, previously filed with the Court at ECF No. 59-1 at 7

(¶ 17).

**RESPONSE:**    **Admit.**

    20.    Plaintiff G began attending the day program at the School starting in first grade in

September of 2009.  See ECF No. 59-1 at 11 (¶ 28).

**RESPONSE:**    **Admit.**

    21.    In October 2012, Mother wrote to the School claiming that she believed "[t]here

is a direct link to illness and wi-fi radiation…," and offered to donate Pong protection cases to

place on the School's iPads, which she stated would reduce radio frequency ("RF") emissions

coming from such iPads.  See Email from Mother to the School, dated October 23, 2012,

previously filed with the Court at ECF No. 78-2 at 3-4.

**RESPONSE:    Admit and that in response, Fay's Peter Fearey responded "Once again, I**

**can not thank you enough for this kind offer. I understand your concerns and appreciate**

**your willingness to help us." and Fay's Marie Beam stated "It is wonderful of you not just**

**to raise our awareness of a potential problem but to also actively offer to help us address it.**

**We're grateful." (ECF 78-2 at 2-3)**

    22.    The Parents removed all Wi-Fi from their home and had their smart meters

removed along with other electronics that operated on wireless technology.  See Testimony of

Plaintiffs' Expert, Dr. Hubbuch, at Daubert Hearing (relevant portions of which are attached at Exhibit 4) at 3-141 – 3-142; Plaintiffs' Expert, Dr. Hubbuch's Expert Report, previously filed with the Court at ECF No. 59-19 at 4; Deposition of Dr. Hubbuch (relevant portions of which are attached at Exhibit 5) at 63-64.

**RESPONSE:**     **Admit.**

23.      At the time they removed the Wi-Fi from their home, the Parents told G that they were removing the Wi-Fi because it was bad for him.  See Deposition of G (relevant portions of which are attached at Exhibit 6) at 15.

**RESPONSE:     Deny.  The cited testimony of G is not specifically clear on time frame when he was told that the Wi-Fi had been taken out of the home because it was "bad" for him and Mother testified that neither Mother nor Father told their children that Wi-Fi was "bad" for them when they removed it from their home. (Ex. 2, Mother Dep., pp. 41, 48-49)**

24.      In addition to removing wireless technology from the family home, Mother embarked on a business venture that she hoped would result in the development of a mitigation protection case for iPads which could reduce RF coming from the devices (to compete with the Pong protection cases), and which she could then market and sell.  See Deposition of Mother (relevant portions of which are attached at Exhibit 7) at 17-22.

**RESPONSE: Admit except note that Mother only researched this topic and no business venture was ever formed. (*See*, Ex. 2, Mother Dep., pp. 34-35)**

25.      By March 2014, Mother came to believe that the mitigation cases were not effective, and that schools should hardwire classrooms instead of using Wi-Fi.  See Email from Mother to University of California Berkeley Prevention Research Center, dated March 31, 2014, previously filed with the Court at ECF No. 78-3.  On March 31, 2014, Mother wrote to the

Director and Principal Investigator at the Center for Family and Community Health of the University of California Berkeley Prevention Research Center seeking his help in her "PSA campaign" to raise awareness about her concerns with Wi-Fi in schools.  See id.  In that email, Mother wrote that she was "working on a PSA campaign targeted to parents and children/schools" and "working on a letter to [her] children's school system (private) as well as form letters for the PSA website…."  See id.  Mother also wrote that she had been talking with other experts in the field "about running such a campaign" and hoped to involve broadcasters and "very well respected celebrities" in her campaign.  See id.

**RESPONSE:   Admit except deny that Mother came to believe that "schools should hardwire classrooms instead of using Wi-Fi." (See, Ex. 2, Mother Dep., pp. 4-5)**

26.     On April 13-14, 2014, Mother emailed with an anti-Wi-Fi advocate, Diane Hickey ("Ms. Hickey"), to obtain ideas on how best to craft her campaign.  See Emails from Mother to Ms. Hickey, dated April 13-14, 2014, previously filed with the Court at ECF No. 78-4. In her email, Mother explained to Ms. Hickey that she first became interested in this topic through her efforts to develop her own iPad mitigation protection cases, and was in talks with another advocate to bring "awareness to young parents via a carefully crafted PSA and information to young parents with Pedi offices nationwide."  Id. at 3.

**RESPONSE:  Admit except deny that Mother was engaged in an "anti-Wi-Fi campaign." (See, Ex. 2, Mother Dep., p. 5)**

27.     In early April 2014, Mother reached out to various individuals at the School, including the School's nurse and a trustee of the School, to express her belief that Wi-Fi in schools created a potential danger to students from RF.  See Letter from Mother to a School trustee, dated April 14, 2014 (attached at Exhibit 8) (without enclosures); Letter from Mother to

the School's nurse, dated April 14, 2014 (attached at <u>Exhibit 9</u>) (without enclosures); Letter from

Mother to the School's Board of Trustees, dated April 25, 2014, previously filed with the Court

at ECF No. 78-1 at 9-11; Email from Mother to the School, dated April 28, 2014 (attached at

<u>Exhibit 10</u>) (without enclosures).

**<u>RESPONSE</u>: Admit.**

28.     In her April 2014 written and electronic communications with the School, Mother

did not disclose any medical issues involving G.  <u>See</u> <u>Exhibits 8-10</u>; ECF No. 78-1 at 9-11;

Deposition of Mr. Gustavson (relevant portions of which are attached at <u>Exhibit 11</u>) at 174-75;

Deposition of Alan Clarance (relevant portions of which are attached at <u>Exhibit 12</u>) at 6-7.

**<u>RESPONSE</u>:  Admit that the communications state what they state but deny that Mother**

**was purposely withholding information on G's symptoms as she brought them to**

**Defendants' attention at the May 12, 2014 meeting with Gustavson and Clarance. (*See*, Ex.**

**2, Mother Dep., pp. 5-6.)**

29.     On April 30, 2014, Mother contacted School administrators and requested a

meeting to discuss her concerns about Wi-Fi.  <u>See</u> Email from Mother to the School, dated April

30, 2014 (attached at <u>Exhibit 13</u>) (without enclosures).  On May 12, 2014, the School's Head of

School, Defendant Mr. Gustavson, along with the School's Director of Operations and the

Director of Information Technology ("IT"), met with the Parents.  <u>See</u> <u>Exhibit 11</u> at 92; <u>Exhibit</u>

<u>12</u> at 6-8, 58-59.

**<u>RESPONSE</u>: Admit and clarify that other parents requested to join meeting as well but the**

**School wanted to meet with Mother and Father only first. (*See*, Ex. 2, Mother Dep., pp. 7-8)**

30.     At the May 12, 2014 meeting, the Parents expressed concerns about Wi-Fi in

general and requested that the School remove the Wi-Fi and hardwire the classrooms instead.

See Exhibit 11 at 74-75; Exhibit 12 at 11-16; Email from Mother to the School, dated May 13, 2014, previously filed with the Court at ECF No. 78-1 at 13-16.

**RESPONSE: Admit that at the meeting the Parents expressed concerns about Wi-Fi but deny that the Parents requested the School to "remove" Wi-Fi and additionally, the Parents raised concerns about G's symptoms at this meeting. (*See,* Ex. 2, Mother Dep., pp. 4-6; *and see*, ECF 97-11 and 97-12 (cited by Defendants in support of this fact) in which there is no testimony that Parents sought to remove all Wi-Fi from School; *see*, ECF 78-1 at 13-16 (cited by Defendants on this point) that does not show Plaintiffs requested removal of the Wi-Fi. *See also,* ECF 97-14, p. 2, Email from Parents to Fay, 5/27/2014, which specifically contradicts this characterization of their request, stating that while they requested a review of the risks of Wi-Fi by the School "Our conversation did not progress to any suggested means of mitigation other than to measure the EMF in the school setting by an independent engineering group of your choice at our expense, which you have refused."; *see also*, ECF 78-1, Email from Parents, 8/1/2014 discussing mitigation of exposure (not removal).)**

31.     Around the same time, Mother emailed other parents at the School and several members of the Parents' Association seeking other parents' support in her campaign to remove Wi-Fi from the School.  See Emails from Mother to other parents at the School, dated April 30 – May 2, 2014, previously filed with the Court at ECF Nos. 78-5 at 2, 78-6 at 2.  Mother also reached out to an advertising agency to obtain assistance with her anti-Wi-Fi campaign.  See Email from Mother to advertising agency, dated May 20, 2014, previously filed with the Court at ECF No. 78-7 at 2.

**RESPONSE: Deny characterization of Mother's communications cited as a "campaign to remove Wi-Fi" and that Mother sought assistance with "her anti-Wi-Fi campaign" as they neither state nor indicate such an agenda. (*See*, Ex. 2, Mother Dep., p. 5)**

32.     After the May 2014 meeting with the Parents, the School consulted with organizations that work with private schools and conducted their own research on the topic.  See Email from the School to Mother, dated May 23, 2014, previously filed with the Court at ECF No. 78-1 at 25-26; Exhibit 11 at 73-75, 95-100; Exhibit 12 at 11-16, 94, 96-97.  School administrators determined that there was no legitimate scientific information to support a belief that the School's Wi-Fi system (which is similar in kind to Wi-Fi systems installed in Schools and businesses across the country) was in any way harmful.  ECF No. 78-1 at 25-26.  As a result, Mr. Gustavson notified the Parents that there was inadequate support for the removal of Wi-Fi from the School.  See id.  Mr. Gustavson also stated the School would "adhere to guidelines from all relevant regulatory agencies" and monitor and comply with any changes made by such agencies.  See id. at 26.

**RESPONSE: Deny to the extent Defendants claim that Parents were seeking removal of Wi-Fi from the School and deny that Wi-Fi was "similar in kind to Wi-Fi systems installed in Schools and businesses across the country" as the documents cited by Defendants do not so establish.  *See also*, Response to Fact 30 above on this same issue.**

33.     Mr. Gustavson requested that the Parents address any future concerns regarding Wi-Fi only to those School employees involved in the May 12, 2014 meeting, that is, the School's Director of Operations or the Director of IT.  See id.; Exhibit 12 at 98.

**RESPONSE: Admit Gustavson made this request but deny that Gustavson gave any reason for this request in his letter. (*See*, the document cited by Defendants ECF No. 78-1 at 25-26)**

And note that Clarance only gave the purpose of ensuring employees "could focus on their educational duties" (Def. Memo, p. 5) later in litigation at his deposition in response to questions by his own counsel (as cited by Defendants). Nor does this educational purpose explain why Gustavson's same letter requests the Parents not speak to "trustees" either.

34.    After receiving the School's decision, Mother continued to email the School with additional information she claimed supported her demand for removal of Wi-Fi from the School, and demanded another meeting.  See Email from Mother to the School, dated May 27, 2014 (attached hereto at Exhibit 14); Email from Mother to the School, dated May 30, 2014 (attached at Exhibit 15 (without enclosures).  In these emails, Mother never mentioned G, or any concerns about G's health.  See Exhibits 14 & 15; see also Exhibit 11 at 174-75; Exhibit 12 at 6-7.

**RESPONSE: Admit that Mother continued to email School additional information but deny that Parents demanded "removal" of Wi-Fi. (*See*, ECF 97-14, p. 2 cited by Defendants in which Parents reiterate their request for a "review process" the issue and that they did *not* "dictate specific action" like removal, and "Our conversation did not progress to any suggested means of mitigation other than to measure the EMF in the school setting"; and *see*, ECF 97-15, cited by Defendants which makes no demand for removal of Wi-Fi.)**

**Also, for clarification, additional information was invited by School. (*See,* ECF 78-1, p. 25, Gustavson letter inviting anymore information on American schools; ECF 97-12, p. 16, Clarance: "…we remained open to reviewing any new information from any source…. Including the [Parents] absolutely. We specifically asked them to continue to share information in the letter.") And, in part, the Parents emailed the School because they were requesting the School to identify the information the School relied on for its May 23**

decision but the School did not respond to those requests. (*See*, ECF 97-14, p. 2, Parents email to School: "we would like to understand the numerous other sources of objective information you reviewed which aided in your analysis, and led to your decision. Please forward this in for; nation onto us so we have a complete understanding of what you based your resolution on."; ECF 78-1, p. 32, Parents' email to School, 7/14/2014: "In our meeting on May 12, 2014, we were promised an open dialog, however after two separate requests for the information that aided with your decision making process we did not receive anything.")

Furthermore, while the two emails cited by Defendants in this fact do not raise G's symptoms, the Parents had raised G's symptoms at the May 12 meeting and thereafter. (*See*, Ex. 2, Mother Dep., pp. 5-6; ECF 78-1, p. 67, Letter from Parents' Counsel summarizing past communications between Parents and School, and in other follow up emails; ECF 78-1, p. 32, Email from Parents to School, 7/14/2014, "want to address taking measurements on our own to quantify exposures particularly with concern to our youngest child,"; ECF 78-1, p. 40, Parents to School on 8/1/2014: "We have some serious information which relates to our youngest child whose school health records and symptoms indicate increasing sensitivity upon exposure to Wi-Fi at school."; ECF 78-1, p. 37, Parents to School on 8/13/2014: "While we hear loud and clear you no longer wish to engage us on the topic of the safety of Wi-Fi use in the school, you were noticeably silent on our need to share with you the health records and symptoms we are seeing with our youngest son. Our request to meet with you was to discuss this concern, not just WiFi safety. Is it also your wish not to meet with us to discuss the important issue of our son's health?")

35.     After reviewing the additional information provided by Mother, the School declined Mother's demand for another meeting because the School did not agree that the information supported removal of the School's Wi-Fi.  See Email from the School to Mother, dated June 2, 2014 (attached at Exhibit 16).

**RESPONSE: Admit that School declined another meeting, but deny that Mother requested "removal of the School's Wi-Fi" and demanded another meeting because School did not agree to removal. (*See*, ECF 97-16, same document cited by Defendants on this point which includes Mother's email asking for 30 minute meeting explaining "Our goals for a brief meeting are transparent: -To show you the EMF simulations and FCC correspondence relating to why the PONG product is not a safe mitigation solution; -To gain a better understanding of our current Wireless infrastructure and its locations throughout the school. We hope to discuss certain pieces of information in the Aerohive manual which may help clarify our concern." A request the School rejected in same document through Peter Fearey who a few days earlier was told by Gustavson (*see*, Plaintiffs' Exhibit 6): "Since it's clear that any response we offer will only encourage ongoing debate, I'm not going to reply-- and I recommend that you refrain, as well." and by Trustee Thomas McKean "I totally agree that they are not to be considered part of the decision making process and should not be communicated with regarding the school's efforts in addressing the issue.")**

*See also above*, **Responses to Fact Nos. 30 and 34.**

36.     On June 2, 2014, Mother wrote to the CEO of Canadians For Safe Technology and stated that although she had "recently been caught up in presenting the WIFI concern to [her] children's private school," she wanted to find time to discuss with him "another effort [she is] managing - a PSA on wireless device safety."  See June 2-13, 2014 Emails from Mother to

Canadians For Safe Technology, previously filed with the Court at ECF No. 78-8.  Mother

further wrote that she had "been working on a strategy to organize and unify the message of

science and medical professionals to get it to the important demographic - young parents and

educators."  See id.  Mother then stated:  "This is a long term PSA strategy (still in development)

that is being crafted cautiously."  See id.

**RESPONSE: Admit.**

C.      **The Parents Attempt to Obtain An EHS Diagnosis For G Without Having G
        Evaluated**

        **\*\*Plaintiffs Object to this Subtitle as Argument**

        37.      A little over a week after meeting with officials from the School about her

concerns with Wi-Fi in general, Mother, on May 20, 2014, brought her son G to his annual

physical with his primary care pediatrician, Marvin Ostrovsky, M.D. ("Dr. Ostrovsky"), at

Southboro Medical Group.  See Dr. Ostrovsky's Medical record, dated May 20, 2014 (attached

at Exhibit 17).  Shortly before the appointment, Mother called Dr. Ostrovsky's office to inform

the doctor that she thought her son was exhibiting "symptoms of chest pressure and stomach pain

at school" due to the School's Wi-Fi.  See id. at 1.  She asked that she be allowed to speak with

Dr. Ostrovsky about her belief without G present.  See id.

**RESPONSE:  Admit but clarify that Mother also expressed that G was having symptoms of
headaches. (See, Ex. 2, Mother Dep., pp. 10-11)  Also deny any inference made by
Defendants that taking G to the doctor was a consequence of the School meeting rather
than based on genuine concerns over the symptoms G had been experiencing up to that
time as indicated in records.**

        38.      At G's annual physical on May 20, 2014, Dr. Ostrovsky conducted a physical

examination of G, and spoke with Mother about her belief that G was exhibiting symptoms

because of the School's Wi-Fi.  See id.

**RESPONSE:  Admit.**

39.     While Mother allowed Dr. Ostrovsky to examine G, she told Dr. Ostrovsky not to tell G about her concerns with the School's Wi-Fi or ask G if he thought the School's Wi-Fi was causing his symptoms.  See id.; Exhibit 4 at 3-173 – 3-174.

**RESPONSE: Admit that Mother made this request to Dr. Ostrovsky and other doctors because she did not want to prejudice G towards the Wi-Fi as the cause to avoid any psychosomatic response or nocebo effect response to Wi-Fi. (*See*, Ex. 2, Mother Dep., pp. 11-12: "I didn't want to put that idea in his head…Because I think that if he had a concern, it could potentially confuse symptoms. And he was symptomatic."; Plaintiffs' Exhibit 7, Deposition of Dr. Jeanne Hubbuch, pp. 28-29 re Mother not wanting to prejudice G.)**

40.     After his examination of G, Dr. Ostrovsky told Mother that he could not support Wi-Fi signals as a cause of G's symptoms.  See Exhibit 17 at 1.  In addition, Dr. Ostrovsky did not place any restrictions on G, and indicated that G "may participate in all activities and/or competitive sports."  See id. at 9.

**RESPONSE: Admit statements of Dr. Ostrovsky, a pediatrician, who has not been established to have any expertise or specialized training in regard to EHS or on whether electromagnetic fields have any impact on humans and has never been so designated as such as expert and note that records do not indicate that Dr. Ostrovsky made any diagnosis as to the cause of G's headaches and other symptoms while at the School. (*See also*, Ex. 2, Mother Dep., p. 30)**

41.     Shortly thereafter, Mother sought a referral from a doctor in Dallas, Texas, Dr. William Rea, who purports to be a specialist in Electromagnetic Hypersensitivity Syndrome

("EHS"), a disorder that allegedly causes some individuals to experience physical symptoms (such as headaches, dizziness, ear ringing, and fatigue) when they are exposed to low-level RF. See June 24 – July 7, 2014 Emails between Mother and Dr. Hubbuch (attached at Exhibit 18). This doctor gave Mother a referral to Dr. Jeanne Hubbuch ("Dr. Hubbuch") in Watertown, Massachusetts.  See id.

**RESPONSE: Admit that Mother received a referral to Dr. Hubbuch from Dr. Rea but deny and object to the rest of this paragraph as an argumentative characterization and not facts established by document cited by Defendants.**

42.      On June 24, 2014, Mother emailed Dr. Hubbuch about symptoms she stated G was exhibiting, including headaches, dizziness, ringing ears, chest pressure, nausea, etc.  See id. Mother informed Dr. Hubbuch that she believed these symptoms were due to the School's Wi-Fi signals, and the Upgrade of the School's wireless network from 2.4 GHz to 5.0 GHz.  See id. Mother asked Dr. Hubbuch:  "What is your protocol for diagnosing children with EHS?"  See id.

**RESPONSE: Admit but deny Defendants' use of this fact for argument (as stated in subtitle) that Parents were attempting to "obtain an EHS diagnosis for G." The email cited by Defendants at ECF 97-18 reflects Mother's statement to Dr. Hubbuch: "I of course want to rule out other causes and for you to tell me I am crazy."**

43.      Dr. Hubbuch replied on July 3, 2014, that EHS "is first of all a diagnosis of exclusion" and "[g]enerally the symptoms should appear every time he is exposed."  See id.

**RESPONSE: Admit and Hubbuch elaborated on this statement at her deposition:**

> **That's what I said there. What this was a general statement about it. I knew nothing about G at this point. I had never -- she had not presented anything other than what we saw in the e-mail. So, there's also a principle that happens in both EHS and in chemical sensitivity where over time, you're exposed to low levels and you may have minimal symptoms, and then at some point you reach a threshold, and after that threshold, then the symptoms become much more consistent and regular and every**

**time. So, I was assuming that he was already in that stage where he was having consistent regular symptoms, and I think at the time of this, in retrospect, he was at the low level exposure where he had symptoms sometimes, and other times he didn't, but that's a process and I didn't know anything about him, I was just giving her a general idea of how you go about looking at this.**

**Plaintiffs' Exhibit 7, Deposition of Dr. Jeanne Hubbuch, pp. 30-31.**

44.     Mother then asked about what "work up" Dr. Hubbuch would do and told Dr. Hubbuch that she "need[s] a diagnosis of this [(*i.e.*, EHS)] for school to accommodate as they are utilizing industrial 5 GHz Wifi."  See id.; Exhibit 7 at 237, 250.

**RESPONSE: Admit and that her complete statements are as follows:**

> **"So what is the work up you would do? Does it include labs to exclude other causes for the symptoms? I will need a diagnosis of this for school to accommodate as they are utilizing industrial 5 GHz Wifi. My son has allergies and therefore a weakened immune system. Please advise so that I can determine if I should proceed with an appointment."**

45.     On July 7, 2014, Dr. Hubbuch responded to Mother and told her EHS was "a trial and error diagnosis," such that "if he [G] goes where WiFi is on at home and other location and gets similar symptoms then [she] could make [a] diagnosis that [EHS] is causing his symptoms." See Exhibit 7 at 250-51; Exhibit 18 at 1.

**RESPONSE: Admit that email so states.**

46.     Mother asked Dr. Hubbuch to make an appointment with only Mother (without G present), and then to write a letter about G to the School.  See Emails between Mother and Dr. Hubbuch's assistant, dated July 17-21, 2014 (attached at Exhibit 19) (without enclosures).  Dr. Hubbuch agreed to meet only with Mother (without G present) "to discuss his case and write the letter." See id.

**RESPONSE: Admit.**

47.     Mother met with Dr. Hubbuch on July 23, 2014, for approximately 60-90

minutes, without G present.  See Exhibit 4 at 3-118 – 3-119; Exhibit 7 at 251-52, 257; Dr.

Hubbuch's medical notes, dated July 23, 2014 (attached at Exhibit 20).

**RESPONSE:  Admit.**

48.      Although she did not perform a physical examination of G at that time, Dr.

Hubbuch made a "preliminary diagnosis" of "EMF sensitivity" for G.  See Exhibit 4 at 3-119;

Dr. Hubbuch's medical record, dated July 23, 2014 (attached at Exhibit 21).  Dr. Hubbuch later

conceded that her diagnosis was "preliminary" because she required further examination of G

and his medical records to confirm the diagnosis.  See Exhibit 4 at 3-119, 3-128 – 3-129.

**RESPONSE: Admit and that Dr. Hubbuch testified that "I said it was a -- certainly a**

**plausible explanation for what was going on and suggested some possible mitigation that**

**might be able to give us some more information about it." (ECF 97-4, p. 3-119 as cited by**

**Defendants.)**

49.      Dr. Hubbuch wrote a letter to the School (dated August 7, 2014) stating that in her

opinion G was "being adversely affected by prolonged exposure to WIFI at school," and that the

School should therefore utilize the "precautionary principle" with respect to its Wi-Fi going

forward.  See Exhibit 4 at 3-118 – 3-121; Letter from Dr. Hubbuch, dated August 7, 2014

(attached at Exhibit 22).

**RESPONSE: Admit.**

50.      Prior to writing her August 2014 letter to the School, Dr. Hubbuch never

physically examined G and did not refer G for any follow-up testing or examination.  See Exhibit

4 at 3-118 – 3-119; Exhibit 7 at 251-52, 257.  Neither Mother nor Dr. Hubbuch's letter however,

informed the School of these omissions. See Exhibit 7 at 259; Exhibit 22.

**RESPONSE: Admit that Dr. Hubbuch had not examined G or referred G to testing prior**

to her August 7, 2014 letter but deny that this information invalidates Dr. Hubbuch's

assessment.  (*See*, ECF 97-22, Letter of Dr. Hubbuch and Ex. 7, Hubbuch Dep., pp. 92-94)

Also, deny to extent Defendants argue or infer that information was purposely

omitted or withheld from Fay nor that there was any intent to mislead the School as

Parents had repeatedly requested a follow-up meeting with School to discuss concerns over

G's symptoms and to assess the situation which were rejected by Defendants. (*See*,

communications prior to Dr. Hubbuch's letter: ECF 78-1, p. 41, Parents to School on

7/14/2014 (prior to Mother meeting with Dr. Hubbuch): "Please let us know when you have

some availability for us to come in and further discuss our concerns directly with you, as

suggested by Rob. …and want to address taking measurements on our own to quantify

exposures particularly with concern to our youngest child."; ECF 78-1, p. 40, Parents to

School on 8/1/2014: "I think at this point we need to be clear, we are requesting a meeting

ASAP…We have some serious information which relates to our youngest child whose

school health records and symptoms indicate increasing sensitivity upon exposure to Wi-Fi

at school.")

51.     By suggesting the precautionary principle in her letter, Dr. Hubbuch was

suggesting that the School should turn off or minimize its use of Wi-Fi as an accommodation to

G.  See Exhibit 4 at 3-38 – 3-39.

**RESPONSE:  Deny that Dr. Hubbuch suggested that the School turn off all Wi-Fi at the**

**School because Dr. Hubbuch's letter mentions reducing exposure (ECF 97-22, p. 4) but**

**otherwise admit as Dr. Hubbuch testified as follows on pages cited by Defendants (ECF 97-**

**4, at 3-38, 3-39):**

**Q. And what did the precautionary principle, as you just described it, have to do**
**with your writing of this particular letter to the school?**

26

**A. It was encouraging them to consider either a 1/H-FI free space or a greatly reduced WI-FI space for the son to see if that made a difference in terms of his symptoms at school.**

*          *          *

**Q. What was your hoped-for objective in writing the letter at that time?**

**A. The hope was that the school would respond by creating a lower or no area of WI-FI and that -- then we would have a trial to see whether that took care of the symptoms or not.**

52.      In an email dated August 28, 2014, the School asked the Parents to provide appropriate medical information:  "Please provide the School's Health Office with all medical information concerning any medical condition that G… may have, including documents from his primary care physician.  Only after receiving this information can the School determine appropriate next steps."  <u>See</u> Email from the School to Mother, dated August 28, 2014 (attached at <u>Exhibit 23</u>) at 1.  Despite this request, the Parents did not provide the requested medical documentation.  <u>See</u> <u>Exhibit 11</u> at 162, 168-69; <u>Exhibit 12</u> at 99-101.

**<u>RESPONSE</u>: Admit that the email from Clarance states as quoted.  Deny that Parents did not provide sufficient medical documents and deny that Parents were not willing to provide requested documentation. Parents provided a letter from Dr. Hubbuch, dated August 7, 2014 which detailed G's symptoms and then wrote (ECF 97-22):**

**It is my opinion, based on my medical training and experience, especially my training in Environmental Medicine that G is being adversely affected by prolonged exposure to WIFI at school.**

**Parents also provided information on G's symptoms, including records from his pediatrician, and other information on EHS.  (Ex. 2, Mother Dep. Pp. 29-30)**

**After Parents sought counsel to assist them with the School, their previous counsel addressed the School's request for more medical documentation. *See,* ECF 78-1, p. 66, Letter from Parents' Counsel (12/19/2014) stating:**

> Over the last few months the School has changed its request for medical records confusing everyone involved and underlying its reluctance to honestly address the Davis Family's health concerns. We are reviewing the newest request for medical information contained in your letter.

Thereafter, the School through counsel explained their request in a letter written on January 23, 2015 (ECF 92-27, p. 3) to G's parents' then counsel:

> To be unequivocally clear, the school is not asking for G's complete medical records, but rather for documentation to support the [Parents'] representation that G has a medical condition. The school is entitled to receive this documentation from an appropriate medical professional [and] need not rely on the representations of [Parents] or their lawyer.

In response, the parents had G evaluated by Dr. Hubbuch (ECF 97-41, Notes of Evaluation of G on 2/3/15) and sent exactly what School counsel had sought, a letter diagnosing G with EHS and urging that he be allowed a "reduced" exposure to Wi-Fi.  (*See*, ECF 97-43; *see also*, ECF 97-44, Dr. Hubbuch Letter providing ICD code for G's condition requested by School.)  Despite having asked for just these letters, the School ignored them and refused to meet with the parents or discuss any accommodation. Instead it demanded that G see doctors it had selected, none of whom, as shown below, made any diagnosis.

53.     Dr. Hubbuch later admitted that "[i]t could be" reasonable for the School to request additional medical documentation after receiving her August 7, 2014 letter, given the preliminary nature of her diagnosis and because she herself wanted more medical documentation before making a final diagnosis.  See Exhibit 4 at 3-129.

**RESPONSE**: Admit and that additional documentation was provided to School. *See,* Response to Fact No. 52.

D.     **The Parents' Behavior**

54.     The Parents reached out to third-parties, parents, and employees of the School (who had not been involved in the earlier meeting with the Parents), in an effort to continue their

campaign to have the Wi-Fi removed from the School.  For example, the Parents reached out to medical professionals and purported "experts" to solicit support of their advocacy efforts.  See Letters attached to Plaintiffs' Second Amended Complaint dated July – August 2014, previously filed with the Court at ECF No. 43 at 49-60.  Mother wrote about these efforts in an email to a friend on July 22, 2014, stating:  "I do have several dr's writing letter[s] to the BOT [Board of Trustees] as we speak.  It will be assumed that I put them up to it but…what else can I do sit and wait for Rob [Gustavson] to become a scientist and medical expert.?! … Can't say they were not warned."  See Email from Mother to friend, dated July 22, 2014, previously filed with the Court at ECF No. 78-10 at 2.  As a result, in July and August 2014, the School received unsolicited letters from four individuals – Dr. Steven Sinatra, Olle Johansson, Dr. Martin Blank, and Dr. David Carpenter – who expressed concern over the School's Wi-Fi system.  See ECF No. 43 at 49-60.

**RESPONSE: Deny Parents were on "campaign to have the Wi-Fi removed from the School." None of the documents cited by Defendants so state or otherwise indicate that was the case.  Parents collegially contacted others in community, including parents to express genuine concerns about son's health and health of other students.  (See, documents relied on by Defendants for this fact; Ex. 2, Mother Dep., p. 5; and see, Response to Fact No. 30 above.)**

55.     In an August 5, 2014 email, Mother wrote to parents at the School, stating that she was "looking for parental support and concern expressed by others – especially if you have seen symptoms in your child . . . ."  See ECF No. 78-11 at 3.  This email contained literature about Wi-Fi in schools and correspondence that was sent to the School from medical professionals solicited by the Parents (including the letters from Drs. Sinatra, Blank, and Carpenter).  Id.

**RESPONSE**: **Admit.**

56.     In an email dated August 19, 2014, Mother wrote to the former Head of School and asked him to meet to discuss her concerns about the School's Wi-Fi.  <u>See</u> Emails between Mother and former Head of School, dated August 19-28, 2014, previously filed with the Court at ECF No. 78-12.  After he declined, Mother wrote a second email to him, asking that he reconsider and get involved.  <u>Id.</u>  In response, the former Head again declined and said that it was "not appropriate" for him to get involved as the matter should be left "in the hands of the current leadership" at the School.  <u>Id.</u>

**RESPONSE**: **Admit and in the same email (ECF 78-12) the former Head of School advised Mother "I'd suggest that you continue your conversations directly with Rob, his administrators, and the trustees you know. There is no better way to review matters of concern…" which the Defendants are now claiming was wrongful and disruptive conduct on the part of the Parents.**

57.     In emails dated August 10-11, 2014, Mother corresponded with an anti-Wi-Fi advocate, Deborah Kopald ("Ms. Kopald"), about the advocate's efforts to remove Wi-Fi from a school and asked for advice on the best course of action the Parents should take against the School.  <u>See</u> Emails between Mother and Ms. Kopald, dated August 10-11, 2014, previously filed with the Court at ECF No. 78-13.  In response, Ms. Kopald recommended that the Parents bring a lawsuit.  <u>See</u> <u>id.</u>

**RESPONSE**: **Admit this communication occurred and clarify that it does not indicate that Mother is anti-Wi-Fi, or trying to remove all Wi-Fi from the School and in fact while Ms. Kopald raised a lawsuit option, she commented "I'm not sure you can sue a private school**

for this…" (*See also*, **Response to Fact No. 30 that shows Parents did not demand removal of all Wi-Fi from School.**)

58.     In August and September 2014, Mother sent emails to a number of parents at the School regarding her Wi-Fi demands to the School and her son's alleged condition.  See Emails from Mother to other parents, dated August 27 – September 3, 2014, previously filed with the Court at ECF Nos. 78-14, 78-15.  Mother even invited these parents to her home for a meeting to have "an open discussion about the concern and the empowering solutions we can propose to [sic] school for safer use of technology."  See ECF No. 78-15.  Mother attached a copy of Dr. Hubbuch's August 7, 2014 letter to these emails.  See ECF Nos. 78-14, 78-15.

**RESPONSE: Admit and note that it is no defense to an ADA claim or the other claims in this case that a Mother of a child spoke to others about her son's condition and potential effects of Wi-Fi with others, including parents, who may be interested in the matter.**

59.     In addition, Mother corresponded with the Parents' Independent School Network ("PIN"), about sponsoring a discussion on Wi-Fi safety at the local library.  See Emails between Mother and PIN, dated June 4 – June 9, 2014, previously filed with the Court at ECF No. 78-16. In doing so, Mother "strongly led [PIN] to believe" that the School and Parents' Association "were aware and in support of this event."  See Letter from Parents' Association to Mother, dated September 16, 2014, previously filed with the Court at ECF No. 78-17.

**RESPONSE: Admit Mother corresponded with PIN but deny that Mother "strongly led PIN to believe that Fay's Parents' Association was aware and in support of event." This was a characterization by the Parents' Association in alliance with defendant Gustavson despite the PIN leader admitting "My error in approving this flyer was in *assuming* that [Mother] was working together with the Fay Parents' Association (and therefore the Fay**

Administration) on this event. *I accept full responsibility for this mistake*." (emphasis added) (*See*, ECF 81-1 and correspondence cited above in Response to Fact No. 2.)

60. In response, the Parents' Association removed Mother from her role in the A & E Committee and Parents' Association and notified PIN that neither it nor the School was sponsoring the event. Id.

**RESPONSE: Admit that Parents' Association so acted, in a united front against the Parents with Defendants and in retaliation against them for not going away when Defendants first rejected their concerns about Wi-Fi and concerns for their son, and that removal of Mother was not justified. (*See*, correspondence cited in Response to Fact No. 2.)**

61. The School sent the Parents a letter on September 15, 2014, regarding their "disrespectful and deceitful behavior" towards the School. See Letter from the School to Mother, dated September 15, 2014 (attached at Exhibit 24). In this letter, the School detailed concerns about the Parents' behavior, including that they: (a) "persisted in criticizing and harassing the School and its community members;" (b) "ignored … [the School's] numerous requests to refrain from contacting other School employees and trustees about … [their] concerns relating to the safety of Wi-Fi;" (c) "cultivated a campaign against the School;" (d) "misused access to family email addresses in … [the] School directory;" (e) "solicited Fay parents in order to advance … [their] personal agenda;" (f) misled members of … [the School's] community by reporting inaccurate information about the School's opinions and efforts, including, but not limited to, fabrications that the School Nurse had seen an increase in Wi-Fi related illness;" and (g) "misrepresented … [themselves] as acting on behalf of Fay and … [the] Parents' Association in the communications with the Parents' Independent School Network, creating the false

impression that Fay is sponsoring a discussion on Wi-Fi safety at the Southborough Library." Id. at 2.

**RESPONSE: Admit that Defendant Gustavson sent the letter and made such statements but deny their truth and accuracy and object to the letter as hearsay to the extent Defendants offer this letter for the truth of the matters asserted.** *See* **Fed.R.Evid. 801(c);** *Davila v. Corporacion De Puerto Rico Para La Difusion Publica***, 498 F.3d 9, 17 (1st Cir. 2007)("It is black-letter law that hearsay evidence cannot be considered on summary judgment.") Furthermore, Plaintiffs contend this letter is part of the evidence of their retaliation claim against Defendants. (***See***, Plaintiffs' Second Amended Complaint, ECF No. 43, ¶78;** *see also***, Ex. 2, Mother Dep., pp. 22, 24 re receipt of "distressing" letter threatening placements of her children at the School.)**

62.    The School indicated in its September 15, 2014 letter that the behavior by the Parents violated the following principles contained in the School's Parent/Student Handbook (the "Handbook"):

> Honesty, respect, responsibility, empathy, and kindness inform our conduct.  The development of manners, civility, and integrity are hallmarks of our school.

See id. at 2-3.  The School requested that the Parents comply with the Handbook's parental comportment expectations for the remainder of the school year. Id. at 3.

**RESPONSE: Deny as stated above in Response to Fact No. 61.**

63.    In response to the School's letter of September 15, 2014, the Parents wrote the School, apologizing and notifying the School that they would "comply immediately with the expectations set forth in your letter." See Letter from the Parents, dated September 17, 2014 (attached at Exhibit 25).

**RESPONSE: Admit that the Parents sent a letter in response to the Gustavson letter which threatened to terminate the enrollment of both their children but deny that Parents admitted to or apologized for the false accusations made against them in the Gustavson letter. (*See,* Ex. 2, Mother Dep., pp. 23-27 and *see* ECF 97-25, pp. 2-3, Parents' Letter cited by Defendants which only apologizes for "any confusion" caused by PIN's error in associating Fay with an independent lecture on Wi-Fi and does not apologize for any other conduct of which Gustavson falsely accused them. )**

64.     In light of the School's request that the Parents comply with the School's parental comportment standards for the remaining school year, the School notified the Parents on January 30, 2015, that the School would defer its determination as to re-enrollment of the Parents' two children (G and his brother) until the end of the school year.  See Letter from the School to the Parents, dated January 30, 2015, previously filed with the Court at ECF No. 78-1 at 95.

**RESPONSE: Admit that Defendants sent the cited letter and deferred its determination of the children's enrollment but deny that this is evidence of any wrongful conduct of the Parents but rather is further evidence of Defendants' retaliation against Parents. (*See,* Plaintiffs' Second Amended Complaint, ECF No. 43, ¶78 and Response to Fact No. 61 above.)**

65.     Thereafter, the School agreed to re-enroll both of the Parents' children for the 2015-16 school year, but the Parents decided to only re-enroll G.  See G's Enrollment Contract (attached at Exhibit 26).

**RESPONSE: Admit and clarify that the Defendants' retaliatory deferment of their decision on whether to allow T and G to re-enroll forced Parents to enroll T at another school due to**

earlier enrollment deadlines over which Parents had no control. (*See*, Plaintiffs' Exhibit 24, Deposition of Mother, pp. 385-386)

66.     In June 2015, the Parents executed an enrollment contract (the "Enrollment Contract") for G, agreeing to all provisions contained therein.  See Exhibit 7 at 34; Exhibit 26.

**RESPONSE: Admit and add that Parents were required by School to execute the contract requiring G to submit to an independent medical exam in order to be allowed to continue his studies at the School. (See further below)**

67.     The Enrollment Contract stated that the Parents "understand that the obligation to pay the tuition and other required fees of the School for the full academic year is unconditional, that no refund or cancellation will be made of any portion of the annual tuition and fees…," unless the Parents withdrew G before June 30, 2015.  See Exhibit 26 at ¶ 5.  The Parents did not withdraw G prior to June 30, 2015.  See Exhibit 7 at 37-38.

**RESPONSE: Admit but note that the provision cited is not the complete contract.**

**E.    The Parents' Demand Letter And The School's Additional Requests For Sufficient Medical Documentation To Assess The Parents' Request For An Accommodation**

**\*\*Plaintiffs Object to this Subtitle as Argument**

68.     On November 14, 2014, an attorney for the Parents sent a letter to the School, claiming that G had a "functional impairment/disability known as Electro Hyper-Sensitivity" caused by the School's Wi-Fi.  See Letter from the Parents' attorney to the School, dated November 14, 2014, previously filed with the Court at ECF No. 78-1 at 49-53.  The letter demanded that the School accommodate G by taking various steps, including, but not limited to, having an independent firm take RF measurements at the School, and reducing the levels of RF at the School.  See id. at 52.

**RESPONSE: Admit except to the characterization of the letter as a "Demand Letter" that demanded the School act. (*See*, letter cited at ECF 78-1, p. 49, which has the RE line "Request for Meeting for Reasonable Review/Accommodation…" and opens with "We have been asked by [Parents] and their children (the "Family") to assist them in asking the Fay School to meet with them to address G's health concerns. My involvement is not intended to be adversarial…..")**

69.     On December 8, 2014, the School sent a letter to the Parents, again seeking appropriate  medical documentation "to enable [the School] to fully evaluate [their] request for assistance for [G]." See unsigned Letter from the School to the Parents, previously filed with the Court at ECF No. 78-1 at 61.  This requested documentation would show the nature, severity, and duration of G's medical condition, functional limitations caused by G's medical condition, and an explanation as to why such accommodations are needed (the "Requested Medical Documentation").  See Letter from the School to the Parents, previously filed with the Court at ECF No. 78-1 at 64.

**RESPONSE: Admit the School's letter states what it states but deny that Parents failed to provide appropriate medical documentation. (*See*, Response to Fact No. 52 above.)**

70.     Over the course of the next few months, the School repeated its request that the Parents provide the Requested Medical Documentation so that the School could assess G's need for an accommodation and to evaluate the alterations the School was being asked to make to its educational environment, including in correspondence dated January 23, 2015, March 10, 2015, March 30, 2015, April 15, 2015, and April 22, 2015.  See Correspondence from the School to the Parents, dated January 23 – April 22, 2015 (attached at Exhibit 27 at 2; Exhibit 28; Exhibit 29 at

1-2; <u>Exhibit 30</u> at 1; <u>Exhibit 31</u> at 1).  The Parents, however, did not provide the Requested

Medical Documentation.  <u>See</u> <u>Exhibit 11</u> at 168-69; <u>Exhibit 12</u> at 99-101.

**<u>RESPONSE:</u> Deny that Parents did not provide the requested medical documentation.**

**(*See*, Response to Fact No. 52 above.) Plaintiffs also note that during this time they had**

**requested copies of G's records from the School that the School did not produce when first**

**requested. (ECF 78-1, p. 74, Plaintiffs' Counsel repeating request of G's records from**

**School.)**

71.     On or about March 19, 2015, the Parents filed a Charge of Discrimination (the

"Charge") with the Massachusetts Commission Against Discrimination ("MCAD").  <u>See</u> the

Parents' MCAD Charge, previously filed with the Court at ECF No. 78-1.  On May 12, 2015, the

MCAD dismissed the Charge for lack of jurisdiction.  <u>See</u> MCAD Dismissal Notice (attached at

<u>Exhibit 32</u>).

**<u>RESPONSE:</u>  Admit.**

**F.    <u>The School's Compliance Survey Confirms The School's Full Compliance With The</u>**
**<u>FCC's Safety Limit For Wi-Fi</u>**

72.     In order to determine whether the School was in compliance with applicable

federal regulations relating to the use of, and human exposure to, RF energy from the frequency

bands used by the School's Wi-Fi (*i.e.*, 2.45 GHz and 5.0 GHz bands), the School hired Mr.

Maxson from Isotrope, LLC to conduct an RF energy survey at the School.  <u>See</u> Mr. Maxson's

Expert Report, previously filed with the Court at ECF No. 59-27 at 10-14; Compliance Survey,

previously filed with the Court at ECF No. 59-28.  Mother had initially suggested (in May 2014)

that the School hire Mr. Maxson to perform an RF survey at the School as he has extensive

experience conducting RF surveys.  <u>See</u> <u>Exhibit 14</u> at 3.  The survey was conducted on

December 5, 2014 (the "Compliance Survey").  <u>See</u> ECF No. 59-27 at 10-14; ECF No. 59-28.

**RESPONSE: Admit that School hired Mr. Maxson from Isotrope, LLC to conduct a survey, that Mother had initially suggested Isotrope (seven months earlier), and that survey was finally conducted in December 2014.  Deny that this survey establishes that Defendants are in compliance with the ADA (as is the issue here).**

73.     During the Compliance Survey, Mr. Maxson examined whether the School was in compliance with RF guidelines established by the Federal Communications Commission ("FCC").  See ECF No. 59-27 at 10-14; ECF No. 59-28.

**RESPONSE: Admit Mr. Maxson's report so states.**

74.     The FCC guidelines for safe human exposure to RF energy were established in 1996, and are consistent with the RF guidelines from other standard-making bodies, including the Institute of Electrical and Electronics Engineers ("IEEE"), which updated its guidelines in 2005, and the International Commission on Non-Ionizing Radiation Protection ("ICNIRP"), which updated its guidelines in 2009.  See Expert Report of Defendants' Expert, Dr. Kenneth Foster ("Dr. Foster"), previously filed with the Court at ECF No. 59-4 at 22-24.

**RESPONSE: Admit that Dr. Foster's Report so states.**

75.     The RF exposure guidelines of the FCC, IEEE, and ICNIRP at the frequency band used by the School's 2.45 GHz and 5.0 GHz bands of Wi-Fi are 10,000 mW/m$^2$ (the "Safety Limit").  See Exhibit 4 at 3-114 – 3-115; ECF No. 59-4 at 22; Chart of Safety Limit and RF measurements taken at the School (attached at Exhibit 33); Testimony of Dr. Foster at Daubert Hearing (relevant portions of which are attached at Exhibit 34) at 4-46 – 4-59.

**RESPONSE:  Admit.**

76.     Mr. Maxson's measurements at the School during the Compliance Survey indicated that the readings for the RF levels from the School's Wi-Fi were consistently below 1

mW/m$^2$.  See ECF No. 59-27 at 12.  As a result, Mr. Maxson concluded that the School was in compliance with the FCC Safety Limit.  See id.

**RESPONSE: Admit that Mr. Maxson's report so states.**

77.     On January 23, 2015, counsel for the School informed Plaintiffs' counsel about the findings of the Compliance Survey and that the School's Wi-Fi was in compliance with applicable federal and state regulations, including the FCC Safety Limit.  See Exhibit 27 at 1.

**RESPONSE:  Admit that letter of counsel so states and that counsel provided Plaintiffs a copy of the three paragraph "follow up article" issued by Gustavson to the School on the results of the survey but deny that the School provided the complete Compliance Survey to Plaintiffs at this time.  (*See*, ECF 97-27)**

78.     In the fall of 2015, the School allowed the Parents to bring a device known as a "dosimeter" to the School in order to take RF measurements.  See Expert Report of Plaintiffs' Expert, Dr. Karl Maret ("Dr. Maret"), previously filed with the Court at ECF No. 59-17.  These readings confirmed that the RF levels at the School were in compliance with the FCC Safety Limit.  See id. at 4; Exhibit 4 at 3-116; Deposition of Dr. Maret (relevant portions attached at Exhibit 35) at 118, 120.

**RESPONSE: Admit (and the claims in this case are not based on an allegation that RF levels are not in compliance with the FCC Guidelines.)**

79.     RF readings taken in April of 2016 again confirmed that the RF levels at the School are below the Safety Limit.  See ECF No. 59-4 at 38; Exhibit 33; Exhibit 34 at 4-52 – 4-53.  Specifically, the April 2016 readings showed that the peak RF levels at the School are between 0.11 mW/m$^2$ and 0.73 mW/m$^2$, while the average RF levels at the School are between approximately 0.02 mW/m$^2$ and 0.067 mW/m$^2$.  See ECF No. 59-4 at 36; Exhibit 33.

**RESPONSE: Admit (and the claims in this case are not based on an allegation that RF levels are not in compliance with the FCC Guidelines.)**

80.     Thus, peak RF levels at the School are 10,000 times lower than the FCC Safety Limit, while the average RF levels at the School are 100,000 times lower than the FCC Safety Limit.  See ECF No. 59-4 at 37; Exhibit 4 at 3-116; Exhibit 33; Exhibit 34 at 4-52 – 4-53 .

**RESPONSE:  Admit (and the claims in this case are not based on an allegation that RF levels are not in compliance with the FCC Guidelines.)**

**G.     The Parents' Continued Attempts To Obtain A Diagnosis Of EHS For G And Their Failure To Provide The School With The Requested Medical Documentation**

**\*\*Plaintiffs Object to this Subtitle as Argument**

81.     On November 11, 2014, Mother contacted Matthew Waugh, M.D. ("Dr. Waugh") at Southboro Medical Group, who was G's new pediatrician after Dr. Ostrovsky retired.  See Medical record of Dr. Waugh, dated November 11, 2014 (attached at Exhibit 36).  Mother told Dr. Waugh that she was convinced her son was having certain symptoms (headaches, dizziness, chest pain, and stomach ache) due to the School's wireless network.  See id at 1-2.

**RESPONSE:  Admit the records so reflect but deny to extent Defendants' argue that Mother did not and would not consider other causes of G's symptoms.  (See, Plaintiffs' Exhibit 8, Deposition of Dr. Matthew Waugh, pp. 79-80 stating Mother was willing to have G take a vision test, took G to Dr. Waugh to have him assess G's symptoms even though not an expert in EHS, and Mother did not tell Dr. Waugh he could not consider other causes of symptoms.) Dr. Waugh recommended that Mother take G to a neurologist (ECF 97-36, p. 2) and Mother did so. (ECF 97-38, p. 2, records of neurologist, Dr. Pradeep Dinakar)**

82.     In G's medical chart, Dr. Waugh noted that Mother "was not at all interested in considering this could be anxiety or school phobia" and "was not at all interested in seeing a psychologist."  See id at 1-2.

**RESPONSE: Admit because there was no evidence to support that G had any school phobia or psychological problem (ECF 97-22, p. 3, Dr. Hubbuch Letter stating G does well in school, has friends, participates in sports; Daubert Hearing Exhibit 15, G's Fourth Grade Year End Review indicating same; Plaintiffs' Exhibit 9, Deposition of Lainie Schuster, pp 70-72 and her January, 2015 Report on G becoming a stronger, more academically able and willing student each year at Lower School up through sixth grade.) After the School demanded a psychological exam, Mother's position was further confirmed. (ECF 97-54, Dr. Lebel report describing G's positive social history and school and concludes he "does not present with significant comorbid psychological stress.")**

83.     Mother told Dr. Waugh that he was not allowed, in examining G, to ask G about the possibility of his symptoms being related to the School's wireless network.  See id.

**RESPONSE: Admit and that Mother did not want to influence the assessment of G's symptoms by possibly introducing a new psychological factor if G was told of concerns about Wi-Fi at School. (*See*, Ex. 2, Mother Dep., pp. 11-12; Ex. 7, Dr. Hubbuch Dep., pp. 28-29 re Mother not wanting to prejudice G.)**

84.     Ultimately, Mother told Dr. Waugh that she would bring G in for an examination and then asked Dr. Waugh for a referral to a neurologist.  See id.  Dr. Waugh noted in the medical charts that G's "symptoms are not neurological based and go away for extended periods."  See id.

**RESPONSE: Admit and that Dr. Waugh did make a "Referral to Neurology" as indicated in his record. (ECF 97-37, p. 3)  Mother took G to a neurologist, Dr. Pradeep Dinakar, to whom she was referred by Dr. Waugh.  After examining G, Dr. Dinakar was concerned by the presentation of his symptoms and ordered an MRI to rule out any sort of central nervous system tumor because Dr. Dinakar could not explain the symptoms and their persistence. (*See*, Ex. 2, Mother Dep., pp. 31-33 and ECF 97-38, Dr. Dinakar record, p. 4) Even though Dr. Hubbuch had diagnosed G with EHS as of this time, Mother took G to Dr. Dinakar and took G for the MRI because, according to Mother:**

> **"We wanted answers. We wanted to find out if it could possibly be something else. We didn't want it to be EHS. Thank God it wasn't a tumor, but we were trying to evaluate him to understand and get the school's help and have him be well at school. We were trying to get to the bottom of it."**

**(*Id.*, p. 33)**

85.    On November 18, 2014, Dr. Waugh examined G.  See Medical record of Dr. Waugh, dated November 18, 2014 (attached at Exhibit 37).  According to Dr. Waugh's notes of the appointment, Mother reported G was coming home from school with headaches, nausea and dizziness during the prior school year (2013-14).  See id. at 1.  G, however, denied experiencing such symptoms during that year and stated "he doesn't get nausea or dizziness this year."  See id. at 1.  G indicated that he had been getting headaches on school days and once on a weekend, and stated when he got such headaches 3-4 times per week, his neck felt tight, so he would crack his neck and headaches would go away for 20-30 minutes.  See id. at 1.

**RESPONSE:  Admit that record so states and that G was having symptoms.**

86.    Mother requested that Dr. Waugh not ask G about his Wi-Fi usage or ask G if he thought the School's Wi-Fi was causing his symptoms.  See id.; Exhibit 4 at 3-173 – 3-174.

**RESPONSE:** Deny that Mother's request was so broad and the documents cited do not show this to be true. Mother's request to doctors was that they not discuss directly her concern that Wi-Fi at School may be the *cause* of his symptoms. (Ex. 2, Mother Dep., pp. 11-12) as corroborated by the records cited by Defendants here.  Dr. Waugh's record indicates "Mother thinks this is from WiFi but doesn't want me discussing this in front of G." (ECF 97-37) and Dr. Hubbuch's testimony cited by Defendants is:

> Q. Do you know if G's parents asked all of the doctors that evaluated him to not make any reference that would imply a possible connection between WI-FI and his symptoms?
>
> A. I know that that request was made of some doctors. I don't know if it was made of all of them.
>
> Q. Do you know if this request limited those doctors' ability to fully question G?
>
> A. I think they did a pretty good job of questioning him.
>
> Q. Well, with respect to the primary care physicians that evaluated G, there's two of them; right?
>
> A. Correct.
>
> Q. Both of them were not allowed to ask G about his WI-FI usage; right?
>
> A. I think the implication was to not -- not make the connection that WI-FI at school -- I don't know that there was ever you can't ask do you use a cell phone, do you play with WI-FI games. I don't know that that was ever restricted.
>
> Q. Well, they couldn't bring up the fact that his symptoms could be caused by WI-FI; right?
>
> A. Correct.
>
> Q. And they couldn't say anything that implied his symptoms were being caused by WI-FI; right?
>
> A. Right.
>
> Q. In other words, they couldn't ask him if every time he had a symptom he was on WI-FI?

**A. I don't know. I'm not -- I'm not sure about that.**

**(ECF 97-4, pp. 173-174)**

87.     After his evaluation of G on November 18, 2014, Dr. Waugh did not diagnose G

with EHS.  See Exhibit 37.  Dr. Waugh told Mother that there was no evidence to support Wi-Fi

signals as a cause for G's symptoms, and referred G to a neurologist.  See id. at 2.

**RESPONSE: Admit and that Dr. Waugh stated he is not an expert on EHS (ECF 97-37)**

**and that Dr. Waugh did not otherwise diagnose the cause of G's symptoms.  (*See,* Ex. 8,**

**Waugh Dep., pp. 80-81; Ex. 2, Mother Dep., p. 31)**

88.     On December 9, 2014, Mother brought G to see a neurologist at Boston

Children's Hospital ("BCH").  See Medical record of Dr. Dinakar, dated December 9, 2014

(attached at Exhibit 38).  The neurologist, Pradeep Dinakar, M.D. ("Dr. Dinakar") of BCH's

Neurology Pain/Headache Clinic, examined G.  See id. at 1.  Dr. Dinakar ordered an MRI and

referred G to physical therapy.  See id. at 3.

**RESPONSE:  Admit and Dr. Dinakar testified about Mother that "she was receptive of all**

**the different diagnoses and we sort of had a working diagnosis, made a plan, and she**

**agreed with it." (*See*, Plaintiffs' Exhibit 18, Deposition of Pradeep Dinakar, pp. 62-67; Ex.**

**2, Mother Dep., p. 23)**

89.     On December 19, 2014, G, per Dr. Dinakar's order, had an MRI exam of his brain

and C spine, which was normal.  See Medical record of MRI ordered by Dr. Dinakar, dated

December 19, 2014 (attached at Exhibit 39).

**RESPONSE:  Admit.**

90.     After the appointment on December 9, 2014, and with the results of the MRI, Dr.

Dinakar did not diagnose G with EHS.  See Exhibit 4 at 3-152; Exhibit 38; Exhibit 39.

**RESPONSE: Admit and that Dr. Dinakar did not diagnose any other cause of G's symptoms, stated he is not an expert on EHS and could not give a definitive opinion on whether EHS could be cause of G's symptoms as "We don't make the diagnosis, we leave it up to experts." (*See*, Ex. 18, Dr. Dinakar Dep, pp. 62-67; Ex. 2, Mother Dep., p. 32)**

91.    On January 7, 2015, Mother contacted Dr. Waugh regarding his November 18, 2014 examination of G to request that he make certain changes to his notes in G's medical chart from that appointment.  See Medical record of Dr. Waugh, dated January 7, 2015 (attached at Exhibit 40).  Specifically, Mother asked Dr. Waugh to include a mention that G was suffering from nosebleeds and to state "mucosa is not dry[,] [a]nd is not found to be a cause of the … nosebleeds."  See id.  Second, Mother wanted the following statement from Dr. Waugh under "assessment/plan" to be "taken out" of the medical notes:

> I had already discussed with [M]other that there is no evidence at this time to support WiFi as a cause.

See id.

**RESPONSE: Admit and that Dr. Waugh stated at his deposition from his observation that Mother sought the record to be accurate as to the symptoms that were reported and Mother was not asking him to lie. (*See*, Ex. 8, Waugh Dep., p. 73-76)**

92.    Dr. Waugh added Mother's report that G had nosebleeds, but did not include the language regarding mucosa not being a cause of the nosebleeds, which Mother requested.  See id.  With respect to Mother's second request to alter the medical records, Dr. Waugh added the following to his notes:

> She [Mother] also asked I remove the above line about evidence to support WiFi as a cause.  While this is a legal document I will not alter it, I can addend that I have not found any credible evidence in my research although I am not an expert in the field.

See id.

**RESPONSE:** **Admit and see Response to Fact No. 91 above.**

93. On February 3, 2015, Mother brought G to an appointment with Dr. Hubbuch. See Notes of Dr. Hubbuch, dated February 3, 2015 (attached at Exhibit 41); Exhibit 4 at 3-146. This was the only appointment in which Dr. Hubbuch performed a physical examination of G. See Exhibit 4 at 3-146. Dr. Hubbuch did not evaluate G alone, but instead Mother stayed with G during the evaluation. Id.

**RESPONSE:** **Admit.**

94. By the time of G's appointment with Dr. Hubbuch in February 2015, G's primary symptom was headaches. See Exhibit 4 at 3-164 – 3-165. Dr. Hubbuch noted that G had been having "recurrent" headaches for about ten (10) months, but they were "not daily." See Exhibit 41 at 3. Dr. Hubbuch noted that the headaches were "not often severe" and occurred "much less often at home…." See id.

**RESPONSE:** **Admit and that Dr. Hubbuch's notes state several other things as well.**

95. Per Mother's request, Dr. Hubbuch did not ask G about his Wi-Fi usage or ask G if he thought the School's Wi-Fi was causing his symptoms. See Exhibit 4 at 3-171 – 3-173, 3-176.

**RESPONSE:** **Admit but Dr. Hubbuch was aware of his usage of Wi-Fi at School per information from Mother. (ECF 97-4, p. 171)**

96. At her appointment with G on February 3, 2015, Dr. Hubbuch ordered certain tests, including a complete blood count test, a Lyme disease test, and an antinuclear antibody ("ANA") test, all of which were negative. See Exhibit 41 at 4; Dr. Hubbuch's Expert Report, previously filed with the Court at ECF No. 59-19 at 3-4.

**RESPONSE: Admit.**

97.   In her notes regarding her evaluation of G on February 3, 2015, Dr. Hubbuch did not indicate that G's symptoms were caused by the School's Wi-Fi.  See Exhibit 41.  She wrote in her notes:  "but if something in school was cause, I'd expect it to persist entire day at school and it does not."  See id. at 3.  Dr. Hubbuch also wrote:  "headache arthralgia neck symptoms could be minor injury from football or wrestling."  See id. at 4.

**RESPONSE: Admit and that Dr. Hubbuch elaborated on her comment about expecting the symptoms to persist every day at her deposition (see, Ex. 7, Dr. Hubbuch Dep., pp. 121-122) and in her testimony at the Daubert Motion Hearing stating:**

> **Usually what happens with repeated exposures and more -- more timed exposures is that it does become more consistent and daily. And at this time, his wasn't every day, and it wasn't lasting all day. Very shortly after this, the pattern changed and that's what we understand about this in environmental medicine, that there is a threshold that you could reach, and then after that point, the symptoms really change and that's -- that is indeed what happened in this case. So the -- my comment about this was more saying this is what I would expect there to be. So we're still watching to see what happened, and then indeed that is what develops.**

**(See, Plaintiffs' Exhibit 19, Dr. Hubbuch Daubert Hearing Testimony, p. 89)**

98.   On February 10, 2015, a doctor at G's pediatrician's office examined G for a head injury resulting from a sledding accident the previous night, in which G hit his head on a tree while not wearing a helmet.  See Medical record, dated February 10, 2015 (attached at Exhibit 42).  He complained of headaches and sharp pain in his ears, and was monitored for concussion symptoms, which were negative.  See id.

**RESPONSE: Admit.**

99.   On February 25, 2015, Mother called Dr. Hubbuch and indicated that G's headaches had gotten worse.  Mother reported that G was "[n]ow coming home daily" with

headaches that were lasting into the evening and that he was getting headaches on and off during the school day.  See Exhibit 41 at 4.

**RESPONSE: Admit and that Dr. Hubbuch has since learned of the sledding incident and observed "They [G's symptoms] certainly started before the sledding accident, and I didn't see where the sledding accident appreciably changed the pattern." (See, Ex. 19, Dr. Hubbuch Testimony, pp. 85-86)**

100.    Mother did not disclose to Dr. Hubbuch that G had recently suffered a head injury from a sledding accident.  See id.; Exhibit 4 at 3-165 – 3-166; Exhibit 5 at 160-63.  Dr. Hubbuch recommended to Mother to "see how [G] is away from school on vacation and then when [he] returns to school."  See Exhibit 41 at 4.

**RESPONSE: Admit Dr. Hubbuch so testified but deny this had any impact on her diagnosis as he had been suffering headaches prior to this incident. See, Response to Fact No. 99 above.**

101.    During Mother's February 25, 2015 call with Dr. Hubbuch, Mother informed Dr. Hubbuch that she had been told that the RF measurements at the School were within the FCC safety limits.  See id. at 4.

**RESPONSE: Admit.**

102.    After the February 3, 2015 appointment, Dr. Hubbuch did not physically evaluate G again.  See id.; See Exhibit 4 at 3-187.

**RESPONSE: Admit.**

103.    In a letter dated March 31, 2015, Dr. Hubbuch diagnosed G with "Electromagnetic Fields (EMF) hypersensitivity."  See Letter from Dr. Hubbuch, dated March 31, 2015 (attached at Exhibit 43).

**RESPONSE:  Admit.**

104.    In a subsequent letter dated April 14, 2015, Dr. Hubbuch stated G had been diagnosed with EHS and listed an ICD-10 code of "T78.8 (Idiopathic Environmental Intolerance)."  See Letter from Dr. Hubbuch, dated April 14, 2015 (attached at Exhibit 44).

**RESPONSE: Admit and that this code was provided in response to School's request made just four days earlier on April 10, 2015. (See, Plaintiffs' Exhibit 20, Schuster Emails re School needing "code-able" diagnosis.)**

105.    On April 14, 2015, G was seen by Dr. Dinakar for a follow-up evaluation.  See Medical record of Dr. Dinakar, dated April 14, 2015 (attached at Exhibit 45).  At this appointment, Dr. Dinakar did not diagnose G with EHS.  Dr. Dinakar recommended that G start taking a headache preventative medication.  See id. at 3.

**RESPONSE: Admit and see, Response to Fact No. 90 regarding Dr. Dinakar making no final diagnosis and giving no definitive opinion on EHS.**

106.    The Parents did not start G on the medication recommended by Dr. Dinakar.  See Deposition of Father (relevant portions of which are attached at Exhibit 46) at 60.

**RESPONSE: Admit as Parents had concerns over use of such medication for 12 year old as indicated.**

**H.    Two Independent Medical Examinations Of G Do Not Support EHS Diagnosis**

107.    On April 27, 2015, the Parents (through their attorney) demanded that the School allow them to perform a "walk-through" of the School.  See Letter from Plaintiffs' counsel to the School's counsel, dated April 27, 2015 (attached at Exhibit 47).

**RESPONSE: Deny that Plaintiffs sent a "demand letter" but rather new counsel for Plaintiffs sent a letter regarding his being retained by the family and then making a**

**proposal for walk-through of the School to assess the Wi-Fi technology in G's classrooms (as reflected in document cited by Defendants).**

108.    As of April 27, 2015, the Parents had still not provided the School with the Requested Medical Documentation.  See Exhibit 11 at 162, 168-69.

**RESPONSE: Deny that Parents had not provided medical documentation. See, Response to Fact Nos. 52 and 104.**

109.    In response to Plaintiffs' demand letter of April 27, 2015, the School and the Parents (the "Parties") agreed that G would undergo a two-part independent medical evaluation ("IME") with medical experts from BCH who were not associated with any of the Parties.  See Email from Plaintiffs' counsel to the School's counsel, dated May 12, 2015 (attached at Exhibit 48).

**RESPONSE: Deny characterization of Plaintiffs' counsel's letter as a "demand letter" and admit that Parents "agreed" only to extent that IME requirement was imposed by School as a condition for G to be permitted to reenroll and return to School that Fall. (*See*, ECF 97-26, Enrollment Contract, para. 2, part (b))**

110.    It was agreed by the Parties that the first assessment would be with a doctor from the Pediatric Environmental Health Center at BCH and the second assessment would be performed by BCH's Multi-Disciplinary Headache Clinic.  See Email from the School's counsel to Plaintiffs' counsel, dated May 27, 2015 (attached at Exhibit 49).  The Parties agreed that "if it [*i.e.*, the IME] is to the effect that EHS is implicated, we will do a walkthrough…."  See Exhibit 48 at 1.

**RESPONSE:  Deny as this was a requirement imposed by the School in order for G to be permitted to reenroll and return to School. *See,* Response to Fact No. 109 above.**

111.    On June 29, 2015, G was seen by Alan Woolf, M.D. ("Dr. Woolf") at the

Pediatric Environmental Health Center ("PEHC") at BCH for the first part of G's IME

evaluation.  See Medical record of Dr. Woolf, dated June 29, 2015 (attached at Exhibit 50).

During this examination, Mother prevented Dr. Woolf from speaking alone with G.  See id. at 6.

After G's medical exam (with Mother present), Dr. Woolf concluded:

> There is a lack of credible, rigorous and controlled, validated
> scientific data to support any relationship between electromagnetic
> radiation and [G's] myriad reported symptoms.  Other
> environmental factors have been proposed as alternative or
> contributory to symptoms noted by patients such as [G], including
> fluorescent light flicker, glare, poor ergonomics, poor indoor air
> quality (note, the school recently changed its HVAC system),
> school refusal syndrome, and/or stress in the school or home
> environment.   We do not support a diagnosis of idiopathic
> environmental illness in this child.

See id.

**RESPONSE: Admit that report cited so states. Deny that the fact that G was not
interviewed separately by Dr. Woolf as stated impeded his ability to conduct a complete
physical examination of G or order any tests to attempt to diagnose G's symptoms. (*See*,
Plaintiffs' Exhibit 10, Deposition of Dr. Alan Woolf Dep., pp. 85-86) Also, Plaintiffs clarify
that Dr. Woolf had no doubt about the "honesty" and sincerity" of G's parents in reporting
G's  symptoms. (*Id.*, at p. 80) Also notable, Dr. Woolf made no diagnosis as to the cause of
G's symptoms. (*Id.*, pp. 104-105) While stating that in his view there was a lack of credible
evidence supporting EHS (meaning that this "independent evaluation was doomed from
the start), all he recommended was "continued monitoring by pediatric neurology." (ECF
97-50, p. 7) Moreover, at his deposition, he admitted that "I've never had a case like this in
my experience." (Ex. 10, Woolf Dep., p. 77) and that "I'm not an expert in EMR, but I have**

not seen such a case in my experience." (*Id*. p. 96). And when pressed, he could remember not one writing or study he had read on the subject. (*Id.*, pp. 78-80.)

112.    On August 3, 2015, the Parents demanded an immediate walk-through of the School.  See Email from Plaintiffs' counsel to the School's counsel, dated August 3, 2015 (attached at Exhibit 51).  As of that date, G had not undergone the second part of the IME.  See Letter from the School's counsel to Plaintiffs' counsel, dated August 7, 2015 (attached at Exhibit 52).

**RESPONSE:  Admit that the cited letter repeats the "Family's long-standing request for walk-through" and admit that G had not undergone the second evaluation required by the School.  (*See*, ECF 97-52, p. 2 (Plaintiffs' counsel's letter relied on by Defendants) in which counsel for Plaintiffs states "The physicians you suggested were in the main not useful. One cannot even see G until December of this year and the other physician does not believe in EHS at all, so one wonders why he was selected by Fay…")**

**Also, clarify on this fact G's parents first asked to come to the school for a discussion of what might be done to minimize G's RF exposure as early as June 5, 2014, when school was in summer recess, so a walk-through to look at the Wi-Fi would not be disruptive. Fay's response was "I see no reason why we should walk her [Mother] around and show her our WAP [access point] locations. (ECF 62-9) G's parents thereafter requested such a meeting four or five times before attorneys were involved. (Ex. 2, Mother Dep., p. 9)   G's attorneys thereafter got involved and sent separate letters asking for such a walk through on 4/27/2015, 5/20/15, 7/6/15, and 7/18/15 (ECF 97-51) Each of these letters requested that they meet "in order to walk through the school to ascertain what parts of G's anticipated school day will expose to Wi-Fi so that we can then use that information to**

**propose a reasonable accommodation." (Plaintiffs' Exhibit 11) No meeting was ever allowed by Fay. In the July 18, 2015 of these letter requests, Fay was reminded by G's parents that "classes start on September 9, 2015 now less than two months away. We need to get G's healthy and safe return to Fay resolved." (*Id*. ) Fay was asked yet again on 8/3/15 for a walk through. (*Id*.)  Again, no meeting was allowed by Fay. No meeting or review of the Wi-Fi system or any accommodation was ever discussed before the suit was filed.**

113.    In response, the School requested that the Parents adhere to the Parties' agreement that G complete the two-part IME before any walk-through of the School.  See id.

**RESPONSE:  Admit that the letter so states.**

114.    On August 12, 2015, Plaintiffs filed the original Complaint in the instant action. See Plaintiffs' Complaint, previously filed with the Court at ECF No. 1.  As of August 12, 2015, G still had not undergone the second part of the IME.  See Exhibit 52.

**RESPONSE:  Admit.**

115.    The School agreed to allow the Parents (and their attorneys and experts) to walk-through the School, so long as the Parents and G completed the second part of the IME process. See Email from Plaintiffs' counsel to the School's counsel, dated August 24, 2015 (attached at Exhibit 53).

**RESPONSE:  Admit.**

116.    On September 10, 2015, the Parents completed the second part of the IME by allowing G to be evaluated at BCH's Multidisciplinary Outpatient Headache Program by Alyssa Lebel, M.D. ("Dr. Lebel"), a pediatric neurologist, and Rupa Gambhir, Psy.D. ("Dr. Gambhir"), a psychologist.  See Medical records of Drs. Lebel and Gambhir, dated September 10, 2015 (attached at Exhibits 54 and 55).  At this evaluation, the Parents instructed the doctors to not ask

G about Wi-Fi.  See Deposition of Dr. Lebel (relevant portions of which are attached at Exhibit 56) at 74-75.

**RESPONSE: Admit and clarify that Dr. Gambhir did discuss Wi-Fi with G. (*See*, ECF 97-55, pp. 4-5, 7, 9.)**

117.    After Dr. Lebel's evaluation of G, Dr. Lebel concluded that G had "tension-type predominant" headaches that should be managed through the use of a headache preventative medication, along with therapies such as massage, essential oils, acupuncture, Reiki, and "relaxation strategies."  See Exhibit 54 at 3.  Dr. Lebel also "strongly encouraged [G] to attend school regularly".  See Exhibit 56 at 74; Medical record of Dr. Lebel, dated September 10, 2015 (attached at Exhibit 57).

**RESPONSE: Admit that medical record so states however clarify that this description of the type of headaches G suffered was not a diagnosis. (Plaintiffs' Exhibit 12, Deposition of Dr. Alyssa Lebel, p. 109; Plaintiffs' Exhibit 13, Deposition of Dr. Rupa Gambhir, p. 55) Dr. Lebel did not feel qualified to give a diagnosis on whether or not G suffered from EHS because she has "not done the study in that area to allow you to say yes or no." (Ex. 12, Lebel Dep., p. 113) Dr. Lebel's entry on September 10, 2015 (ECF 97-57, p. 2, cited by Defendants) also states that G "may benefit from a trial of a reduction in electronic exposure, as appropriate, in his current school setting.)**

**Also clarify on this fact that Dr. Lebel found G a "delightful young boy" (Ex. 12, Lebel Dep., p. 115) and summarized the psychiatric findings of Dr. Gambhir (the psychologist that Fay required G to see)  as well by saying that there were no psychiatric problems and that Dr. Gambhir had likewise found G a 'delightful young boy." (*Id*., at 121) Dr. Lebel examined G for no more than 40 minutes (*Id*., p. 93), from her interaction with**

**Parents she also noted their sincerity and honesty (*Id.*, p. 115), and said Parents were open**

**and did not try to block her from getting information from or about G. (*Id.*)**

118.    After her evaluation of G, Dr. Gambhir noted that "from a psychological

perspective, psychosocial factors may play a role in the maintenance of" G's headaches.  See

Exhibit 55 at 8.  The evaluation notes also state:

> [G] said he thinks the cause of his [headaches] "might be the
> wireless they have at school, it's really strong there.  I might not be
> used to it."  He said he first thought of this cause this summer
> when he wondered why he wasn't getting [headaches] at home and
> then saw a magazine cover that mentioned Wi-Fi exposure related
> concerns.  He had also heard his parents talking about this
> possibility.

See id. at 3-4.

**RESPONSE:  Admit that report so states however, Dr. Gambhir explained in her**

**deposition that she did not make a finding that any psychological factors were the initial**

**cause of G's headaches nor did she find that G's awareness at this time of a concern that**

**Wi-Fi was affecting him was "significant enough" to have "created" his symptoms.  (Ex.**

**13, Gambhir Dep., pp. 35-38)  Dr. Gambhir gave G a lengthy test to see if his headaches**

**were psychosomatic. The answer was negative and he was found to be a "well-adjusted,"**

**happy young boy with "a supportive family who does well academically." (ECF 97-55)**

119.    Although Drs. Lebel and Gambhir did not find that G had EHS, the Parents

represented to the School that Dr. Lebel had in fact recommended changes to the School's Wi-Fi.

See Exhibit 4 at 3-210; Letter from the School's counsel to Plaintiffs' counsel, dated November

10, 2015 (attached at Exhibit 58) at 1-2.  Dr. Lebel later confirmed to the School that she was not

implying that G's symptoms were caused by the School's Wi-Fi and that she did not make any

suggestion that the School alter or remove its Wi-Fi.  See Exhibit 56 at 78-79; Exhibit 58.

**RESPONSE: Admit that Dr. Lebel did not diagnose EHS, however, she is not qualified as an expert in this area. (*See*, Ex. 12, Lebel Dep., pp. 112-113)  Admit that School's counsel's Letter states what it states, however, Dr. Lebel's only recall of this conversation described by Defendants' counsel was "All I can say is that I was asked specifically about a diagnosis of WiFi. … And I said I'm not able to make that diagnosis." (*Id.*, p. 112). Dr. Lebel did state that G "may benefit from a trial of a reduction in electronic exposure, as appropriate, in his current school setting," (ECF 97-57, p. 2) and while she said this could include various forms of exposure she did not exclude Wi-Fi saying "anything that involves technology," and while she did not state that School should totally "remove its wireless internet" from the School, her record entry "was to support a trial of the school doing something, you know, to investigate, you know, to see how he responded within the school by changing electronic exposure..." (Ex. 12, Lebel Dep., pp. 78-79)**

120.     Immediately following G's examination by Drs. Lebel and Gambhir (on the same day), G was seen by Dr. Martha Herbert ("Dr. Herbert"), who is a neurologist at Massachusetts General Hospital.  See Letter from Dr. Herbert, dated September 12, 2015 (attached at Exhibit 59).  Dr. Herbert had never diagnosed a patient with EHS prior to examining G, but has been identified by Plaintiffs to testify as an expert in this litigation.  See Deposition of Dr. Herbert (relevant portions of which are attached at Exhibit 60) at 69, 78; Expert Report of Plaintiffs' Expert Dr. Herbert, previously filed with the Court at ECF No. 59-20.  Dr. Herbert noted (in a letter dated September 12, 2015) that G was "evaluated mid-afternoon when he was tired after a four hour evaluation at another site with no opportunity for lunch."  See Exhibit 59 at 1.  Dr. Herbert concluded that, based on "the literature and in the documentation of G's exposures and symptom patterns," it is "entirely reasonable to diagnose G with [EHS]."  See id.  Dr. Herbert

based her opinion on the tests done earlier by Dr. Hubbuch, and did not do any new tests.  See id.; ECF No. 59-20; Exhibit 60 at 203.

**RESPONSE:  Admit except deny that Dr. Herbert never diagnosed a patient with EHS prior to G (*See*, Plaintiffs' Exhibit 14, Deposition of Martha Herbert, p. 152) and that Dr. Herbert reviewed medical records from G from other doctors in addition to Dr. Hubbuch and did not find a need to do any particular additional testing at that time. (*Id.*, pp. 167-169)**

121.    The Parents agreed to follow Dr. Lebel's recommendations:  they would encourage G to attend school regularly, have him perform relaxation techniques with the School nurse, encourage him to return to class after any visit to the School Nurse, and take the prescribed headache preventative medication.  See Emails between the School's counsel and Plaintiffs' counsel, dated September 17-19, 2015 (attached at Exhibit 61).  The Parents failed to comply with this agreement, as G did not attend school regularly and the Parents never started him on the prescribed medication.  See Medical record of Dr. Lebel, dated October 26, 2015 (attached at Exhibit 62); Email from the School's counsel to Plaintiffs' counsel, dated October 16, 2015 (attached at Exhibit 63) at 1.

**RESPONSE: Agree that Parents agreed "to try the protocol" and that agreement did not mandate that G could never go home or stay home from School if his health and symptoms required. (*See*, ECF 97-61, p. 3 stating terms of trial protocol) Also note that email correspondence cited by Defendants shows Mother expressing her frustration with Defendants failing to keep to the proposed protocol for G as well. (*See,* ECF 97-63, p. 3: "…G was trying to follow the protocol outlined by the Doctor and was left without any way to do so…")**

122.    On October 26, 2015, Mother returned to see Dr. Lebel without G.  See Exhibit

62).  Although she kept G home from school that day, Mother did not bring G to see Dr. Lebel.

See Exhibit 56 at 79-82.  Instead, she brought Dr. Lebel materials regarding EHS to review and

told her she would not be starting the prescribed medication at that time and would return with

her son for follow up the following month.  See id. at 82, 84-85.

**RESPONSE: Admit and note that Dr. Lebel described that when Mother provided**

**materials to her at this meeting "What I felt was that she was asking me to consider that as**

**a diagnosis and asking for my opinion, but I did not feel any coercion." (Ex. 12, Lebel Dep.,**

**pp. 84-86)**

123.    Mother never followed up with Dr. Lebel.  See id. at 87.

**RESPONSE: Admit that G did not go back to Dr. Lebel for further evaluation. Dr. Lebel**

**was one of the doctors the School required G to go for an evaluation and that evaluation**

**had been completed as indicated above.**

124.    Mother also failed to follow the School's requests to only communicate about

accommodation requests through counsel and instead tried to correspond about reductions in RF

exposure with teachers who were not involved in the accommodation dialogue.  See Exhibit 63

at 1; Emails between the School's counsel and Plaintiffs' counsel, dated November 3, 2015

(attached at Exhibit 64) at 1.

**RESPONSE: Admit that Mother sent email to Mr. Heard for the reasons stated in the**

**email seeking assistance with the protocols that were supposed to be in place in the interest**

**of her son's health and not this supposed "failure" as Defendants characterize it is no**

**defense to the Plaintiffs' ADA claim or other claims in this case.**

125.     In addition, although the School had informed the Parents on April 22, 2015, that having G carry a dosimeter in his pocket while at School (without the School's permission) was a violation of the School's policy governing personal electronic devices, the Parents had G carry the dosimeter to School again in the fall of 2015.  See Exhibit 31 at 3; Exhibit 64 at 1.

**RESPONSE: Admit that the letters from Defendants so state but deny that Plaintiffs violated any rules. The April 22, 2015 letter cited by Defendants (ECF 97-31), states that Parents violated the School's rule against "contraband" as set forth in the Parent Student Handbook's "Major School Rules provision."  That provision from the applicable 2014/2015 Handbook provides:**

> **Contraband**
>
> **Items that students are prohibited from possessing at school are considered "contraband." Contraband includes:**
> **• Dangerous materials, including but not limited to firearms, knives, weapons, explosive material, lighters, and matches;**
> **• Explicit literature;**
> **• Wall decorations or computer files that are pornographic, contain graphic violence, or are deemed inappropriate by dorm parents or administrators;**
> **• Cell phones or walkie-talkies during prohibited times;**
> **• Video games rated 11 or above;**
> **• Movies (DVD or digital copies) rated R or above, including "unrated";**
> **• More than $25 in cash.**

**(Plaintiffs' Exhibit 15, 2014/2015 Fay Handbook excerpt) Defendants have not and can not cite any evidence that the dosimeter was dangerous (or even disruptive) nor otherwise fell into any identified contraband categories.**

126.     As a result, the School instructed the Parents on two additional occasions (on November 3 and November 12, 2015) that G's use of a dosimeter without the School's permission was a violation of the School's Handbook.  See Exhibit 64 at 1; Emails between the

School's counsel and Plaintiffs' counsel, dated November 12, 2015 (attached at Exhibit 65) at 1-2.

**RESPONSE: Admit that the School so instructed Parents but deny that Parents violated the Handbook and deny that it was appropriate for School to attempt to withhold permission for use of the dosimeter.  (*See*, Response to Fact No. 125 above and Email of Plaintiffs' Counsel at ECF 97-65, pp. 4-5)**

127.    After receiving this instruction, the Parents still sent G back to School with the dosimeter on November 13, 2015.  See Email from the School's counsel to Plaintiffs' counsel, dated November 13, 2015 (attached at Exhibit 66).

**RESPONSE: Admit and *see*, Response to Fact No. 126 above.**

**I.   The School's Reduction Of G's Exposure To RF From The School's Wi-Fi**

128.    In the summer and fall of 2015, the School undertook a series of efforts to reduce G's exposure to Wi-Fi emissions.  See Mr. Maxson's Expert Report, previously filed with the Court at ECF No. 59-27 at 14-16; Exhibit 7 at 67-69, 74-80.

**RESPONSE: Admit that School undertook these efforts only after multiple attempts by Parents to address their concerns, the involvement of Attorney Cutler on behalf of the family, and then the involvement of the undersigned firm, the filing of a federal lawsuit on August 12, 2015 (ECF 1), Plaintiffs' filing of a Motion for Preliminary Injunction and Request for Expedited Hearing on August 19, 2015 (ECF 4) and this Court's Order Setting a Hearing on the Motion (ECF 11) to be held on September 4, 2015.  (*See also*, Ex. 5, Bowdoin Daubert Testimony, p. 46, that Defendants' counsel commented that Defendants "were willing to do anything to stay out of court.")**

129.     On August 31, 2015, the School allowed Plaintiffs to conduct a walk-through of the School.  See ECF No. 59-27 at 14.  This walk-through was attended by Mother, Plaintiffs' counsel, and Plaintiffs' IT consultant, Rich Peters ("Mr. Peters"), Mr. Maxson (who took the RF readings at the School in December 2014), and Defendants' counsel.  See id.

**RESPONSE: Admit and see Response to Fact No. 128 on the timing of the Defendants' acquiescence after Court ordered a hearing on Plaintiffs' motion.**

130.     During this walk-through, Mr. Maxson demonstrated how the largest source of Wi-Fi emissions G may be exposed to in the classrooms is not from the Access Points, but is from Wi-Fi-enabled user devices such as G's laptop and the laptops near G being used by other students in those classrooms.  See id.

**RESPONSE: Admit that Mr. Maxson's report so states.**

131.     On September 3, 2015, Plaintiffs submitted to the School a proposal prepared by Plaintiffs' electrical consultant, Robert Bowdoin ("Mr. Bowdoin"), to wire 10 classrooms at the School, so that all 15-18 students in each of those classrooms would access the internet using the wired connections instead of the School's Wi-Fi.  See id. at 15; Expert Report of Plaintiffs' expert, Mr. Bowdoin, previously filed with the Court at ECF No. 59-26 at 8-10.

**RESPONSE: Admit that Plaintiffs submitted an estimate of costs of equipment for wiring 10 classrooms but deny this was a final proposal as Mr. Bowdoin had not yet seen the classrooms and was only giving a quote on estimated costs from limited information provided to him.  (*See*, ECF 59-26, p. 9: "The included estimate is for the purpose of understanding the cost to provide wired connections in the 7th grade classrooms at Fay School. The proposed work is based on our best guess as to what can be achieved. A more**

**detailed understanding of the schools current infrastructure is essential to determine best alternatives to achieve a wired classroom (e.g. data poles, wall plates, wired desks, etc.)…")**

132.    On September 3, 2015, Mr. Maxson performed a test of multiple laptops in a classroom at the School.  See ECF No. 59-27 at 15.  From this test, Mr. Maxson confirmed that Wi-Fi levels drop rapidly with distance and a material reduction in potential exposure occurs simply by increasing the separation between a person and the nearest laptop operating on Wi-Fi.  See id.  Mr. Maxson determined this material reduction could occur in as little as four feet of separation.  See id.

**RESPONSE: Admit that Mr. Maxson's Report so reflects what he claims he determined.**

133.    Mr. Maxson developed a proposal that would reduce RF signal levels near G by providing G access to the internet via one data cable in each classroom and situating G in a seat away from other laptop users.  See id.  This proposal was conveyed to Plaintiffs' counsel on or about September 15, 2015.  See id.

**RESPONSE: Admit this was Mr. Maxson's proposal.**

134.    In order to demonstrate Mr. Maxson's proposal, on September 24, 2015, the School allowed Plaintiffs to conduct a second walk-through of the School.  See id.  This walk-through was attended by the Parents, Plaintiffs' counsel, Mr. Peters, Mr. Bowdoin, Mr. Maxson, and Defendants' counsel.  See id.

**RESPONSE: Admit.**

135.    At this walk-through, Mr. Maxson demonstrated the proposal whereby the School would install an Ethernet port in each of G's classrooms so that G could connect his laptop to the internet via a data cable, and then seat all other students using laptops connected to the Wi-Fi at least four feet away from G (the "4-foot proposal").  See id.  Mr. Maxson demonstrated

empirically how the ambient Wi-Fi signal levels from the nearest laptop were greatly diminished by (a) giving G an Ethernet cord to connect G's laptop to the wireless network and disabling G's laptop's Wi-Fi, and (b) moving other laptops four feet away from G.  See id.

**RESPONSE:  Admit that Mr. Maxson's Report so states.**

136.    On October 2, 2015, in response to a request by Plaintiffs, the School provided written details of the School's 4-foot proposal.  See id.; Exhibit 7 at 67-68; Email from School's counsel to Plaintiffs' counsel, dated October 2, 2015 (attached at Exhibit 67).

**RESPONSE:  Admit.**

137.    In order to allow the Parents to take RF readings at the School, on October 7, 2015, the School allowed Plaintiffs to conduct a third walk-through of the School.  See ECF No. 59-27 at 15.  This third walk-through was attended by the Parents, Plaintiffs' counsel, Mr. Maxson, and Defendants' counsel.  See id.

**RESPONSE: Admit but note that there were limits to the use of the RF readings at this time as the readings were not taken during regular school hours when 15 to 18 laptops in every classroom are actively communicating with access points for several hours a day as Mr. Maxson admitted he never did readings under these conditions either. (*See*, Plaintiffs' Exhibit 16, Testimony of Maxson at Daubert Hearing, pp. 74-75)**

138.    During this walk-through, the Parents (with the permission of the School) took RF readings in various classrooms with their own dosimeter.  See id.; ECF No. 59-17 at 7; Exhibit 7 at 69, 74-75.

**RESPONSE: Admit and see Response to Fact No. 137.**

139.    Thereafter, the Parents requested that G be seated six to eight feet from laptops using Wi-Fi.  See ECF No. 59-27 at 15; Exhibit 7 at 74-75.

**RESPONSE:  Deny that Parents requested that G be seated 6 to 8 feet away from his classmates with laptops rather during the walk-through, Parents discussed with Mr. Maxson and counsel greater distances from wireless laptop exposure than 4 feet and ultimately, after the next walk-through, the School proposed that it could arrange for a 6 foot distance between G and wireless laptop exposure and Parents agreed to try it. (*See*, ECF 97-7, pp. 75-77, where Mother states at p. 77 on 6-foot proposal: "It was what the school had offered, so we agreed to try it. We did not agree that it was sufficient.")**

140.   In order to discuss the Parties' conflicting proposals, on October 21, 2015, the School allowed the Plaintiffs to conduct a fourth walk-through of the School.  See ECF No. 59-27 at 15.  This fourth walk-through was attended by the Parents, Plaintiffs' counsel, Mr. Peters, Mr. Bowdoin, Mr. Maxson, and Defendants' counsel.  See id.

**RESPONSE:  Admit and see Response to Fact No. 139.**

141.   At this walk-through, Mr. Maxson demonstrated the difficulties with placing G eight feet from other laptop users (given the size and logistics in each classroom), and then demonstrated a way to revise the School's proposal, such that, in G's classrooms, all students using laptops connected to the Wi-Fi could be seated at least six feet away (instead of four feet) from G (the "6-foot proposal").  See id.  This new 6-foot proposal was demonstrated in all of G's classrooms.  See id. at 15-16; Exhibit 7 at 76-77.

**RESPONSE: Admit and see Response to Fact No. 139.**

142.   Thereafter, the Parents agreed to the 6-foot proposal, and on October 27, 2015, the School implemented the 6-foot proposal.  See ECF No. 59-27  at 16; Exhibit 7 at 77.

**RESPONSE: Admit and see Response to Fact No. 139.**

143.    In November 2015, the Parents raised concerns with the 6-foot proposal in G's Math (Room 226) and Latin (Room 221) classrooms.  See id.  As a result, the School offered to move G's entire Math and Latin classes to a bigger classroom, Room 211, which would still allow G to connect to the internet via an Ethernet cable, while separating him by at least eight feet (instead of six feet) from other laptop users connecting with Wi-Fi (the "8-foot proposal"). See id.

**RESPONSE:** **Admit.**

144.    On November 11, 2015, the School moved G's entire Math and Latin classes to the bigger classroom, Room 211.  See id.; Exhibit 7 at 79-80.

**RESPONSE:** **Admit.**

145.    The adjustments that the School made in the fall of 2015 reduced G's exposure to RF from the School's Wi-Fi.  See ECF No. 59-17 at 14-20; Exhibit 7 at 78; Letter from Plaintiffs' counsel to the School's counsel, dated November 6, 2015 (attached at Exhibit 68).

**RESPONSE:** **Admit there was some reduction, however it was insufficient to accommodate G's disability as he continued to suffer symptoms at School from the Wi-Fi.  (*See*, ECF 62-11, Deposition of G at pp. 99-101, describing headaches getting worse in seventh grade; ECF 97-68 and ECF 97-69, letters from Plaintiffs' counsel reporting on G.)**

146.    Despite the adjustments made by the School, Plaintiffs claimed that G's symptoms continued.  See Letter from Plaintiffs' counsel to the School's counsel, dated November 18, 2015 (attached at Exhibit 69).  Plaintiffs demanded that the School make additional changes to its Wi-Fi until G's headaches stopped, and that G be allowed to take a medical leave until all such changes were made.  Id.

**RESPONSE: Admit that despite the adjustments, that G did in fact continue to suffer symptoms while at School (ECF 62-11, Deposition of G at pp. 99-101) and therefore Plaintiffs, through counsel, made proposals and further requests for an accommodation. Plaintiffs object to the Defendants ongoing mischaracterization and adversarial spin of the facts to attempt to make the Parents seem to be persistently "demanding" that the School act beyond reason as done throughout their "Statement of Facts." (*See,* ECF 97-69, the letter from Plaintiffs' counsel cited by Defendants which begins "I am writing to propose where we go from here" and includes that the family "requests" that G be "allowed a medical leave" among other proposals for counsel to discuss.)**

147.    Dr. Lebel's medical documentation specifically stated that G should attend school regularly.  See Exhibit 57.

**RESPONSE: Admit and that Dr. Lebel's same record states that G "may benefit from a trial of a reduction in electronic exposure, as appropriate, in his current school setting." (ECF 97-57)**

148.    Plaintiffs did not submit any documentation supporting a medical leave for G. See Letter from the School's counsel to Plaintiffs' counsel, dated November 23, 2015 (attached at Exhibit 70).

**RESPONSE: Deny. The request (not a demand) for G to be allowed to go on a medical leave at this time in November 2015 was made as part of the continued attempted negotiations between Plaintiffs and Defendants involving counsel that had first begun between the parties without counsel in April 2014, a period of time over which numerous medical records had been produced, including from evaluations of G required by the School, and after G himself reported ongoing symptoms and at times an inability to**

continue attending School every day (as the School has in their own Nurse Office and Attendance Records). By this time in November 2015, Defendants had records from Parents (*see*, Response to Fact Nos. 52 and 104.), Dr. Hubbuch's letters provided before this time (ECF 97-22, 97-43, 97-44), Dr. Waugh's records of evaluations before this time (ECF 97-36), Dr. Dinakar's records of evaluations before this time (ECF 97-38), Dr. Woolf's examination records which the School required of G in June 2015 (ECF 97-50), Dr. Lebel's and Dr. Gambhir's reports from before this time and required by the School (ECF 97-54) which all reported G's ongoing symptoms while at School.

149.    The School agreed to provide G with a leave that was consistent with other leaves the School had granted to other students in exceptional circumstances.  See id. at 7.  Specifically, G would be allowed to take a leave from School, and G's advisor, Paul Abeln ("Mr. Abeln") would be the point of contact for G's tutor in order to ensure the tutor obtained the educational material he needed from the School to assist G to keep up with his school work.  See id.  G would then be able to return as a student at the School once he was able to attend school.  See id.

**RESPONSE: Admit that the leave was granted in this way.**

150.    On November 30, 2015, the Parents signed a Leave of Absence Agreement (the "Leave Agreement"), which granted G a leave from December 1, 2015 through December 18, 2015.  See Exhibit 7 at 42-43; Leave Agreement, dated November 30, 2015 (attached at Exhibit 71).  Under the terms of the leave, G's Parents obtained a tutor for G, and the School appointed G's advisor, Mr. Abeln, to have all communications with G's tutor and to provide him with any information that G needed to keep up with his school work.  See Exhibit 71; see also Exhibit 1B ¶ 9.

**RESPONSE:  Admit.**

151.    In accordance with the Leave Agreement, Mr. Abeln emailed G's tutor on December 1, 2015, to let him know that Mr. Abeln would "be coordinating all communication and gathering materials" that G and the tutor needed.  See Email from Mr. Abeln to G's tutor, dated December 1, 2015 (attached at Exhibit 72); Exhibit 1B at ¶ 10.  Mr. Abeln told G's tutor that G's "teachers have detailed assignments, schedules, and resources online available to him at any time," and the tutor should contact Mr. Abeln with any "questions regarding these materials" or if the tutor needed Mr. Abeln "to communicate with any teachers."  See Exhibit 72; see also Exhibit 1B at ¶ 10.

**RESPONSE: Admit that Mr. Abeln so stated in his email at ECF 97-72.**

152.    G's tutor only met with Mr. Abeln one time (on December 7, 2015) to pick up hard copies of materials that were already available to G.  See Exhibit 1B at ¶ 11.  After December 7, 2015, G's tutor never contacted Mr. Abeln again.  See id. at ¶ 12.

**RESPONSE: Admit that this one meeting occurred by deny to the extent Defendants argue that this was the fault of or wrongful conduct of Plaintiffs or their tutor.**

153.    G emailed many of his teachers directly, and those teachers responded to G with whatever information G was seeking.  See Exhibit 1B at ¶ 13; Emails between G and his teachers, in December 2015 (attached at Exhibit 73) (without attachments).

**RESPONSE: Admit the emails show this communication.**

154.    During G's leave of absence from the School, the Parents met with administrators from the Southborough Public Schools to discuss possible accommodations they would make for G if he attended the Southborough Public School known as the P. Brent Trottier Middle School ("Trottier"), instead of the School.  See Trottier's Student Accommodation Plan, dated December 23, 2015 (attached at Exhibit 74).  In response, the administrators agreed to provide G

with the following changes to Trottier's Wi-Fi:  (1) G's "in-class electronic device will use physical cables to transfer data ('wired');" and (2) "Preferential seating with the maximum reasonable distance from wireless generating technologies." Id. at 4.  The Parents did not enroll G at Trottier.  Exhibit 7 at 123.

**RESPONSE: Admit.**

155.    On December 18, 2015, the Parents sent a letter to the School, demanding that the School either remove the Wi-Fi from all of G's classrooms and instead provide wired connections to all students in those classrooms, or provide G with a Wi-Fi-free classroom and have all of G's teachers and the students in G's classes come to that Wi-Fi-free classroom.  See Letter from the Parents to the School, dated December 18, 2015 (attached at Exhibit 75).

**RESPONSE: Deny that letter from Parents states that they demanded that School "remove the Wi-Fi from all of G's classrooms." (See, ECF 97-75, in which Parents propose two options: "Option # 1 "Build out" a classroom in the Picardi art building or use one of the existing art rooms for all of G's classes.  …. Option #2: Use room 101 (Mr. Long's science classroom) for all of G's classes….if you wont to try to find a solution over the holiday when we will have ample time to test out the various alternatives when no students are present, we would much prefer that to continuing in the court…")**

156.    The School declined Plaintiffs' requests.  See Email from the School's counsel to Plaintiffs' counsel, dated January 4, 2016 (attached at Exhibit 76 at 1).

**RESPONSE:  Admit that Plaintiffs' declined to try Plaintiffs' proposals but object to the cited email of Defendants' counsel as hearsay to the extent it is offered for the truth of the matters asserted in the email. See Fed.R.Evid. 801(c); Davila v. Corporacion De Puerto Rico Para La Difusion Publica, 498 F.3d 9, 17 (1st Cir. 2007)**

157.     In declining Plaintiffs' request to wire the School's classrooms, the School

considered the negative impact on the School's teachers and students, including that the

proposed alterations would eliminate the mobility and flexibility within the classrooms and

throughout the School's campus that is provided by the Wi-Fi.  See Exhibit 1A at ¶¶ 15-20 ;

Exhibit 1B at ¶¶ 7-8.  The School also considered the following negative impacts which would

result from wired classrooms:

- Many students' laptops do not come standard with data jacks and would require an adapter to make the connection to the wired network;

- The logistical difficulties involved in teachers ensuring that all 15-18 students in each of G's classes connect to the internet using wires as opposed to the School's wireless Wi-Fi, including that each teacher would have to spend significant time at the beginning of every class (or multiple times in one class depending on the lesson plan) ensuring that all 15-18 students in each class (1) turn the Wi-Fi adapters off on their laptops (and keep them off), (2) activate the wired adapters for each laptop, (3) connect properly to the wired connections, and (4) ensure the cables remain positioned in such a way as to avoid tripping or computer-pulling hazards;

- The invasiveness of Plaintiffs' proposed tele-poles in the School's classrooms, as those poles would decrease the size of the usable space in the classrooms, restrict the desks to fixed positions, and obstruct the line of sight for students and instructors;

- The injury hazard posed by the presence of the proposed multiple (up to 18) internet cables in G's classrooms to provide internet to 15-18 students in each class; and

- The wired connections for the internet would have a negative infrastructure impact on the School as the School would need to add numerous network switches in classrooms and/or its server room and may not have the physical space necessary to add such equipment.

See Exhibit 1A at ¶ 21.

**RESPONSE:** **Objection to the Declarations of Joseph Adu and Paul Abeln as an attempt to**

**circumvent the expert disclosure discovery rules by attempting to have supposed lay**

**witnesses testify to specialized knowledge which should have been previously disclosed as expert testimony. Deny that Mr. Adu's and Mr. Abeln's declarations establish what the School and Mr. Gustavson considered as no where is it indicated that either Mr. Adu or Mr. Abeln will part of any administrative decisions of the School concerning whether the School would provide reasonable accommodations to G as requested.**

**Deny that any such concerns cannot be addressed in providing a wired classroom to accommodate G's disability. (*See*, Ex. 5, Bowdoin Daubert Hearing Testimony, pp. 34-47.)**

158.    Plaintiffs' expert regarding the alterations that Plaintiffs are seeking to the School's Wi-Fi did not consider the affects the changes would have on the School's teachers, curriculum, or activities.  See Mr. Bowdoin's Deposition (relevant portions of which are attached at Exhibit 77) at 75-78, 99, 129.

**RESPONSE: Admit to the extent that Mr. Bowdoin does not know the specific curriculum of each teacher but deny that Mr. Bowdoin did not consider the teachers' activities or the way they teach with respect to wiring classrooms. (*See*, Ex. 5, Daubert Hearing Bowdoin Testimony, pp. 39-40)**

159.    Plaintiffs' expert regarding general causation stated that he does not have any proof that that the alterations that Plaintiffs are seeking to the School's Wi-Fi would eliminate G's symptoms.  See Deposition of Plaintiffs' Expert, David Carpenter ("Dr. Carpenter") (relevant portions of which are attached at Exhibit 78) at 53.

**RESPONSE: Admit testimony so states but deny there is no indication that alterations to the School's Wi-Fi would significantly reduce or eliminate G's symptoms. To the contrary, after the first round of alterations, G did have some improvement in certain classrooms (ECF 97-64, p. 4, Email from Plaintiffs' Counsel reporting on initial results of alterations**

including that in one classroom "G is not experiencing symptoms while there, at least no
where near as much…"; ECF 97-68, Letter from Plaintiffs' Counsel providing results of
alterations as to symptoms and attached graphs showing peak readings of RF exposure in
different classroom) and G is no longer experiencing the same symptoms at a new school
where he and his classrooms do not use Wi-Fi all day long. (*See,* Ex. 2, Mother Dep., p. 95
re G not suffering symptoms he had at Fay now that he is at Waldorf School.)

**J.     G's Withdrawal From School**

160.    On January 13, 2016, the Parents notified the School that they were withdrawing
G from School.  See Email from Mother to the School, dated January 13, 2016 (attached at
Exhibit 79).

**RESPONSE: Admit and that Mother also stated in same email:**

> **When the court hears this matter and if it grants those accommodations, G will
> return to Fay to finish his education through the 9th grade. G has an outside tutor
> who will continue to tutor him in such a way that we hope, if Wi-Fi accommodations
> are made that will allow us to have G return to Fay, that he will not have to retake
> his 7th grade year.**

**(ECF 97-79)**

161.    At the time of G's withdrawal, the Parents still owed a portion of tuition pursuant
to the 2015-16 Enrollment Agreement.  See Exhibit 7 at 34, 37-38; Email from Mother to the
School, dated January 30, 2016 (attached at Exhibit 80).  To date, that amount is still
outstanding.  See Exhibit 7 at 34, 37-38.

**RESPONSE: Admit but deny that Parents' have an obligation to honor the contract terms
which was first breached by the Defendants which is in dispute and should go to trial as
evidenced by the rest of the facts relevant to that claim.**

162.    After withdrawing G from the School, the Parents enrolled G in the seventh grade

at Waldorf School of Lexington ("Waldorf"), where he remains enrolled today.  See Exhibit 7 at 136, 145.

**RESPONSE: Admit.**

163.    Waldorf is a pre-K through eighth grade school.  See Deposition of Jason Ek (relevant portions of which are attached at Exhibit 81) at 20.  Unlike the School, Waldorf does not use computers in its classrooms and teaches an essentially computer-free curriculum.  See id. at 20-21, 28, 43-48.  Waldorf's decision to not use technology in the classroom – including Wi-Fi – is pedagogical and is not for health or safety reasons.  See id. at 19-20, 47.  Starting in seventh grade, Waldorf students take typing lessons, where they learn fundamental keyboard skills, but they do not use computers for those lessons.  See id. at 20-21, 43-45.  Nonetheless, Waldorf has a wireless network in its school that is used mainly by administrators.  See id. at 29-30.

**RESPONSE: Admit.**

**K.    Plaintiffs' Claims**

164.    Plaintiffs have alleged five (5) claims in their Complaint:  (a) Violation of the Americans with Disabilities Act ("ADA") (Count I); (b) Retaliation in Violation of the ADA (Count II); (c) Breach of Contract (Count III); (d) Misrepresentation (Count IV); and (e) Damages for Negligence (Count V).  See Plaintiffs' Second Amended Complaint, previously filed with the Court at ECF No. 43 at 29-34.

**RESPONSE: Admit.**

165.    Through their ADA claim, Plaintiffs allege that G has EHS due to the School's Wi-Fi system and that therefore the School should provide G with an accommodation that would lower or eliminate his exposure to RF from the School's Wi-Fi.  See ECF No. 43 at 29-31(¶¶ 72-

76).  More specifically, Plaintiffs request in their ADA claim that the School lower or eliminate

G's exposure to RF through the following "alternatives:"

- Switching to wired internet in all of G's classrooms and eliminating the Wi-Fi in those classrooms (see id. at 31(¶ 76)(i));

- "[R]educing the level of Wi-Fi emissions allowed to enter each classroom" by requiring several students seated next to G to use wired internet, instead of the Wi-Fi system (see id. at 31(¶ 76)(ii));

- Reducing the number of wireless devices in each classroom (see id. at 31(¶ 76)(iii));

- "[R]educing the Wi-Fi or even shutting it off completely" in classrooms when not using the Wi-Fi (see id. at 31(¶ 76)(iv));

- "[M]aintaining the level of Wi-Fi emissions at all times at lower than the levels at which Fay currently sets those emissions" (see id. at 31(¶ 76)(v)); and

- Providing G with a Wi-Fi-free classroom to take all of his classes, such that, all of G's teachers and all students in G's classes would need to attend their classes in this Wi-Fi-free classroom (see id. at 31(¶ 76)(vi)).

**RESPONSE:** **Admit that Plaintiffs alleged as quoted to put Defendants on notice of claim**

**as well as other allegations based on the evidence. (*See,* ECF No. 43 at 29-31(¶¶ 72-76)**

**stating the suggested alternatives "among others" that could be possible to consider.)**

**Plaintiffs made request to have one room wired and as reduced in RF exposure as possible**

**but Defendants refused to try this proposal. (*See*, ECF 97-75, Letter from Parents to School**

**to try one Wi-Fi free classroom for all of G's classes; Ex. 2, Mother Dep., pp. 16-17:**

> **Q. And since they weren't going to let you take measurements, did you ever request of the Fay School that you just have one room be Wi-Fi free and see how that worked with G?**

> **A. Yes. We asked to see if we, we proposed a plan that he would be allowed to be in a classroom that was completely Wi-Fi free so we could determine – we even asked them to shut it off just for a day or a couple of days during periods where students weren't needing their computers. And they denied us to do any of those things to help.**

**Q. So did they ever agree to a trial period where G was allowed to be in a classroom with no Wi-Fi RF exposure for a few days to see if there was any changes in him?**

**A. No.**

166.     In their retaliation claim, Plaintiffs claim that the School retaliated against

Plaintiffs as a result of their requests that the School provide an accommodation to G.  See id. at

31-32(¶¶ 77-80).  Specifically, Plaintiffs allege that the School's retaliatory acts included the

following actions:

- Asking the Parents to "not speak to various relevant personnel on campus about G's problem" and allegedly threatening to not allow G to remain as a student at the School "if the [P]arents discuss this problem with anyone in the Fay community" (see id. at 32(¶ 79), 22(¶ 53));

- Insisting that G be seen by the IME doctors "as a precondition to G being allowed to continue at Fay" (see id. at 32(¶ 79), 22(¶ 54));

- Requesting that G be seen by two different IME doctors (see id. at 32(¶ 79), 22-23(¶ 55));

- Allegedly refusing to "to do anything meaningful about its Wi-Fi system" after G saw the first IME doctor (see id. at 31(¶ 79), 23(¶ 56));

- Requiring G to see a second IME doctor before allowing the Parents to examine the School's Wi-Fi system as it operates in G's classrooms (see id. at 32(¶ 79), 23(¶ 57));

- Forbidding G to bring a dosimeter to School without the School's permission (see id. at 32(¶ 79), 28(¶ 68));

- Requiring the Parents to comply with the conditions of the Leave Agreement (see id. at 32(¶ 79), 28-29(¶¶ 69-71));

- Not allowing G to tape-record classes when he was out on Leave (see id. at 32(¶ 79), 28-29(¶ 70)); and

- Failing to provide Plaintiffs with the accommodations they have requested in their Complaint (see id. at 32(¶ 79), 30-31(¶¶ 75-76)).

**RESPONSE: Admit that Plaintiffs alleged as quoted to put Defendants on notice of claim**

**as well as other allegations based on the evidence.**

167.    Plaintiffs brought a breach of contract claim based on provisions contained in the

School's Handbook.  See relevant portion of the School's 2015-16 Handbook attached at Exhibit

82.  That Handbook contains the following statement:

> The Fay School Parent and Student Handbook ("Handbook") is published
> for members of the Fay School ("Fay" or the "School") community for the
> purpose of providing information on aspects of student and campus life so
> that students may gain as much as possible from their experience at the
> School.  The Handbook provides guidance on aspects of student life
> within the context of Fay's core values.  Students, parents, faculty,
> administration, and staff should all read and be familiar with the contents
> of the Handbook, so that each member of the community knows and
> understands the expectations of students within our community.  This
> Handbook is for informational purposes only.  It is not intended to create,
> nor does it create, a contract or part of a contract in any way, including,
> but not limited to, between Fay and any parent, guardian or student
> affiliated with or attending the School.  Fay reserves the right, in its sole
> discretion, to alter, amend, delete or modify the policies and procedures in
> this Handbook at any time.

See id.

**RESPONSE: Admit that Plaintiffs brought a breach of contract claim based on provisions**

**of the School's Handbook and admit that the 2015-2016 Handbook contains the quoted**

**statement but deny that this statement is a defense to the breach of contract claim and note**

**that the 2014-2015 Handbook (at ECF 62-4) relied on in this case does not have same**

**statement in it. Plaintiffs also note that the Handbook disclaimer revision occurred after**

**School's counsel publically published a recommendation in response to this very Court's**

**recognition of school handbooks as contracts as follows:**

> **[June 2013] Recently, a federal court In Massachusetts highlighted the**
> **importance of the language included in student handbooks by permitting a**
> **lawsuit against an independent school to proceed to trial on the question of**
> **whether the school had breached an implied contract with a student by**
> **falling to follow its student handbook. …**
>
> **…The school, on the other hand, argued that the handbook did not create a**
> **binding contract because the handbook was simply "guidance" and Included**

> language providing that the school had "the right to alter, amend, or modify the policies and procedures ... at any time." …
>
> …The court disagreed with the school, concluding that the "policies, regulations and procedures contained in the Handbook are contractual in nature and binding" on the school and its students.

(Plaintiffs' Exhibit 17 and *compare,* this Court's ruling just three months before in *DMP v. Fay Sch. ex rel. Bd. of Trustees*, 933 F. Supp. 2d 214, 223 (D. Mass. March 18, 2013)("The policies, regulations and procedures contained in the Handbook are contractual in nature and binding on Fay and its students.") Counsel goes on to recommend:

> In light of this recent decision and similar cases around the country, we recommend that independent schools obtain legal review of their student handbooks before issuing them for the 2013-2014 school year. (In this regard, please note that some independent schools refer to student handbooks by other names, such as student parent handbooks.) The following key provisions commonly included in student handbooks deserve close and careful scrutiny:
>
> > Disclaimers: Depending on the case law in your state, carefully crafted disclaimer language may help your school avoid a claim that the handbook constitutes a contract between the school and its students. Including disclaimer language in a student handbook may help dissuade potential plaintiffs from pursuing a claim, even if a court would not find the disclaimer legally enforceable. Therefore, it is important to strategically consider and draft this potential provision for your student handbook.

(Ex. 17)

168.    In their breach of contract claim, Plaintiffs allege that the School breached contractual promises made in the Handbook.  See ECF No. 43 at 32-33(¶¶ 81-83).  The Handbook provisions relied upon by Plaintiffs to support their breach of contract claim include statements in the Handbook that indicate the School will work towards the following:

- "[K]eep as a 'core value . . . the wellness of mind, body and spirit of each student'" (see id. at 8(¶ 24));

- "[P]rovide each student with 'a safe and supportive environment that recognizes, respects and celebrates the full range of human diversity'" (see id. at 8(¶ 25));

- "[H]elp when students 'are in physical need'" (see id. at 8(¶ 25));

- "[R]ecognize and celebrate . . . disabilities'" (see id. at 8(¶ 25));

- "[A]ffirm the necessity of respect for individual differences" (see id. at 8(¶ 25));

- "[M]aintain an environment in which all community members feel supported" (see id. at 8(¶ 25));

- "[A]dmit and educate students otherwise qualifying for admission regardless of whether any such student has 'any disability that can be reasonably accommodated by the School'" (see id. at 9(¶ 26)); and

- Afford all students with "all rights, privileges, programs and activities generally accorded or made available to students at Fay School.  The School does not discriminate on the basis of such factors in the administration of its educational policies, employment policies . . . or other school administered programs."  (see id. at 9(¶ 26)).

**RESPONSE:  Admit that Plaintiffs alleged as quoted to put Defendants on notice of claim as well as other allegations based on the evidence but deny Defendants' aspirational characterization that the Handbook provisions "indicate the School will work towards" the provisions cited.**

169.    In their misrepresentation claim, Plaintiffs allege that the statements from the Handbook that form the basis of Plaintiffs' breach of contract claim "are false representation[s] because despite all those statements and promises, Fay has acted in complete disregard of them and indeed completely contrary to the way it represented that it would act."  See id. at 33(¶¶ 84-85).

**RESPONSE:  Admit that Plaintiffs alleged as quoted to put Defendants on notice of claim as well as other allegations based on the evidence.**

170.    In their negligence claim, Plaintiffs allege that the School failed to "exercise

ordinary care for G's safety" by failing to make "any accommodation to G's EHS…." See id. at

33(¶¶ 86-88).

**RESPONSE:  Admit that Plaintiffs alleged as quoted to put Defendants on notice of claim**

**as well as other allegations based on the evidence.**

Dated:  September 26, 2016

Respectfully submitted,

*/s/ John J.E. Markham, II*
John J.E. Markham, II
(BBO No. 638579)
MARKHAM & READ
One Commercial Wharf West
Boston, Massachusetts 02110
Tel: (617) 523-6329
Fax:(617)742-8604
jmarkham@markhamread.com
*Attorney for the Plaintiffs*

**CERTIFICATE OF SERVICE**

I, John J.E. Markham, do hereby certify that on September 26, 2016, I served the

foregoing document via electronic mail on opposing counsel:

Jaime McKean, Esq.
Sarah Fay, Esq.
Sara G. Schwartz, Esq.
Schwartz Hannum PC
11 Chestnut Street
Andover, MA 01810-3744

*/s/ John J.E. Markham, II*
John J.E. Markham, II