**PLAINTIFFS' EXHIBIT 19 TO OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS


   G., a 12-year-old minor      )
   suing by a fictitious name   )
   for privacy reasons.  Mother )
   and Father suing under       )
   fictitious names to protect  )
   the identity and privacy     )
   of G., their minor child,    )
              Plaintiffs,       )
                                )
                                )
   vs.                          )   Case No. 15cv40116-TSH
                                )
                                )
   The Fay School, by and       )
   through its Board of         )
   Trustees, and Robert         )
   Gustavson,                   )
              Defendants.       )



   BEFORE:  The Honorable Timothy S. Hillman


                     Daubert Motion Hearing
                            Day 3


                            United States District Court
                            Courtroom No. 2
                            595 Main Street
                            Worcester, Massachusetts
                            July 28, 2016



             Marianne Kusa-Ryll, RDR, CRR
                Official Court Reporter
             United States District Court
            595 Main Street, Room 514A
              Worcester, MA 01608-2093
            508-929-3399 justicehill@aol.com
           Mechanical Steno - Transcript by Computer
```

**PLAINTIFFS' EXHIBIT 19 TO OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

I N D E X

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Jeanne Hubbuch, M.D. | | | | |
| By Mr. Markham | 6 | | | |
| By Ms. McKean | | 104 | | |
| By Mr. Markham | | | 212 | |
| By Ms. McKean | | | | 221 |

**PLAINTIFFS' EXHIBIT 19 TO OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

```
               1    Q.   All right.  And are you currently treating patients that
               2    you have diagnosed as EHS?
               3    A.   Yes.
               4    Q.   What is the basic treatment that you give those patients?
11:24:30AM     5    Is there one size fits all?  What do you do?
               6    A.   No, there isn't one size fits all, and there's no specific
               7    treatment other than avoidance.  Avoidance really is the key
               8    here right now.  And often if they meet exposure, whether it's
               9    either in the office, the school, or home is greatly decreased,
11:24:53AM    10    they often will tolerate smaller exposures without symptoms.
              11    Q.   Okay.  Now, are you aware that in relation to all of this
              12    inquiry on the son he was given an MRI?
              13    A.   Yes.
              14    Q.   What's an MRI?
11:25:13AM    15    A.   It's a magnetic test of the -- of a part of the body that
              16    can really show the physical structures.
              17    Q.   Beneath the skin?
              18    A.   Correct.
              19    Q.   What is your understanding of the difference between -- of
11:25:27AM    20    the difference between EMF radiation that comes from WI-FI and
              21    the magnetic radiation that comes from an MRI?
              22    A.   My understanding is that they are quite different.  The
              23    MRI is primarily magnetic energy, not primarily electromagnetic
              24    frequency.
11:25:46AM    25    Q.   Okay.
```

**PLAINTIFFS' EXHIBIT 19 TO OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

|  |  |
|---|---|
| 1 | A.   There may be some frequencies associated with it, but it's |
| 2 | not primarily. |
| 3 | Q.   In any event, can you compare the length, the duration of |
| 4 | an MRI to five days a week, six hours a day in a school? |
| 11:26:00AM 5 | A.   No, again here you're talking about a much shorter |
| 6 | duration in time. |
| 7 | Q.   All right.  And you made note of the fact that the MRI |
| 8 | results on the son came back negative; correct? |
| 9 | A.   That's right. |
| 11:26:11AM 10 | Q.   So you were aware that he had been exposed to an MRI; |
| 11 | correct? |
| 12 | A.   I was. |
| 13 | Q.   Did that alter your opinion about the source of his |
| 14 | symptoms? |
| 11:26:21AM 15 | A.   Well, it -- again, it helped rule out that there was |
| 16 | another cause for it. |
| 17 | Q.   What causes were you looking for, by the way, by the MRI? |
| 18 | A.   The MRI you're really looking for structural problems.  So |
| 19 | a brain tumor or mass, or something else that would be a |
| 11:26:37AM 20 | structural issue. |
| 21 | Q.   All right.  By the way, at some point in his history at |
| 22 | the school the son had a sledding accident and hit his head. |
| 23 |      You're aware of that now? |
| 24 | A.   Yes. |
| 11:26:49AM 25 | Q.   And you didn't -- you weren't aware of that before; |

```
                1    correct?
                2    A.   I was not.
                3    Q.   Does that have any bearing -- well, what bearing does that
                4    sledding incident have on the headaches that he got over the
11:27:01AM      5    course of the two and a half years we're talking about?
                6    A.   They certainly started before the sledding accident, and I
                7    didn't see where the sledding accident appreciably changed the
                8    pattern.
                9    Q.   And that sledding accident was before he returned to
11:27:18AM     10    school in the seventh grade; correct?
               11    A.   I don't recall specifically when it was.
               12    Q.   Okay.  All right.  Take a look at Tab 4 of Exhibit 1.
               13    This is a note from Dr. Ostrovsky, Marvin, M.D., of a visit
               14    that he had with the son, and it looks like this took place in
11:28:11AM     15    May of 2014; correct?
               16    A.   Yes.  Yes.
               17    Q.   That's before the time that the mother got in contact with
               18    you, which was in June by email; correct?
               19    A.   Right.
11:28:19AM     20    Q.   All right.  Did you see this note before you gave your
               21    initial letter?
               22    A.   I'm not sure that I did.
               23    Q.   Okay.  And in this note, it says -- it recites his
               24    symptoms, does it not?
11:28:41AM     25    A.   Yes.
```

**PLAINTIFFS' EXHIBIT 19 TO OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

```
 1   Q.   What does it say the symptoms are?
 2        THE COURT:  What is that tab?
 3        MR. MARKHAM:  It's Tab 4, your Honor --
 4        THE COURT:  Thank you.
 5        MR. MARKHAM:  -- of Exhibit 1.
 6        THE COURT:  Got it.
 7        THE WITNESS:  Can you just show me where that is.
 8        MR. MARKHAM:  I'm looking for it.  I had it marked.
 9   I'm sorry.  I apologize.
10   BY MR. MARKHAM:
11   Q.   Take a look on your screen.  I'm circling it.
12        Do you see it?
13   A.   Yes.
14   Q.   Okay.  Patient is having symptoms of chest pressure and
15   stomach pain?
16   A.   Yes.
17   Q.   All right.  Are those the symptoms that were reported to
18   you?
19   A.   They are some of the symptoms.
20   Q.   Stomach pain?
21   A.   More nausea than stomach pain.
22   Q.   Okay.  But those are not the symptoms that were reported
23   to you in July; correct?
24   A.   No.
25   Q.   And do you know anything about Dr. Ostrovsky's specialty?
```

Timestamps: 11:28:55AM (line 5), 11:29:11AM (line 10), 11:29:28AM (line 15), 11:29:35AM (line 20), 11:29:45AM (line 25).

**PLAINTIFFS' EXHIBIT 19 TO OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

|  |  |
|---|---|
| 1 | A. I believe he's a pediatrician. |
| 2 | Q. All right. Now, he indicates that he cannot support that |
| 3 | WI-FI is the cause of the stomach and chest issues. |
| 4 | Do you see that? |
| 11:30:08AM 5 | A. Yes. |
| 6 | Q. You were criticized for not looking at that before you |
| 7 | wrote a letter about this. |
| 8 | Can you respond to that criticism. Should you have |
| 9 | looked at that and considered it? |
| 11:30:28AM 10 | A. I don't think that that really would have anything to do |
| 11 | with changing my opinion. I -- I base my opinion on my |
| 12 | experience with environmental medicine and looking at his |
| 13 | pattern of symptomatology, and I don't think that someone else |
| 14 | saying they can't -- they don't understand EHS and couldn't |
| 11:30:49AM 15 | support it means that it doesn't exist. |
| 16 | Q. All right. Okay. Take a look at Tab 6. |
| 17 | These are your notes; correct? |
| 18 | A. Yes. Yes. |
| 19 | Q. In your notes you say that -- Tab 6, Exhibit 1, you say |
| 11:31:16AM 20 | that if WI-FI it should exist all day. Can you find that |
| 21 | reference. |
| 22 | A. Yes. |
| 23 | Q. Okay. Dr. Boyer criticized you as giving a diagnosis in |
| 24 | that phraseology, inconsistent with EMF, because if WI-FI |
| 11:31:36AM 25 | should persist all day. |

```
               1                Could you explain why you said that and still
               2        adhere -- that it should exist all day and still adhere to your
               3        opinion that the probable cause of his condition is WI-FI at
               4        Fay.
11:31:49AM     5        A.   Yes.  In the early stages of a sensitivity via to EHS or a
               6        chemical or some other type of thing, the pattern can be
               7        intermittent, and it doesn't have to persist all day.  Usually
               8        what happens with repeated exposures and more -- more timed
               9        exposures is that it does become more consistent and daily.
11:32:16AM    10        And at this time, his wasn't every day, and it wasn't lasting
              11        all day.  Very shortly after this, the pattern changed and
              12        that's what we understand about this in environmental medicine,
              13        that there is a threshold that you could reach, and then after
              14        that point, the symptoms really change and that's -- that is
11:32:34AM    15        indeed what happened in this case.
              16                So the -- my comment about this was more saying this
              17        is what I would expect there to be.  So we're still watching to
              18        see what happened, and then indeed that is what develops.
              19        Q.   Can you take a look at Tab 7.
11:32:58AM    20                Now, by Tab 7, he had been at the
              21        school -- at -- that's dated March 31, 2015; correct?
              22        A.   Correct.
              23        Q.   And you write in Tab 7 of Exhibit 1 about the second --
              24                THE COURT:  Mr. Markham --
11:33:13AM    25                MR. MARKHAM:  Yes.
```

**PLAINTIFFS' EXHIBIT 19 TO OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

```
 1              THE COURT:  -- can you just stop for a minute.  Marty,
 2   can you just show him how to get that green light off.
 3              MR. MARKHAM:  Oh, you hit somewhere.
 4              THE CLERK:  The top right corner.
 5              MR. MARKHAM:  Top left, clear.
 6              THE COURT:  It's giving me a headache.
 7              MR. MARKHAM:  Okay.  It's the radio waves, your Honor.
 8   These are notorious for it.
 9              THE COURT:  I knew it.  I knew it.  Thank you, Marty.
10   Thank you.
11              MR. MARKHAM:  Thank you.
12   BY MR. MARKHAM:
13   Q.   So there we have it.  And it says the persistent symptoms
14   are also interfering with his ability to focus on his
15   schoolwork.
16              His headaches are now interfering with his ability to
17   do his homework?
18   A.   Yes.
19   Q.   All right.  Is that consistent with your thought that
20   these progress and get worse?
21   A.   Yes, it is.
22   Q.   Okay.  And this was what seven weeks later?
23   A.   Yes.
24   Q.   All right.  Now, take a look at Tab 8.  And that is a
25   letter you sent to whom it may concern, dated April 14, about
```

Timestamps: 11:33:24AM (line 5), 11:33:32AM (line 10), 11:33:44AM (line 15), 11:33:51AM (line 20), 11:34:14AM (line 25)

**PLAINTIFFS' EXHIBIT 19 TO OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

```
              1    two weeks after you wrote the letter about the aggravating
              2    symptoms.
              3            And you give a diagnostic code of electromagnetic
              4    hypersensitivity.  The ICD-10 code is T78.8 idiopathic
11:34:40AM    5    environmental intolerance.
              6            Do you recall -- do you recall that you wrote that
              7    letter?
              8    A.   Yes.
              9    Q.   Do you recall why?
11:34:48AM   10    A.   I believe it was needed in order to potentially have
             11    something different happen in terms of the -- the school.
             12    Q.   Do you know whether they asked for it?
             13    A.   They did ask for a code.
             14    Q.   All right.  Now, you gave -- why did you give this
11:35:07AM   15    particular code?
             16    A.   It's the -- the only code that fits it even partially.
             17    There is no specific code for EHS at this time.
             18    Q.   Okay.  Now, I learned this recently before this case, but
             19    I've got to hand it to you, our profession doesn't have a
11:35:23AM   20    refuge called idiopathy, meaning idiopathic EHS and/or
             21    idiopathic bleeding.
             22            Could you tell us what this great escape valve is for
             23    you folks in your profession.
             24    A.   Idiopathic means the exact cause of it has not been
11:35:40AM   25    determined yet.
```

**PLAINTIFFS' EXHIBIT 19 TO OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

|  | |
|---|---|
| 1 | Q. Okay. And how is it that you can sit there under oath |
| 2 | with all your professional prestige on the line and say that, |
| 3 | in your opinion, the most probable cause is EHS from school |
| 4 | WI-FI when this is put into an idiopathic category, and I |
| 11:36:00AM  5 | gather idiopathic comes from the word idiot, which is Greek for |
| 6 | we all know; right? |
| 7 | A. Right. |
| 8 | Q. Explain that. |
| 9 | A. I think in medicine over the centuries, if you look at it |
| 11:36:13AM 10 | historically, there are many, many manifestations of illness |
| 11 | that we don't understand. And over time, and it may take |
| 12 | hundreds of years, we do finally understand the mechanism and |
| 13 | can describe it and understand it. So this is a new area of |
| 14 | medicine and of understanding hypersensitivity, and I think |
| 11:36:35AM 15 | it's important relative to this to realize that our world has |
| 16 | changed in the last 20 years, that the amount of EMFs that |
| 17 | we're all exposed to is radically different in the last 20 |
| 18 | years than it was 20 years ago when people did not have cell |
| 19 | phones, did not have WI-FI in their house. So we don't know a |
| 11:36:56AM 20 | whole lot about it yet. We're really still learning, and the |
| 21 | studies are coming that are scientific in basis. So it's |
| 22 | not -- it's not unusual to not have a specific code to identify |
| 23 | a new -- a newly identified problem. |
| 24 | Q. Are there other newly identified problems that are, in |
| 11:37:16AM 25 | fact, problems, but they're lumped into this category as well? |

**PLAINTIFFS' EXHIBIT 19 TO OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

1    A. Sure. Chemical sensitivity could be in here.

2    Q. All right. Now, if somebody came to you and said, you

3    know, when I -- I work at a gas station, and every time I go to

4    pump gas, I feel nauseous and this or that happens to me.

11:37:35AM 5    What would you consider that the possibility might be,

6    if it didn't happen anywhere else?

7    A. That they have a sensitivity -- hypersensitivity to

8    gasoline exposure, the volatile chemicals that come from that.

9    Q. To what degree of medical certainty are you that certain

11:37:53AM 10    people are sensitive physiologically to fumes such as I

11    described?

12    A. I'm -- I'm quite certain that it exists.

13    Q. All right. But it's labeled under idiopathic?

14    A. That is correct.

11:38:08AM 15    Q. How about EHS, the same for that?

16    A. The same.

17    Q. Now, on Tab 9, this is a -- this is a note from a

18    Dr. Waugh.

19    Do you recall seeing this note at any time?

11:38:33AM 20    It's dated November 12, 2014. That would be -- that

21    would have been after you wrote your first letter; correct?

22    A. I did see it at some time, but I can't tell you exactly

23    when.

24    Q. Okay. It's something you would have seen before you wrote

11:38:49AM 25    your opinion?

**PLAINTIFFS' EXHIBIT 19 TO OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

```
              1   A.   In the end, yes.
              2   Q.   All right.  And this is the one that says, quote, "Mother
              3   was not at all interested in considering this could be anxiety
              4   or school phobia."
11:39:02AM    5        Do you see that?
              6   A.   Yes, I do.
              7   Q.   Okay.  And again did you see any reason to pursue that?
              8   A.   I didn't.  I didn't see any -- any evidence that that was
              9   the case.
11:39:14AM   10   Q.   Okay.  Did you see the note of Dr. Lebel, the one that the
             11   school told her to take her son to where Dr. Lebel indicates
             12   that he was happy with no problems?
             13   A.   Yes.
             14   Q.   All right. All right.  Tab 11, do you recall seeing this
11:39:52AM   15   note, a neurology visit from Dr. Pradeep Dinakar?
             16   A.   Yes.
             17   Q.   Okay.  And you saw that, and you took it into account?
             18   A.   Yes.
             19   Q.   Did it change your opinion?
11:40:11AM   20   A.   No.
             21   Q.   But you considered it?
             22   A.   Yes.
             23   Q.   All right.  Let me ask you something.  Do you ever ask
             24   patients to keep diaries of when symptoms occur?
11:40:28AM   25   A.   Yes.
```