UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(WORCESTER DIVISION)

| | |
|---|---|
| ——————————————————————— )<br>G, a 12-year-old minor suing by a fictitious name )<br>for privacy reasons, MOTHER, and FATHER, )<br>suing under fictitious names to protect the )<br>identity and privacy of G, their minor child, )<br> )<br>    Plaintiffs, )<br> )<br>v. )<br> )<br>THE FAY SCHOOL (by and through its )<br>Board of Trustees) and ROBERT GUSTAVSON,[1] )<br> )<br>    Defendants. )<br>——————————————————————— ) | Case No. 15-cv-40116-TSH |

## DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, The Fay School, Inc. (the "School") and Robert J. Gustavson, Jr.

("Gustavson"), have moved for summary judgment ("Defendants' SJ Motion") for various

reasons, including because the Federal Communications Commission ("FCC"), not this Court,

has the exclusive jurisdiction over the main issue in this case, that is, whether radio frequency

("RF") from the School's wireless network ("Wi-Fi") can cause physical symptoms, when the

RF is well below the FCC's safety limit regulating RF emissions (the "Safety Limit").[2]  Rather

than dispute that the RF from the School's Wi-Fi is 10,000 times lower than the FCC's Safety

Limit, Plaintiffs attempt to avoid dismissal of their claims on jurisdictional grounds by misstating

the law in their Opposition to Defendants' SJ Motion (the "Opposition" or "Opp.").  Plaintiffs

---

[1] The proper names of Defendants are The Fay School, Inc. and Robert J. Gustavson, Jr.

[2] Defendants incorporate by reference Defendants' SJ Motion (ECF No. 95), Memorandum in Support of
Defendants' SJ Motion (ECF No. 96), and the Statement of Undisputed Facts in Support of Defendants' SJ Motion
("SOF") (ECF No. 97), all of which Defendants filed on September 1, 2016.

also attempt to avoid summary judgment on other grounds by adding facts that are not material to any of their claims.  As a result, Defendants are filing this Reply to address Plaintiffs' misrepresentations of the law and their failure to dispute material facts, and thereby clarify why Defendants are entitled to summary judgment on all counts.

## I.      ARGUMENT IN REPLY

### A.      Plaintiffs Misstate The Law Requiring This Court To Decline Jurisdiction

Plaintiffs make a number of misleading arguments in their Opposition in an attempt to save this case from being decided on the basis that the FCC, not this Court, has jurisdiction over Plaintiffs' claims.  See Opp. at 21-28.  Specifically, Plaintiffs argue that their claims are not preempted by the FCC Safety Limit because:  (1) the FCC did not consider the "non-thermal" effects of RF exposure when promulgating its Safety Limits (in 1997) and has not reviewed its Safety Limit since that time to consider such effects (see Opp. at 16-21); (2) the Telecommunications Act ("TCA") does not explicitly preempt the ADA (see Opp. at 22-25); and (3) the FCC does not have jurisdiction over a determination of what constitutes a "disability" under the ADA (see Opp. at 26-28).  Plaintiffs' arguments are factually and legally deficient.  First, the FCC did consider the non-thermal effects of RF exposure when promulgating its guidelines, and is currently undertaking a review of those guidelines.  Second, courts have made it clear that the FCC has exclusive jurisdiction under the TCA to decide safety issues concerning RF exposure (which is the main issue in this case).  Third, the FCC does have exclusive jurisdiction over this matter because the main issue is not what can constitute a disability (as Plaintiffs contend), but rather, the main issue is the causation issue of whether RF from Wi-Fi, at levels well below the FCC's Safety Limit, can cause physical symptoms (which is an issue clearly within the FCC's exclusive jurisdiction).

1.      **The FCC Considered Non-Thermal Effects Of RF Exposure In Promulgating Its Safety Limit And Continues To Review Any Such Effects**

Plaintiffs argue that the FCC Safety Limit does not address the issues raised in their claims because:  (1) the FCC supposedly was unaware of and did not consider non-thermal effects of RF exposure in issuing the Safety Limit (in 1997); and (2) the FCC has not reevaluated its Safety Limit since 1997.  See Opp. at 16-21.  Plaintiffs' arguments are directly contradicted by the FCC's own public statements.

In 1999, shortly after issuing the Safety Limit, the FCC issued a bulletin to address public questions regarding its standards.  See OET Bulletin 56, *Questions and Answers about Biological Effects and Potential Hazards of Radiofrequency Electromagnetic Fields*, FCC Office of Engineering & Technology, at 6-8 (August 1999) (attached hereto at Exhibit A).[3]  In that bulletin, the FCC explicitly stated that it did consider **__all__** potential health effects (both thermal and non-thermal) of RF exposure in issuing its Safety Limit, and did not find any evidence that harmful non-thermal effects existed below the Safety Limit.  More specifically, the FCC made this finding clear in the following statement:

> At relatively low levels of exposure to RF radiation, i.e., field intensities lower than those that would produce significant and measureable heating, the evidence for production of harmful biological effects is **__ambiguous and unproven__**.  Such effects have sometimes been referred to as 'non-thermal' effects….  [T]here has been no determination that such effects might indicate a human health hazard, particularly with regard to long-term exposure.

Id. at 8 (emphasis added).  Likewise, in a case involving a challenge to the FCC's RF guidelines based on an argument that the guidelines failed to account for so called non-thermal effects of RF radiation, the Second Circuit Court of Appeals ruled that non-thermal effects of RF were considered, but it was determined that "no reliable scientific data exists indicating that [n]onthermal . . . exposure may be meaningfully related to human health."  Cellular Phone

---

[3] This FCC bulletin is available at https://transition.fcc.gov/bureaus/oet/info/documents/bulletins/oet56/oet56e4.pdf.

Taskforce v. F.C.C., 205 F.3d 82, 90 (2d Cir. 2000), cert. denied, 531 U.S. 70 (2001).

Moreover, on March 27, 2013, the FCC issued a Notice of Inquiry (the "2013 *Inquiry*") regarding its RF guidelines, and clearly stated that it has long been aware of the dispute concerning non-thermal effects:

> As long ago as the *1979 Inquiry* we sought to gather information 'in light of the increased concern about the biological effects of radio frequency radiation.'  At that time, just as is evident today, there were 'considerable differences of opinion about the biological effects of low level (*i.e.*, non-thermal or athermal) and long-term (chronic) exposure to RF radiation.'

See 2013 *Inquiry* (relevant portions are attached hereto at Exhibit B)[4] at 73-74 at ¶ 208 (quoting 1979 *Inquiry*, Gen. Docket 79-144, 72 FCC 2d 482 (1979)).  Thus, Plaintiffs' argument that the FCC was unaware of and/or did not consider non-thermal effects at the time it issued the Safety Limit (in 1997) is false and completely unsupported.[5]

Similarly, Plaintiffs' assertion that the FCC has not reconsidered its Safety Limit since 1997 is just plain wrong.  The FCC issued the 2013 *Inquiry* as part of its rulemaking process to reconsider its Safety Limit.[6]  See Exhibit B.  As a result, the 2013 *Inquiry* requests public and expert comments to determine whether its RF exposure limits and policies need to be changed. See id.  In issuing the Inquiry, the FCC stated as follows:

> The *Inquiry* is intended to open discussion on both the currency of our RF exposure limits and possible policy approaches regarding RF exposure. While the FCC has

---

[4] The entire *Inquiry* can be found online at https://apps.fcc.gov/edocs_public/attachmatch/FCC-13-39A1.pdf.

[5] Plaintiffs' attempt to include Exhibit 22 to their Counter-Statement of Facts ("COF"), which is a July 16, 2002 letter from the Environmental Protection Agency ("EPA"), that Plaintiffs claim supports their argument, should be denied.  This Court has already rightly determined that this letter is hearsay (See *Daubert* Hearing, Day 6 (ECF No. 107) at 61).  "[I]t is black-letter law that hearsay evidence cannot be considered on summary judgment for the truth of the matter asserted."  Bhatti v. Trs. of Boston Univ., 659 F.3d 64, 71 (1st Cir. 2011).  Thus, the letter (at ECF No. 120-22), should be stricken.

[6] According to the FCC's website, the FCC releases a Notice of Inquiry "for the purpose of gathering information about a broad subject or as a means of generating ideas on a specific issue."  Such notice is the first step in the FCC's evaluation process of whether to change or implement new rules or guidelines regarding issues within its jurisdiction.  See https://www.fcc.gov/general/rulemaking-fcc.

continuously monitored research and conferred with experts in this field, and is confident in its RF exposure guidelines and the soundness of the basis for its rules, it is a matter of good government to periodically reexamine regulations and their implementation. The FCC looks forward to developing a complete record by soliciting the input of qualified expert agencies and organizations and the public, to determine whether the current rules and policies should remain unchanged, or should be relaxed or tightened.

https://www.fcc.gov/general/radio-frequency-safety-0.  Thus, contrary to Plaintiffs' assertions, there is no doubt that the FCC has been reevaluating its RF Safety Limit (since at least 2013), and yet presently has not changed the RF Safety Limit.  Indeed, despite their assertion otherwise, Plaintiffs had actual knowledge of the FCC's review of its guidelines prior to filing their Opposition, because Defendants' expert, David Maxson, recently testified about the FCC's review process at the *Daubert* hearings held in this matter.  See Day 8 of the *Daubert* hearing testimony (relevant portions of which are attached hereto at Exhibit C) at 8-17 – 8-22.

2.      **Courts Have Ruled That The FCC Has Exclusive Jurisdiction Under The TCA To Decide Safety Issues Concerning RF Exposure**

In their Opposition, Plaintiffs ignore the relevant case law and argue that this Court should retain jurisdiction based on their assertion that the TCA does not specifically preempt Plaintiffs' claims.  See Opp. at 22-25.  Plaintiffs' argument entirely misses the point and misstates the law.

First, Congress, did, in fact, say so, when it included the preemption provision specifically for ADA claims brought against providers.  See 47 U.S.C. § 255(f) ("The [FCC] shall have exclusive jurisdiction with respect to any complaint under this section.").  While the School is not the "provider" of telecommunication services, the gravamen of Plaintiffs' claims is directly analogous to preempted claims against providers based on an alleged disability caused by RF exposure.  Congress understood that there could be a potential conflict, and resolved that issue in favor of a coherent and consistent national telecommunications network.  See H.R. Rep.

No. 104-204(I), at 95 (1995), *reprinted in* 1996 U.S.C.C.A.N. 10, 61-62 (stating FCC given authority over RF guidelines as "it is in the national interest that uniform, consistent requirements, with adequate safeguards of the public health and safety be established").

Second, Plaintiffs' arguments attempt to create a conflict where none exists.  Defendants do not argue that there can be no regulation of RF emitting devices to protect individuals with purported disabilities.  Rather, the method for such regulation is through the FCC.  The TCA (passed later in time than the ADA) mandates that the FCC take adequate measures to protect human health, which includes individuals with disabilities.  See id. (indicating Congress contemplated that FCC's RF standards would "contain adequate, appropriate and necessary levels of protection to the public.")  Thus, it is the FCC's, not a district court's, job to make such determinations about RF safety.  See Firstenberg v. City of Santa Fe, N.M., 782 F. Supp. 2d 1262, 1271-3 (D.N.M. 2011) ("[T]he broad language of the ADA prohibiting discrimination against the disabled cannot override the specific terms of the TCA with regard to regulating RFEs."), rev'd on other grounds, 696 F.3d 1018 (10th Cir. 2012).

Third, Defendants are not aware of any cases (and Plaintiffs have failed to cite a single instance) where a court has forced an entity to lower RF emissions from a FCC-compliant device.  To the contrary, every court that has addressed this issue has held that such requests are beyond the scope of judicial review and are within the provenance of the FCC.  See U.S. v. Dunifer, 219 F.3d 1004, 1007 (9th Cir. 2000) (finding district court lacked jurisdiction to adjudicate defendant's affirmative defenses which essentially challenged FCC rules); AHM v. Portland Public Schools, No. 11-cv-00739-MO, *Transcript of Proceedings* (D. Or. July 20, 2012) (attached at Exhibit A to Defendants' SJ Motion) (dismissing claims based on RF exposure from school's Wi-Fi because "very core" of trial would be about whether FCC is correct about safe

levels of RF).[7]

###### 3.     This Court Should Decline to Exercise Jurisdiction Because The Main Issue Is Whether A FCC-Compliant RF Emitting Device Can Cause Physical Symptoms, Which Is Squarely Within The FCC's Exclusive Jurisdiction

Plaintiffs argue that this Court should disregard the FCC's congressional mandate to establish safe operating standards for RF emitting devices because the FCC does not have jurisdiction over a determination of what constitutes a "disability" under the ADA.  See Opp. at 26-28.  Plaintiffs' argument is superficial, at best.

To support their argument, Plaintiffs attempt (but fail) to distinguish the holding in Comm. of Mass. v. Blackstone Valley Elec. Co., 67 F.3d 981 (1st Cir. 1995), which found that the dispute should be dismissed and referred to the EPA because the case turned on a determination of whether the term "cyanide" was on the EPA's hazardous substances list.  See Opp. at 26.  Plaintiffs argue that, unlike the EPA's jurisdiction over the term "cyanide" in the Blackstone Valley Elec. case, in the instant matter, the FCC does not have jurisdiction over the term "disability," and therefore should not have any role in the outcome of this matter.  Id. Plaintiffs, however, are wrong in their conclusion that the instant matter turns on the definition of "disability" under the ADA.  Rather, the instant matter turns on the **cause** of G's disability, which Plaintiffs claim is the result of RF exposure from a FCC-compliant device (i.e., the School's Wi-Fi).  There is no dispute that Congress vested in the FCC an exclusive mandate to establish safe operating standards for RF emitting devices.  TCA of 1996, Pub. L. No. 104–104,

---

[7] See also Firstenberg v. Monribot, 2015-NMCA-062, 350 P.3d 1205, 1216 (dismissing claims based on alleged injury caused by RF emissions from cell phones as claims preempted because claims would require jury to find "that FCC's regulations are inadequate to ensure the safe use of cell phones"), cert. denied, 2015-NMCERT-006, 367 P.3d 850; Farina v. Nokia Inc., 625 F.3d 97, 133-34 (3d Cir. 2010) (dismissing plaintiff's cell phone product liability claim where underlying product complied with FCC's regulation of RF emissions), cert. denied, 132 S. Ct. 365 (2011); Murray v. Motorola, Inc., 982 A.2d 764, 778-79 (D.C. 2009) (holding state law claims based on non-thermal emissions were preempted by federal law because FCC has authority to regulate such emissions); Stanley v. Amalithone Realty, Inc., 940 N.Y.S.2d 65, 70 (N.Y. App. Div. 2012) (holding plaintiffs' claims preempted because "all of plaintiffs' claims are premised on the notion that the RF emissions … are unsafe or dangerous.").

§ 704(b), 110 Stat. 56 (1996); see also Cellular Phone Taskforce, 205 F.3d at 96 (stating Congress gave FCC exclusive jurisdiction to place restrictions on wireless networks based on effects of RF radiation).  Thus, as the very core of Plaintiffs' claims calls into question the validity of the FCC's Safety Limit, this case lies solely within the jurisdiction of the FCC.[8]

Furthermore, if Plaintiffs prevail in this case, it will set a precedent that would allow anyone claiming to suffer harm from a FCC-compliant RF emitting device to supersede federal regulations governing the use of Wi-Fi.  See Farina, 625 F.3d at 125-26 ("Were the FCC's standards to constitute only a regulatory floor upon which state law can build, juries could re-balance the FCC's statutory objectives and inhibit the provision of quality nationwide [wireless] service.").  This would open the floodgates to a patchwork scheme of regulation wherein individual claimants dictate the appropriate safety level for RF emissions, instead of the FCC. This is exactly (and expressly) the situation that Congress sought to avoid when empowering the FCC with the sole authority to review such claims.  See H.R. REP. NO. 104-204(I), at 95 (Congress stating "high quality national wireless telecommunications network cannot exist if each of its component[s] must meet different RF standards in each community.").  Tellingly, Plaintiffs do not even attempt to distinguish the Ninth Circuit's decision in Dunifer, 219 F.3d at 1007, which ruled that any claims essentially challenging FCC rules are within the FCC's exclusive jurisdiction, or the Oregon Federal District Court's decision in Portland Public Schools (attached at Exhibit A to Defendants' SJ Motion), which dismissed claims that raised safety concerns of RF exposure from a school's Wi-Fi because the "very core" of any trial of the dispute would be about whether the FCC's decision is correct that RF levels below the Safety Limit are not harmful.  As a result, Plaintiffs' claims must likewise fail as such determinations

---

[8] The fact that the FCC has not intervened in this matter is of no consequence.  The FCC is currently evaluating its standards for safe exposure to RF emissions (see Exhibit B), so it should be allowed to complete its rule-making procedures before this (or any) court authorizes a patchwork system of regulation based on individual complaints.

are within the sole jurisdiction of the FCC.

**B.** **Plaintiffs Cannot Demonstrate Any Causal Connection Between The School's Wi-Fi And G's Physical Symptoms**

**1.** **Circumstantial Evidence Cannot Prove Causation**

Plaintiffs' lead argument regarding causation is a confusing attempt at misdirection, but does not raise any disputed issue of fact that would preclude entry of summary judgment in favor of Defendants. Plaintiffs argue that they do not need expert evidence to establish causation, because a "rational juror" could conclude that "circumstantial evidence" is sufficient for a finding of causation. See Opp. at 28-30. Simply put, this is a bold misstatement of the law. Circumstantial evidence cannot form the basis for raising a question of fact on the issue of causation for a medical diagnosis, which must be established by expert testimony. Milward v. Rust-Oleum Corp., 820 F.3d 469, 476-77 (1st Cir. 2016).

The cases cited by Plaintiffs to support their position are wholly inapposite. See Opp. at 28. The Ninth Circuit's Head v. Glacier Nw., Inc. decision, quoted by Plaintiffs, states that circumstantial evidence can be used to create a factual dispute at the summary judgment stage "*regarding the impairment of a major life activity*." 413 F.3d 1053, 1058 (9th Cir. 2005) (emphasis added). Defendants' SJ Motion, however, is not based on whether G's affliction results in an impairment of a major life activity.[9] Rather, Defendants argue (and Plaintiffs cannot dispute) that there is insufficient evidence demonstrating a connection between the **cause** of G's physical symptoms and the School's Wi-Fi. See Infra I(B)(2). As circumstantial evidence cannot be used to prove causation for the purposes of a medical diagnosis, Plaintiffs' argument should be rejected. See Milward, 820 F.3d at 476 (holding expert testimony is required to establish both general and specific causation for a medical condition).

---

[9] Should this matter proceed to trial, Defendants expressly reserve their right to challenge whether G is, in fact, disabled within the meaning of the ADA.

## 2.    Plaintiffs' Expert Testimony Fails to Establish Causation

As detailed in Defendants' Motion to Exclude Plaintiffs' Expert Witnesses (see ECF Nos. 58, 59), Plaintiffs have failed to prove causation through accepted scientific principles or opinions.  Even if Plaintiffs' experts were allowed to testify, the undisputed facts demonstrate that there is no scientific evidence demonstrating a link between low-level RF exposure from Wi-Fi and the physical symptoms experienced by G (*i.e.*, headaches, etc.).  In fact, Plaintiffs' own experts, over the course of several days of *Daubert* hearings, conceded as much.

For example, Plaintiffs' purported expert on general causation, Dr. David Carpenter ("Dr. Carpenter"), relies upon a number of studies to support his opinion that Wi-Fi can cause physical symptoms like the ones experienced by G.  At the recent *Daubert* hearings, however, Dr. Carpenter admitted that **only one** of the studies he cites involved Wi-Fi, and significantly, that study **did not** find that Wi-Fi can cause physical symptoms.  See Day 7 of the *Daubert* hearing testimony (relevant portions of which are attached hereto at Exhibit D) at 7-86 – 7-87, 7-111 – 7-112).  Dr. Carpenter also admitted that only two of the studies he relies upon showed any physical symptoms, and significantly neither of those studies involved Wi-Fi.  Id. at 7-75, 7-112. In other words, **not a single study** relied upon by Dr. Carpenter showed that Wi-Fi can cause physical symptoms like those claimed by G.[10]  As a result, none of the evidence presented at the *Daubert* hearings supports a finding of general causation in this case.

With respect to specific causation, Plaintiffs' purported expert, Dr. Jeanne Hubbuch ("Dr.

_____

[10] Dr. Carpenter also "cherry-picked" his citations.  He admitted to either negating or excluding from his consideration sixteen (16) other studies, which are cited by Defendants' expert, Dr. Stacy Eltiti, demonstrating that low-level RF exposure cannot cause physical symptoms like those claimed by G.  Id. at 7-65 – 7-66; 7-131 – 7-132. Likewise, Dr. Carpenter ignored nineteen (19) expert reviews performed by governmental agencies and eight (8) reviews and meta-analysis conducted by RF professionals, which were cited by Defendants' expert, Dr. Kenneth Foster, all of which concluded that there was no evidence to support a finding that low-level RF can cause physical symptoms.  Id. at 7-114 – 7-115; 7-131 – 7-132.

Hubbuch"),[11] admitted at the *Daubert* hearings that she did not rely upon a single scientific study to support her opinion, and she did not even consider whether G developed (or failed to develop) symptoms at other locations where Wi-Fi was present.  See Day 3 of the *Daubert* hearing testimony (relevant portions of which are attached hereto at Exhibit E) at 3-189 – 3-195, 3-199.  Dr. Hubbuch also never went to the School, never considered the RF levels at the School, never asked G about his Wi-Fi usage, never knew about a head injury G suffered, and did not rule out other possible causes of G's symptoms.  Id. at 3-166, 3-171 – 3-172, 3-205 – 3-206.  In addition, Dr. Hubbuch conceded that her opinion was in direct contradiction to the opinions of six other doctors who had seen G, none of whom found that G's symptoms were related to the School's Wi-Fi.  Id. at 3-152 – 3-153.  As a result, Dr. Hubbuch failed to offer any proof that G's symptoms were caused by the School's Wi-Fi.

Finally, contrary to Plaintiffs' characterizations, this case is not a simple matter of labeling Plaintiffs' experts as being on the "fringe" of science.  Indeed, Defendants have never asserted that low-level RF exposure has no biological effects, as Plaintiffs contend.  See Opp. at 37, n. 17.  But this case (and G's entitlement to an accommodation) is not about whether there are any biological effects of RF exposure.  Rather, Defendants' persuasive argument is that there is no evidence, and no scientific support, that Wi-Fi exposure at the School caused G's physical symptoms (such as headaches).  As detailed above, Plaintiffs' experts have conceded that there is not a single scientific study demonstrating such a causal connection.  Plaintiffs have the burden of demonstrating both general and specific causation, and are required to do so through expert testimony supported by scientific evidence.  See Firstenberg, 350 P.3d at 1212 (stating plaintiff

---

[11] While Plaintiffs initially produced an expert report of a second specific causation expert, Dr. Martha Herbert ("Dr. Herbert"), Plaintiffs failed to have Dr. Herbert testify at the *Daubert* hearings, and thereby failed to meet their burden that Dr. Herbert is qualified to testify in this matter.  As Dr. Hubbuch's testimony is the only alleged "proof" that Plaintiffs have regarding specific causation, this Reply will only address Dr. Hubbuch's testimony.

seeking "to establish injury as a result of exposure to a harmful substance, including radiation, …

is required to prove both general and specific causation.").  Their inability to prove either form of

causation ends this inquiry, and renders summary judgment appropriate in favor of Defendants.

> **C.**   **There is No Dispute That The School Actually Provided Plaintiffs With The Requested Accommodations**
>
> > **1.**   **The Undisputed Facts Demonstrate That Plaintiffs Were Provided With Reasonable Accommodations Despite Plaintiffs' Failure To Provide The Requested Medical Information**

Plaintiffs do not dispute that the School actually provided numerous accommodations to

G.  Instead, Plaintiffs argue that Defendants did not act quickly enough (waiting until after a

lawsuit was filed before agreeing to make changes), and that Defendants failed to try *everything*

that was proposed.  See Opp. at 38-40.  Curiously, Plaintiffs misstate Defendants' obligations

within the same paragraph that they concede that they are only entitled to a reasonable

accommodation (and "not to any accommodation they might want").  See Opp. at 38.  Of course,

Defendants are not required to "try everything proposed."  See Quintiliani v. Mass. Bay Transp.

Auth., No. 98-11085-RGS, 2000 WL 1801841, at *6 (D. Mass. Nov. 29, 2000) (finding

defendants are not required "to choose the best accommodation available or the accommodation

that the [plaintiff] prefers . . ."); Bryant v. Caritas Norwood Hosp., 345 F. Supp. 2d 155, 169 (D.

Mass. 2004) (holding ADA requires a reasonable accommodation, not necessarily

accommodation sought).

Plaintiffs also conveniently ignore that their protestations are belied by their own actions.

The following undisputed facts (which Plaintiffs either admitted or failed to dispute)

unequivocally establish that Plaintiffs failed to provide sufficient medical documentation

establishing G's need for an accommodation (and, in fact, have yet to do so)[12], and that despite

---

[12] The law clearly allowed the School to seek additional medical documentation regarding G's purported disability,

such failure by Plaintiffs, Defendants still provided G with accommodations that actually

reduced his RF exposure:

- The School met with the Parents in May 2014 to listen to their concerns about the School's Wi-Fi.  At the time, the Parents did not provide any medical documentation, from a medical provider who had evaluated G, to support their concerns.  See COF at ECF No. 120 at ¶¶ 29, 30, 32; see also Day 2 Deposition Transcript of Mother (relevant portions of which are attached hereto at Exhibit F) at 407.[13]

- On August 7, 2014, without having actually evaluated G, Dr. Hubbuch sent a letter to the School indicating that G was being adversely affected by the School's Wi-Fi.  Thus, as of August 2014, the Parents did not have any medical documentation from a medical provider who had evaluated G to support their concerns about the School's Wi-Fi.  See COF at ¶¶ 49-50; see also Exhibit F at 398, 407, 51-52.

- On at least seven occasions between August 28, 2014 and April 22, 2015, the School sent the Parents written requests for additional medical documentation concerning G's alleged condition and any request for an accommodation, including requests regarding the nature of G's medical condition, functional limitations caused by G's medical condition, and an explanation as to what accommodations were being requested.  The School made it clear in its requests that it would need this medical documentation before it could evaluate which accommodations to provide.  See COF at ¶¶ 52, 69, 70.

- In December 2014, the School hired Isotrope LLC, at the Parents' suggestion, to conduct an RF Compliance Survey at the School.  The Survey found the School's Wi-Fi complied with the FCC's Safety Limit.  See COF at ¶¶ 72-76.

- On March 31 and April 15, 2015, Dr. Hubbuch wrote letters to the School stating that G had EHS, and one letter stated that he "should be accommodated in a reduced environment."  This was the first time the Parents provided any medical documentation stating G had EHS, from a medical provider who had met and evaluated G.  See COF at ¶¶ 103-104; see also Exhibit F at 423, 70-73.

- None of the letters that Dr. Hubbuch sent to the School stated what specific accommodations (other than "a reduced environment") Plaintiffs were seeking

---

including requesting that G submit to additional medical evaluations.  See Guckenberger v. Boston Univ., 974 F. Supp. 106, 135 (D. Mass. 1997) ("The ADA permits a [school] to require a student requesting a reasonable accommodation to provide current documentation from a qualified professional concerning his [ ] disability.")

[13] The conclusion of Mother's deposition was held on September 23, 2016, several weeks after Defendants filed their summary judgment motion.  As this testimony was not available at the time of the filing of Defendants' SJ Motion, and the testimony clarified many of the undisputed, material facts in this case, Defendants are attaching hereto Mother's relevant testimony from that deposition.

from the School.  See Dr. Hubbuch's three letters attached to the SOF (ECF No. 97) at Exhibits 22, 43, and 44.

- G underwent a two-part independent medical evaluation ("IME") that failed to yield a diagnosis of EHS.  See COF at ¶¶ 109, 111-14, 116, 119; see also Exhibit F at 425-429, 431.

- Despite the findings of the IME, the School allowed the Parents to complete four walk-throughs of the School, which took place on August 31, 2015, September 24, 2015, October 7, 2015, and October 21, 2015.  See COF at ¶¶ 129, 134, 137, 140; see also Exhibit F at 429.

- The School developed a proposal to reduce G's exposure to RF.  This proposal involved the School installing Ethernet ports in each of G's classrooms (near where G would be seated), along with other equipment, so that G could connect his laptop to the internet via a data cable, and then seating all other students using laptops connected to the Wi-Fi at least six feet away from G (the "6-foot proposal").  See COF at ¶¶ 133, 135, 141; see also Exhibit F at 75-77.

- In October 2015, the School implemented the 6-foot proposal.  See COF at ¶¶ 133, 135, 141; see also Exhibit F at 75-77.

- The 6-foot proposal actually reduced G's RF exposure.  See COF at ¶¶ 143, 145; see also Exhibit F at 343-344, 356, 390.  This satisfied the only accommodation requested by any medical professional (i.e., Dr. Hubbuch's request that the School create a "reduced environment").

- In response to concerns raised by the Parents regarding G's Math and Latin classrooms, and still without any medical certification concerning an accommodation, the School agreed to move those two classes to a bigger classroom, in an attempt to further reduce G's RF exposure (the "8-foot proposal").  The Parents agreed and the 8-foot proposal was implemented on November 11, 2015.  See COF at ¶¶ 143, 144.

- In response to a request by the Parents, the School allowed G to take a leave of absence from school starting on December 1, 2015.  The School allowed this request even though the Parents did not have a doctor's note indicating G needed to take such a leave and the Parents had not had G evaluated by a doctor since the day of the second IME (i.e., September 10, 2015).  See COF at ¶¶ 149, 150; see also Exhibit F at 436-439.

- The School made the above accommodations despite the fact that all RF readings taken at the School have confirmed that the RF levels at the School are in compliance with the FCC's Safety Limit.  See COF at ¶¶ 76, 78-80.

Despite Plaintiffs' complaints that the School has not done enough, and their constant

requests for more, the School provided the numerous accommodations described above, notwithstanding Plaintiffs' lack of medical documentation or proof that the RF levels from the Wi-Fi were at all harmful.  Significantly, the School provided the only accommodation requested by G's medical doctor (a "reduced environment"), and thereby satisfied its obligations under the ADA as a matter of law.  See Darian v. Univ. of Mass. Boston, 980 F. Supp. 77, 88 (D. Mass. 1997) (denying students' additional requests for accommodations after having been granted a reasonable accommodation).

**2. The Undisputed Facts Demonstrate That The Accommodation That Plaintiffs Are Now Seeking Is Unreasonable**

In their Opposition, Plaintiffs try to claim that their accommodation request never involved removing Wi-Fi from the School.  See Opp. at 2.  At her recent deposition, however, Mother described the accommodation she is now seeking for G as follows:

- "Providing one of several classrooms that could be workably arranged for this purpose **to be completely Wi-Fi-free** so that G and his fifteen or so classmates could take all of their classes in that classroom using Ethernet cable instead of WiFi to access the internet would probably be the best approach, and that's what I think we've asked for."  See Exhibit F at 358-59 (emphasis added).

- "**To eliminate it [RF exposure]** by using hardwired connections in the classroom like we proposed….  For the class, for the entire class like we proposed."  Id. at 84 (emphasis added).

- "A classroom that has **no wireless** in proximity to him….  From all radiating sources."  Id. at 86 (emphasis added).

- "We want a classroom for him that is **free of wireless** frequencies that are provoking his symptoms."  Id. at 86 (emphasis added).

- "I would be looking for little to **no Wi-Fi exposure** in the room."  Id. at 87 (emphasis added).

Thus, Mother made it clear that the accommodation Plaintiffs seek is for the School to **remove all Wi-Fi** in an area of the School, so that G is not subject to any RF exposure while he

15

is at the School.  See id. at 358-59, 84-87.  As more fully detailed in Defendants' SJ Motion

(ECF No. 96 at 25-28), Plaintiffs' requests to remove the School's Wi-Fi in G's classes would

fundamentally (and detrimentally) alter how teachers at the School provide instruction to their

students, how students interact with technology in the educational setting, and the manner in

which the School's curriculum is delivered to all students at the School.[14]  As a result, Plaintiffs'

additional accommodation requests are not reasonable.  See Bercovitch v. Baldwin Sch., Inc.,

133 F.3d 141, 152-53 (1st Cir. 1998) (finding requested accommodation was not reasonable

where it would alter fundamental requirement of school's academic program).

**D.**     **There Is No Factual Support For Plaintiffs' Retaliation Claim As Plaintiffs Do Not Dispute The School's Legitimate, Non-Retaliatory Reasons For Its Actions**

The entirety of Plaintiffs' argument concerning their retaliation claim rests solely on the

notion that they were acting in "good faith" when they sought an accommodation for G.  See

Opp. at 40-41.  Plaintiffs do not, however, dispute that every action taken by Defendants was for

a legitimate, non-discriminatory purpose.  Defendants submit that Plaintiffs were not acting in

good faith, *but even if they were*, their retaliation claim still fails because Defendants did not

unlawfully retaliate against Plaintiffs.  See Defendants' SJ Motion at 29-37.

Throughout their Opposition, Plaintiffs go to great lengths to paint an unsavory picture of

the School, its administrators, and its employees.  They reference emails and conversations in

which, in Plaintiffs' opinion, they were being treated poorly or given an "awful" response from

the School.  But Plaintiffs' subjective opinion does not establish retaliation.  See Boutin v. Home

Depot U.S.A., Inc., 490 F. Supp. 2d 98, 106 (D. Mass. 2007) (entering summary judgment in

---

[14]  Contrary to Plaintiffs' argument, there was nothing improper by Defendants' inclusion of Paul Abeln's Affidavit to support these undisputed facts.  Mr. Abeln is a teacher and department head at the School providing testimony about how teachers use technology in their classrooms.  In other words, he is a lay witness testifying about matters within his personal experience, which is clearly permissible.  See Fed. R. Civ. P. 701(a).  In addition, a review of Mr. Abeln's affidavit and his deposition testimony fails to reveal any contradictory testimony.  His affidavit can, and should, be considered by this Court.

favor of defendant on ADA retaliation claim and finding that "[p]ersonality conflicts and 'snubbing'" by defendants do not constitute actionable conduct).[15]  Further, Plaintiffs fail to offer any evidence, or even dispute, that the actions taken by Defendants were for legitimate, non-discriminatory purposes.  Accordingly, summary judgment should enter in favor of Defendants on the retaliation claim.

### E.    There Is No Factual Support For Plaintiffs' Common Law Claims

#### 1.    Plaintiffs Failed to Cite Any Handbook Provisions That Are Contractual

Plaintiffs assert that their breach of contract claim survives because the quoted provisions of the School's Parent and Student Handbook (the "Handbook") create a "reasonable expectation of Plaintiffs based on those promises."  Opp. at 41-43.  But Plaintiffs cannot create a factual dispute out of whole cloth.  Whatever Plaintiffs' expectations, none of the language cited in the Handbook creates any of the obligations Plaintiffs ascribe to it.

First, the quoted Handbook language is "aspirational" in nature.  Indeed, Plaintiffs do not even point to a specific provision that they contend the School breached.  Instead, the entirety of their Opposition is rooted in an expression of disappointment with the actions of the School because they did not feel that the School was forthcoming enough.  None of the quoted Handbook language creates a legal, contractual obligation of "forthcomingness," and no hopeful expression of their subjective "expectation" creates a contract where none exists.  See Morris v. Brandeis Univ., 60 Mass. App. Ct. 1119, at *3, n. 6 (2004) (finding general, aspirational

---

[15] Defendants additionally move to strike Plaintiffs' argumentative responses in their COF.  Specifically, **after** admitting to the facts alleged by Defendants, Plaintiffs include additional "facts" and argument that are not responsive to the fact alleged, or otherwise unsupported.  See COF ¶¶ 2-4, 12, 14-16, 18, 21, 24, 28-30, 33-35, 37, 39-44, 48, 50, 52-53, 56-61, 63-66, 68-69, 72, 77-84, 86-88, 90-91, 94-95, 97, 99, 100, 104-06, 111-12, 116-20, 122-31, 137-42, 145-47, 152, 156, 158-61, 166-68.  Plaintiffs cannot rely on such "conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative" to defeat summary judgment.  Rogan v. City of Boston, 267 F.3d 24, 27 (1st Cir. 2001).  Accordingly, Defendants move to strike Plaintiffs' additional facts and argument that are not responsive to the fact alleged in the aforementioned paragraphs of Plaintiffs' COF.

language is not enforceable as a contract because it is not a definite or certain promise).

Second, none of the quoted Handbook language imposes an obligation on Defendants greater than their obligation to provide a reasonable accommodation under the ADA.  There is nothing in the Handbook that promises that the School will provide any accommodation requested.  And despite Plaintiffs' desire that things may have been handled differently, they do not point to a single contractual provision that was actually breached by Defendants.

Finally, to the extent that this language imposes a contractual obligation on the School (which it does not), none of this language otherwise relieves Plaintiffs from their obligations to provide adequate medical documentation that would allow the School to properly evaluate an accommodation request.  Stated another way, if the Handbook is a contract and Defendants are obligated to provide a reasonable accommodation, then Plaintiffs' contract claim fails because they interfered with Defendants' ability to perform under the contract by failing to provide the requisite medical certifications demonstrating their entitlement to relief.

### 2.    Plaintiffs' Misrepresentation Claim Is Not Based On A Statement Of Fact

Plaintiffs' misrepresentation claim continues to make no sense, as they argue out of both sides of their mouths.  On the one hand, Plaintiffs argue that the Handbook is an enforceable contract that forms the basis for their breach of contract claim.  But on the other (only a page later), Plaintiffs argue that the Handbook is not a contract, and the misrepresentation claim survives.  Regardless, Plaintiffs have not offered any evidence that:  (a) the quoted Handbook language contains false statements of fact; (b) Plaintiffs relied on any of those statements in taking the actions that they did; or (c) Plaintiffs incurred damages as a result of such reliance.

Plaintiffs weave a fanciful argument based on a disclaimer that the School included in its 2015/2016 Handbook stating that the Handbook was not a contract.  Plaintiffs then elevate this

disclaimer to prove that all of the statements made in the School Handbook were knowingly false when made.  See Opp. at 44.  This is nonsense.[16]  Plaintiffs, once again, ignore the critical concept of timing.  The disclaimer appears in a Handbook for the 2015/2016 academic year, the term after Plaintiffs brought their lawsuit.  It is simply absurd for Plaintiffs to assert reliance on a document as the basis for their misrepresentation claim that was created after Plaintiffs asserted their misrepresentation claim.  Further, as stated above, the language quoted in the Handbook is merely aspirational in nature, and none of it a concrete statement of fact, so the language cannot constitute a statement of fact, and as such, cannot form the basis for a misrepresentation claim.  See Orton v. Parametric Tech. Corp., 344 F. Supp. 2d 290, 301 (D. Mass. 2004) (stating statements that are vague, optimistic, and "kind of general, 'rosy affirmation'" cannot reasonably be relied upon); see also Samia Companies LLC v. MRI Software LLC, 898 F. Supp. 2d 326, 343-44 (D. Mass. 2012) (dismissing misrepresentation claim where only alleged promise was stated in parties' written agreement).

### 3.      Plaintiffs Failed To Raise An Issue Of Fact To Save Their Negligence Claim

Plaintiffs' negligence claim continues to be an improper attempt at asserting a claim based on an injury allegedly caused by an RF emitting device that is fully compliant with the FCC standards governing RF emissions.  While conceding that the School's Wi-Fi is FCC compliant (see Opp. at 16-17), Plaintiffs argue that Defendants "ignored the harm being caused by its Wi-Fi," which would allow a reasonable juror to find that it was negligent.  See id. at 45.  Such an argument is precisely why Plaintiffs' negligence claim fails as a matter of law.  Courts have consistently held that the installation and use of devices that comply with FCC standards

---

[16]  The "blog comments" do not support Plaintiffs' contention.  The comments are hearsay and should be stricken from the record.  Further, the comments were not made by Defendants.  There is no evidence that Defendants saw or read those comments, or included the disclaimer language based on the blog comments.  Plaintiffs cannot attribute those blog post comments to Defendants in an effort to create a factual dispute.

**cannot** form the basis of an injury claim, and such claims are preempted by federal law.  <u>See</u>

<u>Farina</u>, 625 F.3d at 133-134 (dismissing plaintiffs' cell phone tort claim where underlying device

complied with FCC's regulation of RF emissions); <u>Firstenberg</u>, 350 P.3d at 1216 (dismissing

claims based on alleged injury caused by RF emissions).  Defendants are not aware of a single

case in which a court allowed a personal injury claim to proceed on this basis, and Plaintiffs have

cited none.  Accordingly, Plaintiffs' negligence claim fails as a matter of law.

    F.    **<u>Plaintiffs Offer No Argument To Refute Entry of Summary Judgment</u>**
            **<u>Dismissing All Claims Individually Against Defendant Gustavson</u>**

       Plaintiffs apparently concede that Defendant Gustavson is not individually liable for the

contract claim.  <u>See</u> Opp. at 45 ("Individual defendant Gustavson, while not a party to the

Fay/Plaintiffs contract claim, is subject to any injunction . . . .").  Further, Plaintiffs fail to offer

any disputed facts (let alone any semblance of an argument) that would allow any claims against

Defendant Gustavson to survive.  As there is absolutely no evidence that Gustavson benefited, in

any way, from the acts of the School, he should be dismissed as a party.  <u>See</u> <u>Jones v. Experian</u>

<u>Info. Solutions, Inc.</u>, 141 F. Supp. 3d 159, 162 (D. Mass. 2015) (stating corporate officer is not

liable unless "he or she has personally participated in, **and** benefited from, an illegal act")

(emphasis added).

**II.**    **<u>CONCLUSION</u>**

       Summary judgment must enter for Defendants on all counts because:  (a) the FCC, not

this Court, has exclusive jurisdiction over the instant matter; (b) Plaintiffs cannot establish the

School's Wi-Fi caused G's symptoms; (c) Defendants took reasonable steps to accommodate G's

purported condition; and (d) the undisputed facts do not support Plaintiffs' claims.  Accordingly,

Defendants respectfully request that this Court grant their Motion for Summary Judgment.

Respectfully submitted by,

Defendants,
THE FAY SCHOOL, INC. and ROBERT J.
GUSTAVSON, JR.,

By their attorneys,

/s/ Jaimie A. McKean
Sara Goldsmith Schwartz (BBO No. 558972)
Jaimie A. McKean (BBO No. 657872)
Brian M. Doyle (BBO No. 680704)
Sarah H. Fay (BBO No. 690660)
SCHWARTZ HANNUM PC
11 Chestnut Street
Andover, MA 01810
Phone: (978) 623-0900
Fax:  (978) 623-0908
schwartz@shpclaw.com
jmckean@shpclaw.com
bdoyle@shpclaw.com
sfay@shpclaw.com

Date:   October 7, 2016

## CERTIFICATE OF SERVICE

I, Jaimie A. McKean, hereby certify that on the 7th day of October, 2016, the foregoing

document was filed through the ECF system and will be sent electronically to the registered

participants as identified on the Notice of Electronic Filing (NEF).

John J.E. Markham, II
Markham & Read
One Commercial Wharf West
Boston, MA 02110

/s/ Jaimie A. McKean