# EXHIBIT E

3-1

```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS


G., a 12-year-old minor      )
suing by a fictitious name   )
for privacy reasons.  Mother )
and Father suing under       )
fictitious names to protect  )
the identity and privacy     )
of G., their minor child,    )
              Plaintiffs,    )
                             )
                             )
vs.                          )    Case No. 15cv40116-TSH
                             )
                             )
The Fay School, by and       )
through its Board of         )
Trustees, and Robert         )
Gustavson,                   )
              Defendants.    )


BEFORE:  The Honorable Timothy S. Hillman


                    Daubert Motion Hearing
                           Day 3


                            United States District Court
                            Courtroom No. 2
                            595 Main Street
                            Worcester, Massachusetts
                            July 28, 2016


              Marianne Kusa-Ryll, RDR, CRR
                 Official Court Reporter
              United States District Court
               595 Main Street, Room 514A
                Worcester, MA 01608-2093
            508-929-3399 justicehill@aol.com
         Mechanical Steno - Transcript by Computer
```

3-2

```
 1    APPEARANCES:

 2    Markham & Read
      John J.E. Markham, II, Esquire
 3    Bridget A. Zerner, Esquire
      One Commercial Wharf West
 4    Boston, Massachusetts 02110
      on behalf of the Plaintiffs
 5
      Schwartz Hannum, P.C.
 6    Jaimie A. McKean, Esquire
      Brian Michael Doyle, Esquire
 7    11 Chestnut Street
      Andover, Massachusetts 01810
 8    on behalf of the Defendants

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# I N D E X

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Jeanne Hubbuch, M.D. | | | | |
| By Mr. Markham | 6 | | | |
| By Ms. McKean | | 104 | | |
| By Mr. Markham | | | 212 | |
| By Ms. McKean | | | | 221 |

3-152

```
              1    Q.    Did you know by the time you rendered the opinion in this
              2    case, meaning your expert report, that Dr. Dinakar had
              3    evaluated G in December of 2014 and had not diagnosed him with
              4    EHS?
02:07:07PM    5    A.    Yes.
              6    Q.    But you don't mention that in your expert report; correct?
              7    A.    Correct.
              8    Q.    Is that because that's not -- that was not an important
              9    factor in your expert opinion?
02:07:15PM   10    A.    I was giving my expert opinion.  I wasn't giving everybody
             11    else's opinion.
             12    Q.    Do you know how many doctors who have evaluated G have not
             13    found that he has EHS?
             14    A.    I know that there's one other doctor who has found that he
02:07:34PM   15    has EHS.
             16    Q.    Is that Dr. Herbert?
             17    A.    Yes, it is.
             18    Q.    Do you know if six other doctors evaluated G and did not
             19    find that he had EHS?
02:07:42PM   20    A.    Yes, I do know that, and as we have gone over many times,
             21    it is a diagnosis that is not well understood in the medical
             22    profession, and if you don't have additional training about it,
             23    you won't consider it.
             24    Q.    You don't mention those six other diagnoses in your expert
02:08:00PM   25    report; correct?
```

1    A.    Correct.

2    Q.    And is that because you didn't think the fact that six

3    other doctors evaluated G and did not diagnose him with EHS was

4    an important factor in your diagnosis of G?

02:08:12PM 5    A.    What -- what I put as an opinion in my expert opinion was

6    my opinion.  I also didn't include that Dr. Herbert thought

7    that he had it.  I just gave my opinion of what I thought was

8    going on.

9    Q.    But it's fair to say that you did not consider the fact

02:08:30PM 10   that these six other doctors had not found EHS to be an

11   important fact in rendering your opinion in this case?

12   A.    No, I would say that's not a fair thing to say.  I did

13   consider it.  I disagreed with them.

14   Q.    You didn't think it was important that they had not

02:08:45PM 15   diagnosed him with EHS?

16           MR. MARKHAM:  Objection, your Honor.  Asked and

17   answered.

18           THE COURT:  Overruled.  You may answer that.

19   BY MS. McKEAN:

02:08:52PM 20   Q.    Just so we're clear, Doctor.  The question is you did not

21   think it was important that these six other doctors had not

22   diagnosed G with EHS?

23   A.    It would not change my opinion.

24   Q.    You list in your expert report some tests you ran; right?

02:09:12PM 25   A.    Yes.

```
             1    A.    That's right.
             2    Q.    And in this note, you're noting that the fact that the
             3    symptoms are more prevalent; correct?
             4    A.    Correct.
02:25:47PM   5    Q.    Now, G actually had a sledding accident in between the
             6    time of your first visit and this phone call; correct?
             7    A.    Correct.
             8    Q.    And until the day of your deposition, you had no knowledge
             9    about that head injury; right?
02:26:03PM  10    A.    Right.
            11    Q.    So when you prepared your expert report in this case, you
            12    never considered whether that head injury could have caused
            13    this increase in symptoms?
            14    A.    That's correct.  I didn't know about it.
02:26:16PM  15    Q.    Have you ever heard of "testing in the dark"; Doctor?
            16    A.    No.
            17    Q.    You never heard anyone use that term?
            18    A.    No.
            19    Q.    Now, in your report, back to your report, which is
02:26:41PM  20    Exhibit 2.
            21    A.    What page are we on?
            22    Q.    On page 2.  You -- are you there, Doctor?  I'm sorry.
            23    A.    I'm not sure which tab I'm under.
            24    Q.    It's not a tab, it's Exhibit 2.
02:27:06PM  25    A.    Exhibit 2.  Okay.  Excuse me a minute.
```

3-171

|  |  |  |
|---|---|---|
| | 1 | A. I read some of it, not all of it. |
| | 2 | Q. Did you read G's deposition testimony? |
| | 3 | A. No. |
| | 4 | Q. Did you read Dr. Boyer's testimony? |
| 02:32:21PM | 5 | A. I did. |
| | 6 | Q. Did you read any other depositions? |
| | 7 | A. Not that I'm recalling at the moment. |
| | 8 | Q. When you met with G, you did not ask him if he thought |
| | 9 | WI-FI at Fay School was causing his symptoms; correct? |
| 02:32:40PM | 10 | A. Correct. |
| | 11 | Q. Because the mother asked you not to; right? |
| | 12 | A. That's right. And he wasn't really -- he hadn't been told |
| | 13 | there was even a possibility. |
| | 14 | Q. Now, did there ever come a point where you were ever able |
| 02:32:55PM | 15 | to ask G about that fact? |
| | 16 | A. No. |
| | 17 | Q. So you were not able to ask him about his WI-FI usage; |
| | 18 | right? |
| | 19 | A. I know that he used WI-FI usage -- well, he -- from my |
| 02:33:08PM | 20 | understanding, he only used the WI-FI primarily at school; |
| | 21 | otherwise, he had an Ethernet cable when he was on the |
| | 22 | computer. |
| | 23 | Q. But you learned that information from mother; correct? |
| | 24 | A. That's correct. |
| 02:33:19PM | 25 | Q. You were never able to ask G directly whether he would get |

3-172

| | | |
|---|---|---|
| | 1 | a symptom every time he was in front of a computer? |
| | 2 | A. No. |
| | 3 | Q. You were never able to ask him exactly what he was doing |
| | 4 | every time he got a symptom; right? |
| 02:33:35PM | 5 | A. Again, his symptoms happened in school. Now, they weren't |
| | 6 | happening at home. So he was on the computer most of the time |
| | 7 | in school. |
| | 8 | Q. There were some symptoms at home; right? |
| | 9 | A. Very few. |
| 02:33:46PM | 10 | Q. There were times he had symptoms in the morning; right? |
| | 11 | A. There were -- I don't have really reports of morning. I |
| | 12 | know more about symptoms extending from the school day going |
| | 13 | into the evening. |
| | 14 | Q. Do you know of -- strike that. |
| 02:34:00PM | 15 | Do you know whether some of the nurse records in this |
| | 16 | case indicate that G told the nurse on several occasions that |
| | 17 | he came to school with a headache? |
| | 18 | A. I don't think I have that information. |
| | 19 | Q. So that's not something you considered in rendering your |
| 02:34:16PM | 20 | expert opinion in this case? |
| | 21 | A. I would want to know when that happened if it -- again if |
| | 22 | it's happening more toward the end of his school time there, |
| | 23 | which was in 2015. The headaches might have been extending |
| | 24 | from the night before going into the morning so that would be a |
| 02:34:33PM | 25 | reasonable way of interpreting it. |

```
 1   A.   Many of the conditions, okay.
 2   Q.   So do you see where it says, When G is not in attendance
 3   his parents keep him away from WI-FI --
 4   A.   Yes.
 5   Q.   -- exposure?
 6   A.   Yes.
 7   Q.   Do you believe that to be a true statement?
 8   A.   I -- I do.
 9   Q.   Is that why you did not consider whether G had symptoms in
10   other locations where he was exposed to WI-FI?
11   A.   No, I -- it would have come from hearing whether he had
12   symptoms.  I do know that he did have symptoms in the one place
13   that the hotel that they stayed in that there was a cell tower
14   next to it, but there was no other reported going someplace and
15   getting a headache.  And again, he wouldn't be there for the
16   same length of time that he's at school.  A lot of this is time
17   dependent.
18   Q.   Did you consider whether G had symptoms at any other
19   locations where he was exposed to WI-FI?
20   A.   Yes, that would be important information, but again it's
21   the timing and the length of time of the exposure that's
22   significant, just like I said to you before when you said I
23   could do an experiment in my office of turning on and off or
24   giving him a cell phone.  It's a totally different exposure,
25   because we're talking about cumulative exposure.
```

```
                  1    Q.   What other locations that G frequents that have WI-FI did
                  2    you consider in rendering your report?
                  3    A.   I wasn't really told of any that he did on a regular basis
                  4    that had WI-FI that were a problem.
03:11:27PM        5    Q.   So there were not other locations that you considered?
                  6    A.   I wasn't told of any that caused -- that he also had
                  7    repetitive headaches at.
                  8    Q.   Now, you don't mention in your report any other locations
                  9    that G visited that had WI-FI, but at which he did not have
03:11:44PM       10    symptoms; right?
                 11    A.   Right.
                 12    Q.   Your only focus in your report is that G's symptoms
                 13    happened at school; right?
                 14    A.   Right.
03:11:53PM       15    Q.   Are you aware that G's family shops at Whole Foods?
                 16    A.   I wouldn't be surprised.
                 17    Q.   Are you aware that Whole Foods has WI-FI?
                 18    A.   I'm sure they do.
                 19    Q.   Are you aware that Whole Foods has microwaves?
03:12:08PM       20    A.   I'm sure they do.
                 21    Q.   Did you ever consider the radio frequency levels that G
                 22    would be exposed to when he was at Whole Foods with his mother
                 23    shopping?
                 24    A.   No, because again we're talking about a brief exposure,
03:12:21PM       25    and the Whole Foods situation is probably not of the same level
```

```
                                                              3-191

 1    as the school so we're comparing apples and oranges here.
 2    Q.   So it's fair to say that you never even considered --
 3              THE COURT:  Or apples and granola.
 4              THE WITNESS:  There you go.  I like that.
 5    BY MS. McKEAN:
 6    Q.   It's fair to say that you never even considered if G had
 7    symptoms, or did not have symptoms, at Whole Foods when being
 8    exposed to radio frequency?
 9              It's just a yes-or-no answer -- question.
10    A.   It's a weird question, because did I ever consider it.
11    What, you know, what happened at Whole Foods was not -- not
12    ever brought up, and I didn't investigate everywhere the child
13    went that could have had WI-FI.
14    Q.   You said in one of your early emails to mother that you
15    would be able to diagnose G with EHS if every time he was
16    exposed he exhibited symptoms.
17              Do you remember writing that?
18    A.   I do.
19    Q.   But then when you ultimately diagnosed G, you did not
20    consider whether he had symptoms every time he was exposed at
21    locations other than the school?
22    A.   Okay.  So we're talking about two different ideas here.
23    There are people that are sensitive to WI-FI at a level that
24    every time they're exposed to it, even briefly, it makes
25    symptoms, and they're sick.  They have problems with it,
```

3-192

```
                1    whether it's headaches or dizziness or ear ringing.  This was
                2    not the presentation that G had, and there's another
                3    manifestation that happens of sensitivity that is really much
                4    more the cumulative effect, rather than a brief short effect in
03:14:14PM      5    different locations.  So, yes, I made that statement.  That
                6    doesn't really pertain to G.  That's not the kind of
                7    sensitivity he has.  He's not that sensitive that every time he
                8    gets exposed he instantly has a symptom.  So there are two
                9    different situations.  Either one of them could be true, and
03:14:34PM     10    what I said doesn't negate what I'm saying here about G.
               11    Q.   Doctor, I understand that you want to explain to me why
               12    you didn't consider certain locations, but I'm just asking you
               13    if you did consider those locations.  So if you could limit
               14    your answers to my questions that would be helpful.
03:14:50PM     15         Do you understand that?
               16              MR. MARKHAM:  Your Honor, I -- that's not a question.
               17    I object to being harassed.  She's really giving the best
               18    answer she can give.  I object.  Asked and answered.
               19              THE COURT:  Let's have a question, please.
03:14:59PM     20              MS. McKEAN:  Absolutely.
               21              THE COURT:  Let me boss the witnesses around, okay.
               22              MS. McKEAN:  Thank you, your Honor.  I appreciate
               23    that.
               24    BY MS. McKEAN:
03:15:06PM     25    Q.   So you did not consider whether G had symptoms at Whole
```

3-193

1  Foods?
2           MR. MARKHAM: Objection. Asked and answered.
3           THE COURT: Overruled. You may answer that, Doctor.
4           THE WITNESS: I had no information about him having
5  symptoms at Whole Foods.
6  BY MS. McKEAN:
7  Q.  Did you ever look into whether G's family church has
8  WI-FI?
9  A.  No.
10 Q.  Did you ever consider whether he got symptoms at church
11 while he was exposed to WI-FI?
12 A.  I wasn't given that information.
13 Q.  Now, you talked earlier about the MRI; correct?
14 A.  Yes.
15 Q.  Is it fair to say though you did not consider whether G
16 had symptoms while he was having the MRI done?
17 A.  I don't remember any specific information about him having
18 symptoms at that time, and that wouldn't rule out that he's
19 having symptoms on a prolonged exposure. The MRI lasts
20 45 minutes.
21 Q.  Do you know what the exposure level is when someone's in a
22 MRI machine?
23 A.  Its know it's mostly magnetic and not electromagnetic.
24 It's primarily magnetic.
25 Q.  Do you think there's a difference between those two?

Case 4:15-cv-40116-TSH   Document 125-5   Filed 10/07/16   Page 15 of 19

```
                                                            3-194

 1    A.   I do.
 2    Q.   And what do you base that on?
 3    A.   Widespread information.
 4    Q.   Can you cite for me a study that supports that?
 5    A.   No.
 6    Q.   You have a number of times talked about the cumulative
 7    effect of WI-FI; correct?
 8    A.   Correct.
 9    Q.   Can you cite for me a single study that supports your
10    statements here today about the cumulative effect of WI-FI?
11    A.   I can't cite a study for you, but I'm sure that there are
12    those studies we could find.
13    Q.   You didn't cite any in your expert report; right?
14    A.   Right.
15    Q.   Are you aware that many of the doctors' office where G was
16    evaluated had WI-FI?
17    A.   Yes.
18    Q.   Did you know that Dr. Waugh, Dr. Dinakar, Dr. Woolf and
19    Dr. Lebel's office all had WI-FI?
20    A.   Yes, I'm not surprised.
21    Q.   And do you know if the exposure level that G would have
22    been exposed to at those office would have been very similar to
23    the exposure level that he was exposed to at Fay School?
24    A.   I don't think that that's true.
25    Q.   What do you base that on?
```

| | |
|---|---|
| 1 | A.   I base that on the fact that in the school there were |
| 2 | multiple routers and multiple computers.  In most of these |
| 3 | offices there would be a few computers and one router. |
| 4 | Q.   But it's fair to say you don't know what the exposure |
| 03:17:27PM 5 | level is from multiple computers and multiple routers versus |
| 6 | one computer and one router? |
| 7 | A.   I can't say that I did, but you can't say that it's the |
| 8 | same. |
| 9 | Q.   And you don't have a study to cite that says that they |
| 03:17:44PM 10 | aren't the same? |
| 11 | A.   No, and you don't have a study that cites -- that says |
| 12 | they are. |
| 13 | Q.   We may get to that tomorrow, Doctor. |
| 14 | Are you aware that G had his birthday party at a paint |
| 03:17:55PM 15 | ball facility this year that has WI-FI? |
| 16 | A.   No. |
| 17 | Q.   Did you consider whether he got symptoms at that paint |
| 18 | ball facility where he was exposed to WI-FI? |
| 19 | A.   No, because I didn't know he had a paint ball party. |
| 03:18:08PM 20 | Q.   Earlier in your testimony, Mr. Markham showed you |
| 21 | Dr. Boyer's report, and he asked you about Dr. Boyer's |
| 22 | statements that WI-FI is everywhere in everyday life. |
| 23 | Do you remember seeing those statements? |
| 24 | A.   Yes. |
| 03:18:26PM 25 | Q.   Do you know if G has ever taken a trip to Boston for the |

1   million times higher than with WI-FI?
2   A.   I don't think that -- I don't think that's the case.
3   Q.   Have you read Dr. Foster's deposition testimony in this
4   case?
5   A.   No.
6   Q.   Have you read any of the documents that we submitted in
7   connection with the *Daubert* motion in this case?
8   A.   I think I read some of those.
9   Q.   Did you read the fact that Dr. Foster made it clear in his
10  deposition that the exposure levels were -- in that study
11  you're talking about, are not even close to the exposure levels
12  we're talking about with WI-FI?
13  A.   Again, I'm not here as an expert, and I'm not here as
14  someone who can cite studies.  That's not my position, and I'm
15  not claiming to have any of that expertise.
16  Q.   So you're not an expert on any of the studies that have
17  been published on the subject of whether radio frequency can
18  cause adverse health effects?
19  A.   I'm understanding that there is -- there are studies that
20  show that, and no, I'm not an expert on it.
21  Q.   And you're not going to -- you have not relied on any of
22  those in your expert opinion?
23  A.   I have looked at information that particularly Dr. Herbert
24  reviewed.  There were a lot of studies that looked at
25  physiologic changes that can happen to cell membranes and

```
                 1   A.   Yes.
                 2   Q.   Now, you never went to the school; right?
                 3   A.   Right.
                 4   Q.   So you don't know if the school has fluorescent lights;
03:30:37PM       5   right?
                 6   A.   Right.
                 7   Q.   So you don't know if G experienced glare from fluorescent
                 8   lights?
                 9   A.   Right.
03:30:48PM      10   Q.   And you don't know if G had other visual problems from
                11   visual display units at the school?
                12   A.   I don't, but he didn't report any of those symptoms, and
                13   his eye exams were normal.
                14   Q.   And you don't know about the design of Fay's computer
03:31:04PM      15   workstations; right?
                16   A.   Right.
                17   Q.   And you didn't consider Fay's indoor air quality; right?
                18   A.   Right.
                19   Q.   And you didn't consider the emails we looked at earlier
03:31:19PM      20   that indicate G was experiencing some stress at school; right?
                21   A.   Right.
                22   Q.   So with respect to these other factors listed in this
                23   World Health Organization document, you didn't consider any of
                24   them?
03:31:32PM      25   A.   I didn't think that any of them were the significant
```

```
 1              factors in this case.
 2         Q.   Can you turn for me to the third page of Exhibit 27.
 3              Are you there, Doctor?
 4         A.   I am.
 5         Q.   Do you see the section that's entitled "physicians?"
 6         A.   Yes.
 7         Q.   Do you see it states, "Treatment of affected individuals
 8              should focus on the health symptoms and the clinical picture
 9              and not on the person's perceived need for reducing or
10              eliminating EMF in the workplace or home."
11              Did I read that correctly?
12         A.   You did.
13         Q.   Now, you did not follow this recommendation by the World
14              Health Organization; correct?
15         A.   Correct, and I would strongly disagree with it.
16         Q.   You're very first suggestion before even meeting G was for
17              the school to remove the WI-FI from the school; right?
18         A.   To do a therapeutic trial of a lower -- yes, a lower
19              exposure to see if that was the problem.
20         Q.   So your suggestion directly contradicts the suggestion of
21              the World Health Organization?
22         A.   Yes, it did.
23         Q.   Did you follow any of the recommendations of the World
24              Health Organization in diagnosing G?
25         A.   I don't know.  What are you referring to specifically?
```