EXHIBIT F

ORIGINAL

REDACTED

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

(WORCESTER DIVISION)

G, a 12-year-old minor suing by a        :

fictitious name for privacy reasons,:

MOTHER and FATHER, suing under           :

fictitious names to protect the          :

identity and privacy of G, their         :

minor child,                             :

        Plaintiffs                       :

                               :

vs.                                       :Case No.15-cv-40116-TSH

THE FAY SCHOOL (by and through its       :        VOLUME II

Board of Trustees) and ROBERT            :

GUSTAVSON,                                :

        Defendants.                      :

CONTINUED DEPOSITION OF H██████ D██████

Friday, September 23, 2016

9:30 A.M.

THE FAY SCHOOL

31 Main Street

Southborough, Massachusetts 01772

- - -

Linda S. Pezza, CSR

WARROOM DSI

103 Dyer Street

Providence, Rhode Island 02903

401.621.7300

REDACTED


1    A    Okay.  They just moved him, they didn't tell us

2  why, they didn't measure the room prior, they didn't give us

3  any information other than, you know, here we are making

4  this big change, and you know, there was an access point

5  fairly close to the, you know, close to that room, and we

6  have no knowledge if that room was any better.  In fact, he

7  was not well.

8    Q    Okay.  But when you said a few moments ago that

9  you raised concerns about Math and Latin and the school did

10  nothing, that is not entirely accurate, because the school

11  did move the Math and Latin classes to a bigger classroom,

12  didn't they?

13    A    They chose a classroom.  They told us it was

14  bigger.  They told us it would be better.  We saw nothing to

15  empirically prove that that was the case.  So, you know, our

16  hands were tied, we had to accept it.  It wasn't our, you

17  know, it wasn't what we would have done, it wasn't a

18  thorough way to ensure that he was going to be actually in a

19  reduced environment.

20    Q    Okay.  So is it fair to say that there did appear

21  to be a reduction in RF exposure after the school put into

22  place the 6 foot distance, except --

23    A    In some classrooms, yes.

24    Q    -- in Math and Latin?

REDACTED


1        A    Yes, it was successful in some classrooms.

2        Q    Okay.  And were there other classes other than

3    Math and Latin where it wasn't successful?

4        A    I think so, but at this time, I'm remembering Math

5    and Latin, and I think there could be more done.

6        Q    More done in other classes?

7        A    More done in those classrooms to reduce it.

8        Q    How low would you like the school to reduce the RF

9    exposure?

10       A    We would like to reduce them to the level that he

11   is well and able to attend.  We've offered levels that were

12   levels to shoot for.  We achieved some of those levels in

13   the simulation, but not in all classrooms.

14       Q    Is the level to shoot for the BioInitiative level?

15       A    The BioInitiative level is a recommendation.  I

16   can't say that that's the level that's going to make his

17   symptoms go away at the Fay School.  Certainly, you know,

18   his interim school, the levels are tolerable, they're next

19   to nothing, and I think that can be achieved in a classroom

20   with proper measurements, proper consideration of all RF

21   generating equipment in the room.

22       Q    Now, you just mentioned his interim school, is

23   that The Waldorf School in Lexington?

24       A    Yes.

REDACTED

Page 356

1      A    Um-hum.

2      Q    Is that correct?

3      A    Yes.

4      Q    Okay.  So in the fall of 2015, there were several

5   classrooms where you believe the school was successful in

6   reducing the RF exposure levels?

7      A    There were classrooms where they were successful.

8      Q    And is it your recollection that they were

9   successful in reducing the levels to the BioInitiative

10  level?

11     A    It's my recollection that we were able to reduce

12  to our target, at that point, I think it was that level.

13     Q    So, then in this case, are you seeking that all of

14  G's classrooms be reduced to that same BioInitiative level?

15          MS. ZERNER:  Objection, asked and answered.

16     She repeatedly said that they were looking to reduce to

17     where G was not symptomatic, and we keep going over

18     this again and again.  I know you have the target of

19     BioInitiative, Jaimie, but --

20          MS. McKEAN:  It's not my target, it's her

21     target, and I'm just trying to figure out --

22     A    That was the target at the time.

23          MS. McKEAN:  -- what you want the school to

24     do.

REDACTED

September 23, 2016                          ▮▮▮ - Vol. II D▮▮▮

                                                        Page 358

1        Q    Do you want the school to try all of these

2    alternatives and see if they have an affect on G?

3        A    Yes.

4        Q    Do you want the school to try them one at a time

5    or all at once?

6             THE DEPONENT:  Let me read them, it's been a

7         while.

8             MS. McKEAN:  Absolutely.

9                  (DEPONENT PERUSING DOCUMENT)

10            MS. McKEAN:  Can we just take a quick break.

11                 (BRIEF RECESS)

12            MS. McKEAN:  Back on the record.

13            MS. ZERNER:  There was a pending question,

14        right?

15       Q    Let me ask you this, have you had a chance to

16   review --

17       A    Yes.

18       Q    -- the alternatives in the Complaint?

19       A    Um-hum.

20       Q    Okay.  Do you want the school to try each of these

21   alternatives one at a time or all at once?

22       A    I think the last alternative, Providing one of

23   several classrooms that could be workably arranged for this

24   purpose to be completely WiFi-free so that G and his fifteen

REDACTED

September 23, 2016                            - Vol. II

Page 359

1    or so classmates could take all of their classes in that

2    classroom using Ethernet cable instead of WiFi to access the

3    internet would probably be the best approach, and that's

4    what I think we've asked for.

5         Q    Okay.  But in your Complaint, you list six

6    different alternatives; is that right?

7         A    Those were alternatives at the time, yes.

8         Q    Okay.  But this is the Complaint that is your

9    present Complaint in this litigation?

10        A    Yes.

11        Q    And you filed this Complaint on February 11, 2016;

12   is that right?

13        A    I think we've written letters and stated pretty

14   much this last alternative is the best alternative.

15        Q    So is the last alternative the only one you're

16   seeking in this case?

17                    (DEPONENT PERUSING DOCUMENT)

18        A    I think that's the best alternative.

19        Q    So if you prevail at trial of this case, is that

20   the only alternative you'll be seeking?

21        A    I think that there are other things that should be

22   done, which include students and teachers to adhere to a

23   cell phone policy with wireless devices enabled.  Like, if

24   children have -- if there are fifteen cell phones in

REDACTED

September 23, 2016                                    H▮▮▮▮ - Vol. II ▮▮▮▮

1    talked just now that that one room would be a great

2    alternative, probably be doable for you guys, and we could

3    reduce his exposure by doing it methodically and with

4    measurements.

5        Q    Now, last fall when we attempted to reduce G's RF

6    exposure, there was hope that that would eliminate G's

7    symptoms, correct?

8        A    We had hope, yes.

9        Q    Okay.  But when that -- those proposals were put

10   into place, you didn't know for sure if they would eliminate

11   G's symptoms?

12       A    We thought that we would have a good shot if we

13   achieved that level in all the classrooms, we didn't achieve

14   it in all the classrooms by our measurements.

15       Q    And as far as we sit here today, you think that we

16   achieved those levels in all the classrooms except Math and

17   Latin?

18       A    We were successful in some classes.

19       Q    And as we sit here today, you can't mention any

20   other ones other than Math and Latin that we were not

21   successful in?

22       A    I cannot.

23       Q    Okay.  Other than the tuition damages that we

24   spoke about a few moments ago, are there any other monetary

REDACTED

1    Q    Can you turn to Tab 1 of Exhibit 310?

2    A    Back to Tab 1, yes.

3    Q    Now, these are some notes of a visit you had with

4  Dr. Hubbuch on July 23, 2014; is that correct?

5    A    I don't see the date, but -- yes, 7/23, yep.

6    Q    Okay.  Did you go see Dr. Hubbuch on July 23,

7  2014?

8    A    I did.

9    Q    And you went alone without your son, correct?

10    A    I did.

11    Q    Now, after this visit, Dr. Hubbuch made a

12  preliminary diagnosis that G was sensitive to the school's

13  WiFi; is that correct?

14    A    She stated this in a letter to the school, which

15  they disregarded, yes.

16    Q    And you heard her testify at the Daubert hearings,

17  correct?

18    A    I did.

19    Q    And did you hear her say that that was a

20  preliminary diagnosis?

21    A    I can't recall at this time.

22    Q    Now, you just mentioned the letter that she wrote

23  -- that Dr. Hubbuch wrote to the school, is that at Tab 3 of

24  Exhibit 310?

REDACTED

September 23, 2016                                    H - Vol. II D

Page 407

1    provide it, and he threatened our children's dismissal in

2    that letter.  This is not the same letter.

3         Q    My question is simply this, as of the time

4    Mr. Clarance asked for additional medical information on

5    August 28, 2014, is it fair to say that the only medical

6    documentation you had given the school at that point

7    regarding G possibly having EHS was Dr. Hubbuch's

8    August 2014 letter?

9         A    No, she should have had this, which is symptoms

10   that are related to his EHS, whether or not Dr. Ostrovsky

11   knew anything about it, he didn't diagnose it, but he did

12   know what the symptoms were.

13        Q    So is it fair to say that the only medical

14   documentation that actually found that G's symptoms were

15   connected to the school's WiFi was Dr. Hubbuch's August 2014

16   letter?

17        A    In August 2014, yes.

18        Q    Now, in response to this e-mail, on August 28,

19   2014, that is Exhibit 211 --

20             THE DEPONENT:  311.

21        Q    -- I'm sorry, 311, thank you, did you provide any

22   other medical documentation showing that G's symptoms were

23   caused by the school's WiFi?

24        A    Yes, we did.

REDACTED



Page 423

1  fair to say the only medical documentation you provided to

2  the school were the three letters that we looked at from

3  Dr. Hubbuch?

4          MS. ZERNER:  Explicitly.

5      A   Yes.  Excuse me, I'm sorry, I don't recall the

6  date of Dr. Herbert's letter which stated she had also

7  evaluated him, I don't recall the date.

8      Q   Okay.  That's September 2015, isn't it?

9      A   I don't recall the date.

10     Q   I actually think it's at Tab 16 of Exhibit 310, is

11 that the letter from Dr. Hubbuch (sic) that you're referring

12 to?

13         MS. ZERNER:  Herbert.

14         MS. McKEAN:  Herbert, thank you.

15     A   Yes, Dr. Herbert stated that as well.

16     Q   Okay.  But that was after the lawsuit was filed;

17 is that right?

18     A   Yes.

19     Q   So before the lawsuit was filed, the only medical

20 documentation that says G has EHS or that the school needed

21 to make changes to the WiFi are the three letters from

22 Dr. Hubbuch?

23     A   Yes, and that should be enough to get a

24 conversation with the school.

REDACTED

September 23, 2016                              H███ - Vol. II D███

Page 425

1   Markham; is that right?

2        A    Yes.

3        Q    And John Markham is your attorney in this case,

4   correct?

5        A    Yes.

6        Q    And would you agree with me that this appears to

7   be related to your son?

8        A    Um-hum, yes.

9        Q    Now, do you see in the e-mail, your attorney is

10  indicating terms of a proposal from you and your husband?

11       A    I haven't quite read it.

12       Q    Sure, take all the time you need.

13                    (DEPONENT PERUSING DOCUMENT)

14       A    Um-hum.

15       Q    Have you had a chance to read it?

16       A    Yes.

17       Q    Okay.  Do you see on Number 2 in the proposal, it

18  indicates that the parties will find a good doctor to give

19  an Independent Medical Evaluation --

20       A    Yes.

21       Q    -- in order to obtain an assessment of both

22  whether there's some other condition causing G's symptoms or

23  whether this is caused by WiFi, do you see that?

24       A    I see that, yes.

REDACTED



Page 426

1    Q    And that's something you agreed to, correct?

2    A    Yes.

3    Q    Now, do you see in Paragraph Number 3, your

4  attorney writes, Once we get that medical opinion and if it

5  is to the effect that EHS is implicated, we will do a

6  walkthrough of the Fay buildings of where G will be next

7  year and determine how much exposure in each location he

8  will have to WiFi.  Did I read that correctly?

9    A    I think so.

10    Q    Okay.  So is it fair to say that the agreement you

11  reached with the school in May of 2015 was that G would

12  undergo this Independent Medical Evaluation, and if it is to

13  the effect that EHS is implicated, then the school would

14  allow you to do a walkthrough?

15    A    I see that.

16    Q    And you agree that's what the agreement was,

17  correct?

18    A    Yes.

19    Q    Now, you then brought G to two different doctors

20  as part of that Independent Medical Evaluation, correct?

21    A    Yes, in fact, four doctors, there were two at each

22  appointment.

23    Q    Okay.  So at the first appointment was the head

24  Doctor, Dr. Alan Woolf?

1          THE DEPONENT:  Head of the department?

2          MS. McKEAN:  Correct.

3     A    Yes, Environmental something or other.

4     Q    And that was at Boston Children's Hospital?

5     A    Correct.

6     Q    And did you take G to see Dr. Woolf in June of

7  2015?

8     A    We did.

9     Q    Now, G did not -- excuse me, strike that.

10  Dr. Woolf did not diagnose G with EHS after that

11  appointment, correct?

12     A    Dr. Woolf didn't know anything about EHS, no, he

13  did not.

14     Q    And Dr. Woolf did not recommend that the school

15  make any changes to its WiFi, correct?

16     A    No, Dr. Woolf didn't make a diagnosis either.

17     Q    Now, is it fair to say that EHS was not implicated

18  after the IME with Dr. Woolf?

19     A    No, I don't think so.

20     Q    You don't think that's fair to say?

21     A    I don't think he knew anything about it, he didn't

22  make a diagnosis, so I don't think it was a good evaluation,

23  in my opinion.

24     Q    So you didn't like the evaluation?

REDACTED



Page 428

1        A     I just don't think it resolved anything.  He gave

2   us referrals.  So, it wasn't a diagnosis, it wasn't EHS and

3   it wasn't not EHS.

4        Q     But it certainty didn't implicate that G had EHS?

5        A     Like I just stated, he didn't say it was and he

6   didn't say it wasn't.

7        Q     Now, even though Dr. Woolf did not indicate G had

8   EHS, you then demanded the walkthrough, correct?

9        A     We asked for the walkthrough, yes, because school

10  was starting and we needed to resolve his symptoms.

11       Q     So that was a little bit different than the

12  agreement was, right?

13              MS. ZERNER:  Objection.

14       A     I can't recall.

15       Q     Well, we looked at -- we're looking at Exhibit

16  314, the agreement says, Once we get that medical opinion

17  and if it is to the effect that EHS is implicated, we will

18  do a walkthrough of the Fay buildings, right?

19       A     Yes.

20       Q     That was the agreement, right?

21       A     Sure.

22       Q     And then you went and had the first part of the

23  IME and it didn't implicate EHS, right?

24              MS. ZERNER:  Objection.

REDACTED



Page 429

 1      A    It didn't -- it didn't conclusively either way.

 2      Q    So even though it didn't implicate EHS, you then

 3  asked for the walkthrough?

 4            MS. ZERNER:   Objection.

 5      A    School was starting.

 6      Q    So you did ask for the walkthrough even though

 7  Dr. Woolf did not implicate EHS?

 8            MS. ZERNER:   Objection.

 9      A    Yes.

10      Q    And ultimately, the school allowed you to conduct

11  four walkthroughs at the Fay School in the fall of 2015; is

12  that correct?

13      A    After we filed the lawsuit, I believe we did have

14  a couple of walkthroughs.

15      Q    Does four sound right?

16      A    I can't recall the dates.

17      Q    Do you disagree with the number four?

18      A    We can call it four.

19      Q    Now, as part of the agreement to allow the

20  walkthroughs, you agreed to finish the IME process, correct?

21      A    Yes.

22      Q    And part of that process was to take G to see

23  Dr. Alyssa Lebel at Boston Children's Hospital; is that

24  right?

REDACTED



Page 431

1          Q      And at that point, you still didn't want G to know

2     that you had made a connection between his symptoms and the

3     school's WiFi?

4          A      That's correct, yes.

5          Q      And you conveyed that to Dr. Lebel?

6          A      Possibly in that meeting, yes, I don't recall.

7          Q      Now, after Dr. Lebel evaluated G, she didn't

8     diagnose him with EHS, correct?

9          A      She didn't make a diagnosis either.

10         Q      She diagnosed him with tension-type headaches,

11    didn't she?

12         A      She described his headaches as tension-type

13    headaches.

14         Q      You don't think that's a diagnosis?

15         A      I don't.

16         Q      But she did say he had tension-type headaches?

17         A      He has other symptoms at the Fay School, in

18    addition to headaches.

19         Q      So my question is, did Dr. Lebel diagnose G with

20    tension-type headaches?

21         A      She wrote something to that effect as a

22    description, I don't see that as a diagnosis.

23         Q      Do you know if Dr. Lebel sees it as a diagnosis?

24         A      I don't.



Page 436

1      Q     Okay.  So did G -- strike that.  Was G seen by his

2   Pediatrician this past May or June?

3      A     No, not until July this year, we were traveling in

4   June.

5      Q     At this July 2015 appointment with G's

6   Pediatrician, first of all, was that Dr. Waugh?

7      A     It was his associate.

8      Q     Who's that?

9      A     I don't know her name, it was one of the nurses

10  that's doing the Pedi. (sic/phonetic) visits.

11     Q     Okay.  And were any symptoms associated with WiFi

12  discussed at this appointment?

13     A     Just that he had resolved his symptoms and that he

14  was doing well.

15     Q     At the eye appointment that you mentioned, were

16  any symptoms associated with WiFi discussed?

17     A     No.

18     Q     So is it fair to say that the last medical

19  appointment that G was present at where symptoms associated

20  with WiFi were discussed were the appointments you had on

21  the same day with Dr. Lebel, Dr. Gambhir, and Dr. Herbert?

22             THE DEPONENT:  In September?

23             MS. McKEAN:  September 2015.

24     A     I think so.  If my memory serves right.  He hasn't

REDACTED

September 23, 2016                    H - Vol. II D

Page 437

1   needed, thankfully, a doctor, because his symptoms resolved

2   when he moved to the interim school.

3        Q    Now, the school allowed G to take a leave of

4   absence starting on December 1, 2015; is that right?

5        A    That sounds right.

6        Q    And you signed an agreement in connection with

7   that leave of absence; is that right?

8        A    I think so.

9        Q    Prior to allowing G to take the leave of absence,

10  did you ever provide Fay with a doctor's note stating that

11  he needed to take that leave of absence?

12       A    It was not requested.

13       Q    So you didn't provide them with one, right?

14       A    We weren't asked.  I don't recall if we provided

15  one, but we certainly weren't asked.

16       Q    You don't recall getting a letter from my office

17  saying you've never given us a letter that says that?

18       A    I don't.

19       Q    So if one is out there, you didn't see it?

20       A    It's very possible.

21       Q    Now, the last time G saw a doctor regarding

22  symptoms related to WiFi was on that September 10 date,

23  2015, correct?

24       A    I believe.

REDACTED



Page 438

1    Q    And Dr. Lebel actually issued a note after that

2    appointment, correct?

3    A    I think so.

4    Q    And do you recall that Dr. Lebel stated in that

5    note that G should attend school regularly?

6         THE DEPONENT:  Do you have a copy of it?

7    Q    Absolutely.  This is Exhibit is 112?

8         (DEPONENT PERUSING DOCUMENT)

9    A    Yes.

10   Q    And do you see in the third sentence, Dr. Lebel

11   writes, At this time, G was strongly encouraged to attend

12   school regularly?

13   A    Yes.

14   Q    Okay.  Did you ever provide the school with any

15   note after this September 10, 2015, note that indicated G

16   should not attend school regularly?

17   A    Not to my knowledge.

18   Q    And you never provided the school with a note that

19   said G needs to take a leave of absence from a doctor?

20   A    No, but I recall the conversation I had with

21   Dr. Lebel, and I believe her nurse, Lori, when I went to

22   that October meeting, and they said it was reasonable to

23   wait until the accommodations that the school was hopefully

24   going to put in place were tried before he went back, and I

REDACTED

September 23, 2016                    H▓▓▓ - Vol. II D▓▓▓

1    did have that conversation with them.  I don't have a record

2    of this, but I'm sure one exists if they take notes.

3        Q    Did you ask them for a note that said G needs to

4    take a leave of absence?

5        A    I didn't, no, because I wasn't asked for a note.

6        Q    So even though you didn't provide the school with

7    a note, they did give G a leave of absence, right?

8        A    Sure.

9        Q    You looked at this a few moments ago, Tab 20 of

10   Exhibit 310, this was your spreadsheet regarding G's

11   symptoms?

12                  THE DEPONENT:  Tab 20?

13                  MS. McKEAN:  Tab 20.

14       A    Okay.

15       Q    Tab 20 is a document that you drafted, right?

16       A    Yes.

17       Q    Did your husband have any part in drafting this?

18       A    Not to my recollection.

19       Q    Did anyone else have any part in drafting this?

20       A    I think it was between G and myself, possibly my

21   husband, if he noted a symptom that I didn't, he would give

22   it to me and I would put it in here, that's the extent of my

23   recollection.

24       Q    Did G ever type in any of this information?

1

1                                          Volume 2B
                                           Pages 1-99
2          REDACTED                        Exhibits per index

3

4                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
5                         Worcester Division

6              Civil Action No. 15-cv-40116-TSH

7      ----------------------------------------:
       G, a 12-year-old minor suing by a       :
8      fictitious name for privacy reasons,    :
       MOTHER and FATHER suing under           :
9      fictitious names to protect their       :
       identify and privacy of G, their        :
10     minor child,                            :
                           Plaintiffs,         :
11                                             :
           V.                                  :
12                                             :
       THE FAY SCHOOL (by and through its      :
13     Board of Trustees) and ROBERT           :
       GUSTAVSON,                              :
14                     Defendants.             :
       ----------------------------------------:

15

16                  DEPOSITION OF H███ D███, a witness
       called on behalf of the Plaintiff, taken pursuant to the
17     Federal Rules of Civil Procedure, before Patricia M.
       Haynes, a Certified Shorthand Reporter and Notary Public
18     in and for the Commonwealth of Massachusetts, CSR No.:
       14620F, at the conference offices of the Brackett House,
19     31 Main Street, Southboro, Massachusetts, on Friday,
       September 23, 2016, commencing at 1:19 p.m.

20

21

22                  COPLEY COURT REPORTING, INC.
                      THE MERCANTILE BUILDING
23                    71 COMMERCIAL STREET #700
                      BOSTON, Massachusetts 02109
24                        (617) 423-5841

1    evaluating his medical history.

2        Q.    You talked a lot about the fact that the

3    school had all it needed to make changes.  But what the

4    school had was your letter from Doctor Hubboch from

5    August of 2014, correct?

6        A.    I'm sorry, I don't understand the question in

7    terms of your time frame.

8        Q.    You mentioned upon being questioned by Ms.

9    Zerner that in the fall of 2014 the school was refusing

10   to meet with you.  Is that correct?

11       A.    In the fall of 2014?

12       Q.    Correct?

13       A.    Yes, after the summer of 2014.

14       Q.    And the school had asked for additional

15   medical documentation.  We saw that when I was

16   questioning you, right?

17       A.    We went through this earlier.

18       Q.    But at the point in the fall of 2014, the one

19   document you had provided that said G had EHS or said

20   that he was sensitive to the Wi-Fi was Doctor Hubboch's

21   letter.  Is that right?

22       A.    That specifically said the concern about EHS,

23   yes.

24       Q.    And Doctor Hubboch issued that letter without

1    ever meeting your son?

2         A.    She evaluated his records and his history

3    completely.  And she evaluated him later in the school

4    year.  As did several other doctors.

5         Q.    My question is, Doctor Hubboch issued the

6    August 2014 letter without ever meeting your son,

7    correct?

8         A.    She never stated that she had met him.  No one

9    offered us a meeting to discuss it.  It's not important.

10        Q.    So we are clear because you're answering

11   different questions, it's a simple yes or no, Doctor

12   Hubboch issued the August 2014 letter without ever

13   meeting your son, correct?

14        A.    Correct.

15        Q.    And it's your belief as you sit here today

16   that the school should have made changes to his Wi-Fi

17   based on Doctor Hubboch's August 2014 letter?

18             MS. ZERNER:  Objection.  It

19   mischaracterizes the testimony.

20   BY MS. MCKEAN:

21        A.    No.  What I'm saying is the school should have

22   opened their doors widely to meet with us when we

23   brought up the concern in the spring, had our child's

24   records evaluated by a doctor, not prejudicing our child

70

1    professional.  I'm sure she can determine who she would

2    like to see.  And I think Doctor Betthony spoke to

3    teachers about the concern.  That's what she expressed

4    to me.

5        Q.    You said upon being questioned by Ms. Zerner

6    that when you requested an additional meeting in the

7    summer of 2014 the school just absolutely refused to

8    meet with you, correct?

9        A.    In the summer of?

10       Q.    2014?

11       A.    Yes.

12       Q.    Please look at Exhibit 311.  This is the

13   e-mail we looked at earlier, August 28, 2014 from Alan

14   Clarance to you, correct?

15       A.    Yes.

16       Q.    Now, we looked at that paragraph about

17   two-thirds of way down this morning.  Do you remember

18   looking at that paragraph?

19       A.    Which one?

20       Q.    The one that says, "With respect to your

21   concerns about G?"

22       A.    Yes.

23       Q.    "We will certainly engage in discussions so

24   that we can better understand whether he is experiencing

1   medical difficulties."  Did I read that correctly?

2       A.   Yes.

3       Q.   So in that sentence, the school does not

4   reject your request for a meeting, right?

5       A.   Not in that sentence, no.

6       Q.   Mr. Clarance then goes on to write, "Please

7   provide the school's health office with all medical

8   information concerning any medical condition that G may

9   have, including documents from his primary care

10  physician.  Only after receiving this information can

11  the school determine appropriate next steps."  Did I

12  read that correctly?

13      A.   Yes.

14      Q.   We talked about that this morning --

15      A.   Sure.

16      Q.   The next document you provided to the school

17  after receiving this e-mail that showed G had EHS was

18  the following March of 2015, right?

19      A.   After which, after Doctor Hubboch's August 14

20  letter?

21      Q.   Just so we are clear.  You provided the August

22  2014 letter?

23      A.   Doctor Hubboch did, yes.

24      Q.   And then the school said we need more medical

72

1    documentation before we can determine appropriate next

2    steps, right?

3        A.    Which we gave them documentation of symptoms,

4    reports to the pediatrician, the nurse's records, the

5    things she requested and on and on.

6        Q.    But the pediatrician records said we can't

7    support that Wi-Fi causes these symptoms, right?

8        A.    They noted the symptoms, some of the symptoms

9    that are consistent with EHS.  And then they did not go

10   on to make a diagnosis of EHS because they did not

11   diagnosis anything.

12       Q.    They did say, "We can't support this belief

13   that the Wi-Fi is causing G's symptoms."

14       A.    Doctor Ostrovsky said that.  Doctor Waugh said

15   he was not an expert so he wasn't qualified to.  So

16   that's why we sought out an expert in environmental

17   medicine to understand and get to the bottom of what

18   this child was suffering.

19       Q.    But this expert in environmental medicine, you

20   didn't take G to see her until February of 2015,

21   correct?

22       A.    Ultimately, yes.

23       Q.    So that would have been five months after Alan

24   Clarance's e-mail to you asking for additional

1       information before the school could figure out the

2       appropriate next steps?

3            A.   We provided much information in that time

4       frame and we've illustrated it to you earlier.  We

5       provided a lot of information, not specifically from

6       Doctor Hubboch but other doctors.  I don't know how else

7       to answer the question.

8            Q.   But not medical documentation saying G has

9       EHS, right?

10           A.   Not specifically.  Can I go back to 311 for a

11      moment?  I want to point out that there was a threat in

12      the last line of Mr. Clarance's e-mail.  "If for any

13      reason you're not able to work cooperatively with the

14      school as set forth above, please contact me and we can

15      discuss alternatives."

16           Q.   You think that's a threat?

17           A.   Oh, absolutely it's a threat.  Alternatives?

18      Yes.

19           Q.   Did you call him and say --

20           A.   I did call Mr. Clarance several times.  He's

21      never returned a call.  Which in fact we saw in the

22      e-mail that they were trying to avoid speaking with me.

23      Unfortunately for my son.

24           Q.   We saw this morning that the school asked you

75

1     important.

2         Q.   So with respect to Doctor Waugh's changes, he

3     did note, as you mentioned, nosebleeds, but he refused

4     to mention what you said about mucosa not being the

5     cause of the nosebleeds, right?

6         A.   I'm not sure why that is because that's the

7     note I had when I went home from my visit.

8         Q.   So while you asked Doctor Waugh to update his

9     records to reflect that G was having nosebleeds, you did

10    not go back and ask Doctor Ostrovsky's office to make

11    the change that G was having headaches?

12        A.   You know, I don't recall if I did.  I know

13    Doctor Ostrovsky retired, so I don't know.

14        Q.   You never asked his nurse to update those

15    records?

16        A.   I guess I didn't.

17        Q.   You said that to your knowledge the school did

18    not install any equipment in the fall of 2015, rather

19    they just handed G a bright green cord, right?

20        A.   The Ethernet was in the classroom.  To my

21    knowledge, they didn't install anything but they covered

22    the Ethernet with a mat I believe.

23        Q.   Do you know if they actually had to put a new

24    Ethernet port in almost every classroom so that it would

1    be close to where G was being seated?

2         A.    I do recall that they may have moved some

3    equipment around that was already existing.  And we had

4    offered to pay for that way back.

5         Q.    But the school paid for it themselves, right?

6         A.    But we had offered.

7         Q.    But you didn't pay for it ultimately?

8         A.    No.

9         Q.    Do you know if that involved wiring that the

10   school had to engage in?

11        A.    I'm not an expert.

12        Q.    Do you know if the school once it installed

13   the Ethernet port and wiring necessary in each classroom

14   then ran a cord under a mat which it had installed in

15   each classroom?

16        A.    I guess that's what would have to be done,

17   yes.

18        Q.    So the green cord didn't attach to the wall,

19   it actually attached to the wiring that the school put

20   in that went under that mat to G's seat, right?

21        A.    The Ethernet cord connected from his computer

22   to the port.  And he was to carry it around to every

23   classroom.  The agreement was that he would have

24   Ethernet, which is very inexpensive cable, in every

77

1    classroom.   And yet he was given the scarlet letter.

2        Q.    Did you go look at what the school actually

3    did?

4        A.    You know, I wasn't invited to come in.

5        Q.    Do you know if the school actually installed

6    the port and installed the Ethernet line that went under

7    the mat and then from there needed G to have his own

8    cord so that there wouldn't be a cord hanging off the

9    desk all day to connect from his laptop to the cord that

10    was placed directly below where G would be seated?

11        A.    Thank you for clarifying that.

12        Q.    Does that make sense?

13        A.    Sure.

14        Q.    Do you remember seeing a letter from me to

15    your attorney explaining just that?

16        A.    No, I don't.  Sorry.

17        Q.    Is it fair to say that you're not

18    knowledgeable about all the equipment that the school

19    installed in the fall of 2015 in its efforts to reduce

20    the RF exposure in G's classrooms?

21        A.    I guess you could say that.

22        Q.    Now, you mentioned that you asked the school

23    to take measurements after the school put in place this

24    6 feet proposal, right?

84

1   his symptoms.  He has a physiology that's sensitive.  We

2   tried.  We asked the school to try something and we

3   started with that level.

4        Q.    So as you sit here today, you don't know what

5   RF level will eliminate G's symptoms if that level was

6   above the bio-initiative level?

7        A.    If that level is above the bio-initiative

8   level, it could possibly, yes.

9        Q.    But you don't know one way or the other?

10       A.    He will not have symptoms in the proposal that

11  we have given you.

12       Q.    And the proposal you have given me is to

13  completely eliminate all his RF exposure?

14       A.    To eliminate it by using hardwired connections

15  in the classroom like we proposed.

16       Q.    And when you say using hardwire in the

17  classroom?

18       A.    For the class, for the entire class like we

19  proposed.

20       Q.    How about the class next door?

21       A.    We would need to measure to see what the

22  levels were.  And then we would evaluate if he's

23  tolerated them in the past.

24       Q.    What levels would you want that classroom next

85

1      door to be?

2          A.    We would have to have experts evaluate that.

3      We would want him symptom-free.  If there's a level

4      that's above the bio-initiative where he is not

5      symptomatic, I'll take it.

6          Q.    So you don't know what level is going to work.

7      Is that right?

8          A.    I know in the classroom where there's little

9      exposure from wired connections, he should be okay.

10         Q.    But you don't know what specific level is

11     going to work for G, do you?

12              MS. ZERNER:  You mean a number?

13              MS. MCKEAN:  Yes.

14     BY MS. MCKEAN:

15         Q.    I'm talking about --

16         A.    I can't give you a number as I sit here today.

17     Some individuals are sensitive to levels that others can

18     tolerate.  ICNIRP says that themselves.

19         Q.    So the only level that you're 100 percent sure

20     about with respect to whether or not it will eliminate

21     G's symptoms is if there's no RF exposure, right?

22         A.    If we can create a classroom or two like we

23     have proposed, we have to try that.

24         Q.    And that classroom would prevent any RF

86

1    exposure.  Is that right?

2       A.   It could be set up in a way that it would be

3    much reduced not to provoke symptoms.

4       Q.   What is much reduced?  That's what I'm trying

5    to get at.  What do you mean when you say much reduced?

6            MS. ZERNER:  Objection.  Asked and

7    answered.

8    BY MS. MCKEAN:

9       A.   A classroom that has no wireless in proximity

10    to him.  Let your experts figure it out.  From all

11    radiating sources.

12       Q.   You're bringing this lawsuit.  I'm asking you

13    what is the level that you want the school to provide

14    your son with respect to RF exposure?

15       A.   We want a classroom for him that is free of

16    wireless frequencies that are provoking his symptoms.

17       Q.   So you want no Wi-Fi in his particular

18    classroom?

19       A.   That's what we've asked for.  We want that,

20    yes.

21       Q.   So this classroom that you're proposing would

22    need to block out any other RF exposure?

23       A.   You're talking about Wi-Fi and you're talking

24    about RF.  We are talking about frequencies of Wi-Fi.

87

Q.   So it's just the Wi-Fi you want to eliminate, not other sources of RF?  You mentioned earlier cellphones and projectors and other things.

A.   No, I mentioned earlier devices that have the frequencies of Wi-Fi that they are generating.  Do you see this cellphone?  It has a Wi-Fi antenna.  Mine is off.  It can be turned off or on.

Q.   So if we set up a room and took out all the Wi-Fi, had wired connections, put the shield thing in you proposed this morning, you would still want to come in and take RF readings, right?

A.   I think the only way to logically do this is with empirical data, yes.

Q.   Okay.

A.   That is why we use the dosimeter.  That's why we tried to solve this problem and asked for Fay's help.

Q.   When you come in and take these readings and there's no Wi-Fi in the room, what is the level that you would be looking for before you would say, Okay, G can come back to school and try this classroom now?

A.   I would be looking for little to no Wi-Fi exposure in the room.

Q.   So it would clearly be a level below the bio-initiative level?