# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| G, a 12-year-old minor suing by a fictitious name for privacy reasons, MOTHER, and FATHER, suing under fictitious names to protect the identity and privacy of G, their minor child, | ) ) ) ) ) ) | CIVIL ACTION NO. 4:15-CV-40116-TSH |
| **Plaintiffs,** | ) ) ) | |
| **v.** | ) ) | |
| THE FAY SCHOOL, INC. (by and through its Board of Trustees) and ROBERT J. GUSTAVSON, JR. | ) ) ) ) | |
| **Defendants.** | ) ) | |

_____ )

### MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERTS (Docket No. 58) AND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Docket No. 95)

**September 29, 2017**

**HILLMAN, D.J.**

Plaintiffs "G," a 12-year old minor suing by a fictitious name for privacy reasons, and G's parents brought the present action against defendants The Fay School, Inc. ("Fay School" or "School") and Robert Gustavson, its Head of School ("Gustavson") after the Defendants' refused to remove Wi-Fi from his classrooms. Plaintiff G, a former student of the Fay School, alleges that he suffers from Electromagnetic Hypersensitivity Syndrome, and experiences a spectrum of symptoms, including headaches and nosebleeds, because of the Wi-Fi at the School. Plaintiffs claim that the School's refusal to take down the Wi-Fi in G's classrooms, and replace it with Ethernet access, amounts to a failure to make a reasonable accommodation in violation of the

Americans with Disabilities Act, 42 U.S.C. §12101 *et seq.* ("ADA") (Count I). Plaintiffs also claim that the Fay School retaliated against them in violation of the ADA (Count II), and further assert common law claims for breach of contract (Count III), misrepresentation (Count IV), and negligence (Count V) against the Fay School and Gustavson. Defendants move to exclude several of the Plaintiffs' expert witnesses, and for summary judgment on all Counts. For the reasons set forth below, the Defendants' motion to exclude experts (Docket No. 58) is ***granted-in-part and denied-in-part***, and Defendants' motion for summary judgment (Docket No. 95) is ***granted-in-part and denied-in-part***.

## Background

The Fay School is an independent private school in Southborough, MA, for children in pre-K through 9th grades. Plaintiff G attended the Fay School from September 2009 through January 2016 (midway through his 7th grade year). The Fay School's curriculum is, in large part, delivered electronically, with each student equipped with a laptop that connects to the School's network using Wi-Fi.

At least as early as October 2012, G's parents came to believe that Wi-Fi was generally harmful, and expressed their concerns to the School and other parents. By May 2014, after discussing the issue with G's parents, the School had decided that there was insufficient evidence to require any mitigation of their Wi-Fi system. Around the same time, G's mother took G to his primary care provider complaining that her son suffered from Wi-Fi-related symptoms, including headaches, nosebleeds, and chest tightness, and subsequently sought the advice of specialists. The parents continued to advocate against Wi-Fi within the School community, to which the School administration objected.

In November 2014, G's parents formally asserted that G had a disability known as Electromagnetic Hypersensitivity Syndrome ("EHS"), and requested accommodation, including reducing the level of radio frequency emissions ("RF") at the School. The School verified that it was in compliance with the Federal Communications Commission's Wi-Fi safety limits, but declined to recognize G's EHS, requesting additional medical evidence. The parents and the School continued to dispute the steps necessary to establish the medical evidence needed to support an EHS diagnosis. Plaintiffs filed the present action on August 12, 2015.

From mid-2015, G's parents and the School participated in negotiation concerning mitigation of G's Wi-Fi exposure. In an attempt to mitigate G's Wi-Fi exposure, the School arranged for G to access curriculum using an Ethernet cable, and have at least an 8 ft. separation from Wi-Fi emission sources, principally other laptops in the classroom. In November 2015, G's parents advised that G continued to suffer symptoms, despite the reductions in his Wi-Fi exposure achieved by the mitigations, and demanded further accommodation.

G took leave from the School on December 1, 2015, and on December 18, 2015, the parents requested that the School provide only wired connections to all students in G's classrooms, or provide G with a Wi-Fi-free classroom, and rotate G's classes into that room. The School formally declined this request as impractical on January 4, 2016. G's parents withdrew him from the School on January 13, 2016.

The Plaintiffs noted several sequelae to their dispute with the School that they have alleged were retaliatory. During G's Fall 2015 medical leave (due to headaches), the School declined to allow G's classes to be recorded, or for him to listen to classes remotely. The Fay School also declined to allow G to participate in school athletics during the period that he was on leave, studying away from the School. The School omitted G's brother's name from the written program

3

of an 8th grade graduation dinner, and did not recognize him by name at the dinner, causing distress to the child. When it emerged that G had been carrying a dosimeter at the School to measure RF emissions, the School threatened to expel him on the grounds that carrying the device breached the terms of the Fay School student handbook ("Handbook"). In discovery, it emerged that some of the Fay School staff derided the parents' claims concerning Wi-Fi, and suggested that the school ignore or otherwise frustrate their claims. For example, , a member of the Fay School staff sent an email to teachers entitled "Rabbit Ears and Aluminum Foil," that instructed teachers not to respond to emails from G's mother about Wi-Fi issues. In a reply email, one of the teachers wrote back, "Blahahahahahahahaha!" Docket No. 62-7. The President of Fay's Board of Trustees sent an email to other Trustees accusing G's parents of harassment, and claiming that G's mother misrepresented herself, a claim that G's parents have suggested the Headmaster knew to be false but failed to correct. The Plaintiffs assert that, as a result of such misrepresentations, the Parents' Association removed G's mother from her long-standing committee service.

The School publishes a Handbook for each academic year that sets out, *inter alia*, standards of behavior in the school community, as well as making declaratory statements about the School's commitments to civility, diversity and equality of opportunity. The Handbook provides that

> [t]he School keeps "as a 'core value…the wellness of mind, body and spirit of each student;'" "will provide each student with a 'safe and supportive environment that recognizes, respects, and celebrates the full range of human diversity;'" "will help when students are in physical need;" "will 'recognize and celebrate…disabilities;'" "affirms the necessity of respect for individual differences;" the School maintains an environment where "all community members feel supported;" and, the School affords its students "all rights, privileges, programs, and activities generally accorded or made available to students at Fay School. The School does not discriminate on the basis of such factors in the administration of its educational policies, employment policies…or other school administered policies." The Handbook also states that "[h]onesty, respect, responsibility, empathy and kindness inform our conduct" and that "[t]he development of manners, civility, and integrity are hallmarks of our school."

Docket No. 121, p. 13.  Plaintiffs also highlight that the Handbook states

> Fay School promotes and affirms the concept of human dignity.  We expect all members of the community to respect the rights of others and to behave appropriately at all times.  Fay recognizes and celebrates the diversity of our school community regarding racial, cultural, ethnic and religious backgrounds, gender identity, disability, sexual orientation…and the school affirms the necessity of respect for individual differences….

Docket No. 121, p. 13.

Plaintiffs filed the present action on August 12, 2015.  Defendants now move to exclude the Plaintiffs' expert witnesses, and for summary judgment on all Counts.

## Motion to Exclude Plaintiffs' Experts

Defendants move to exclude the reports, opinions, and testimony of five of Plaintiffs' disclosed expert witnesses: David Carpenter, M.D. ("Dr. Carpenter"), Jeanne Hubbuch, M.D. ("Dr. Hubbuch"), Martha Herbert, M.D. ("Dr. Herbert"), Karl Maret, M.D., Ph.D. ("Dr. Maret"), and Robert Bowdoin ("Mr. Bowdoin").

Per Federal Rule of Evidence 702, a witness who is qualified as an expert may testify in the form of an opinion or otherwise provided that

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In applying Rule 702, the court qualifies expert testimony by "ensuring that [it] ... both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597, 113 S.Ct. 2786 (1993).  In seeking to introduce expert

testimony, the plaintiff has the burden of establishing its reliability. *See U.S. ex rel. Loughren v. UnumProvident Corp.*, 604 F. Supp. 2d 259, 264 (D. Mass. 2009).

A. *David Carpenter, M.D.*

Plaintiffs provided the expert testimony of Dr. Carpenter to prove general causation – that EHS is a real, albeit rare, phenomenon. Dr. Carpenter received his medical degrees from Harvard Medical School, is the Director of the Institute for Health and the Environment at the University of Albany, and a Professor of Environmental Health Sciences within the School of Public Health. He is a researcher and educator on the subject of environmental causes of human disease, and his education and experience support his opinions as set forth in his expert Statement. Docket No. 59-3.

Dr. Carpenter generally opines that exposure to electromagnetic fields ("EMFs") can, in some people, cause EHS, the symptoms of which are consistent with those reported by G. Dr. Carpenter also suggests that it is biologically plausible that the symptoms described could be caused by the known biological effects of EMFs. Defendants move to exclude Dr. Carpenter's testimony on the grounds that his opinions are not based on reliable methods of assessing scientific evidence, and are outside the consensus of the relevant scientific community.

If an expert's testimony is within "the range where experts might reasonably differ," the jury, not the trial court, should be the one to "decide among the conflicting views of different experts." *United States v. Zolot*, 968 F. Supp. 2d 411, 417 (D. Mass. 2013). As the First Circuit instructed in *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998),

> Daubert does not require that a party who proffers expert testimony carry
> the burden of proving to the judge that the expert's assessment of the situation is

> correct. As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies. In short, Daubert neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance. It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.

*Ruiz-Troche*, 161 F.3d at 85 (citing *Daubert*, 509 U.S. at 590, 596 113 S.Ct. 2786; *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir.1997); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir.1994)).

The Defendants most pointed attack on the admissibility of Dr. Carpenter's opinion is that it is not based on reliable methods of scientific evidence. Defendants note that Dr. Carpenter credits studies and parts of studies that support the hypothesis that EHS exists, and discards or rejects studies or parts of studies that do not confirm this. Defendants refer to this as "cherry picking," and evidence that Dr. Carpenter lacks objectivity, and is merely an advocate or "hired gun." However, if the Court looks at the heart of Dr. Carpenter's opinion – EHS is a rare but real phenomenon – then the fact that a few studies confirm that some individuals manifest EHS while most studies do not, is entirely consistent with his opinion. Rather than "cherry picking," Dr. Carpenter offers detailed methodological criticism of certain studies by providing an expert opinion as to why they might be unable to detect EHS. Such differences of opinion between experts need to be weighed by fact finders.

Regarding Defendants' arguments that Dr. Carpenter's opinions are outside the consensus of the relevant scientific community, the Court notes that it does not exclude a minority view merely because it is a minority view. To the extent Defendants argue that Dr. Carpenter's opinion concerning "no safe threshold" cannot be validated, the "no safe threshold" argument is

not essential to the testimony that he offers.  Dr. Carpenter's education and Considering Dr. Carpenter's report and testimony as a whole, the Court finds it meets reliability requirements under a Rule 702 analysis.  Accordingly, Defendants motion to exclude him is denied.


   *B.  Jeanne Hubbuch, M.D.*

   Plaintiffs offer Dr. Hubbuch's opinion as evidence of specific causation.  It is her opinion, "to a reasonable degree of medical certainty," that the Fay School's Wi-Fi causes EHS in G. Docket No. 59-19.  Dr. Hubbuch uses the traditional method of "differential diagnosis" to conclude that G suffers from EHS, and then makes the extraordinary leap that this can only be attributed to the Fay School's Wi-Fi.

   In *Milward v. Rust-Oleum Corp.*, 820 F.3d 469, 476 (1st Cir. 2016), the First Circuit noted that plaintiffs were "certainly correct that a differential diagnosis can be a reliable method of medical diagnosis," but that the plaintiffs "still must show that the steps taken as part of that analysis—the "ruling out" and the "ruling in" of causes—were accomplished utilizing scientifically valid methods."  *Milward*, 820 F.3d at 476 (internal citations omitted).  Differential diagnosis proceeds by assembling possible causes for the symptom or symptoms, and conducting inquiries designed to provide evidence that possible causes are more or less likely, until one possibility emerges as a reasonable conclusion as to the actual cause, essentially a "process of elimination."  *Id.* at 472.  In a context where an incident of the plaintiff's condition is frequently found to occur for no known cause (idiopathic etiology), the First Circuit has asked experts to provide a reliable means to exclude an idiopathic cause prior to concluding that a specific cause is acting, where "the record does not contain a scientifically reliable basis to 'rule in' [that cause]."  *Id.* at 476.  Thus, in *Milward*, the Court found that failing to fully accommodate a major

possibility on a list of possible causes renders a process of elimination from that list inherently unreliable. *Id.*

In the instant case, Dr. Hubbuch fails to articulate a scientifically reliable basis linking the constellation of symptoms reported by G with EHS in order to "rule in" that particular diagnosis. She also neglects to account for the possibility of an idiopathic etiology, which is ironic as "idiopathic" was included in the actual diagnostic code she assigned to G.[1] Reviewing all the facts on the record, the Court sees a pattern of symptoms associated with G being at the Fay School. While the Fay School has a Wi-Fi system, that is not the totality of the environmental factors that might impact the child at the School. Despite the fact that the School is identified by the Plaintiffs as the geographical nexus of G's affliction, Dr. Hubbuch failed to document or testify to her efforts to identify and exclude other environmental factors at the School that might cause or contribute to G's symptoms. Dr. Hubbuch's opinion and hearing testimony fail to establish that she considered any environmental factor at the school except Wi-Fi. Rather, as the Plaintiffs themselves state, "Dr. Hubbuch weaves the circumstantial facts with her medical opinion in a way that could persuade a rational juror." Docket No. 122 at p. 32. However, the "weaving-in" of circumstantial evidence is simply a façade for her unsupported conclusion. Given that Dr. Hubbuch's differential was based on her presumptive diagnosis of an environmental cause, the Court finds that her subsequent use of the differential diagnosis method failed to reasonably survey other potential causes of G's symptoms at the geographic nexus she identified. Thus, her opinion is excluded under Fed. R. Evid. 702(d).

---

[1] Dr. Hubbuch provided a letter to G's mother addressed "To Whom it May Concern" on April 14, 2015, which stated that G had been "diagnosed with Electromagnetic Hypersensitivity," and identified the corresponding diagnostic code as "Idiopathic Environmental Intolerance." Docket No. 97-44.

In addition to the unreliable and inconsistent application of her diagnostic method to conclude that G's suffered from EHS, Dr. Hubbuch's further conclusion that the EHS was caused by Wi-Fi with "reasonable medical certainty" is based on insufficient data. Dr. Hubbuch's opinion adds nothing to G's mother's assertions that the Fay School's Wi-Fi harmed her son. She presents nothing that would allow any reasonable arbiter of the facts to distinguish between the possibility that Fay's Wi-Fi causes or exacerbates G's EHS, and the alternate hypothesis that some other factor at the school is responsible for his symptoms. Those facts and data are simply not present in the record here, and thus Dr. Hubbuch's only argument is to assign causation based solely on correlative data. Because her conclusions cannot be supported by the facts and data she is working from, Dr. Hubbuch's testimony lacks sufficient facts or data (nothing that actually links G's symptoms to Fay's Wi-Fi), and thus falls short under Rule 702(b).

As previously discussed, because the principles and method of differential diagnosis were not reliably applied, Dr. Hubbuch's testimony falls short on Rule 702(d), and thus ultimately under 702(a) as well, especially given the misleadingly forceful wording of her conclusions. Any of these would suffice to exclude Dr. Hubbuch's testimony. Accordingly, this Court finds that Dr. Hubbuch's opinion does not rest on a reliable foundation, and Defendant's motion to exclude her is granted.

### C.  Martha Herbert, M.D.

Dr. Herbert is offered as an expert as to specific causation. Specifically, her opinion outlines why she finds G's EHS diagnosis to be appropriate and medically correct. She notes the temporal association of the symptoms as reported by G's mother with G's presence at the Fay School, and

opines that the symptoms, as reported, are consistent with those reported for some other patients believed to be afflicted by EHS. Dr. Herbert's qualification as an expert in this case is based on a Rule 702 analysis of her March 12, 2016 expert opinion disclosure (Docket No. 59-20), as she did not testify in the *Daubert* hearing in this case.

The Defendants have faulted Dr. Herbert's qualification as an expert on several grounds. First, they argue that Dr. Herbert is not qualified to diagnose G with EHS. This Court disagrees. Accepting, *arguendo*, that EHS is a real but rare phenomenon, the very existence of which is doubted by many, it is unreasonable to expect the Plaintiffs to produce an expert who is specifically qualified as an EHS diagnostician. Dr. Herbert's education and experience as a pediatric neurologist and neuroscientist at Massachusetts General Hospital, and Assistant Professor in the Department of Neurology at Harvard Medical School, is sufficient to support her opinion as documented in the Expert Opinion Disclosure. Docket No. 59-20.

Defendants further argue that Dr. Herbert's application of the differential diagnosis is unreliable because she considered factors not deemed relevant by other physicians, and conflated correlation with causation in concluding that the School's Wi-Fi caused G's EHS. Again, the Court disagrees. While experts may differ on how Dr. Herbert has used the method, she does not appear to have misused it. Dr. Herbert's report is carefully framed and, in stark contrast to Dr. Hubbuch's report and testimony discussed above, does not present her conclusions as certainties unsupported by argument and data. Specifically, it is noteworthy that Dr. Herbert is careful to describe that other patients diagnosed with EHS have reported a wide range of symptoms, ranging from "none" to "other symptoms," and confines herself to concluding that G's reported symptoms are consistent with some of the symptoms on this very broad list. Dr. Herbert outlines a plausible mechanism ("oxidative stress") hitherto not coherently articulated anywhere in the case, while

being careful to note that many other environmental factors could cause the observed oxidative stress, thus leaving the door open to other explanations. The Court also notes that Dr. Herbert draws attention to a possible mitigation of EMF-induced oxidative stress (other than decreasing exposure), which she supports with four literature citations.

As for the claim that Dr. Herbert conflates temporal correlation with actual causation (the *post hoc, ergo propter hoc* fallacy), this is simply untrue. Dr. Herbert carefully notes the temporal correlation and that the symptom reporting is based on the mother's account, and reaches a tentative conclusion that an EHS diagnosis is correct in the absence of another explanation. This conspicuously lacks the hyperbolic "medical certainty" asserted by Dr. Hubbuch. The Defendants go on to assert that Dr. Herbert lacks sufficient facts and data to support her opinion, but for the same reasons, this argument is rejected. Dr. Herbert maintains a thread of argument from facts and data to her conclusions that is plausible and scientific.

Finally, the Defendants argue that Dr. Herbert's opinion should be excluded because it is cumulative to Dr. Hubbuch's opinion, and solely based on tests and evaluations performed by others. If the latter assertion was true, which it is not, this is not a proper grounds to exclude expert opinion. Rule 702 simply asks that the expert offer a useful opinion based on a reliable method, used properly, and based in sufficient data. An expert need not generate the data with her own hands. Even if this Court had not excluded Dr. Hubbuch's testimony, Dr. Herbert's opinion is not simply cumulative: it brings mechanistic explanations, knowledge of the relevant literature, and a clarity of analysis that, however much the Defendants and their experts disagree with, is useful to the Court in understanding the controversies at the heart of this case. The Defendants' motion to exclude Dr. Herbert as an expert is denied.

### D. Karl Maret, M.D., Ph.D.

Dr. Maret if offered as an expert on the workings of a dosimeter. The workings of a dosimeter are not in dispute. The Defendants concede that G was exposed to Wi-Fi, and that in principle, the exposure can be quantitated by a dosimeter. Dr. Maret is technically well qualified to give the opinion he offers. However, because he cannot substantiate how the dosimeter was used in this case, or the correlation of dosimeter readings with location and other events, his testimony will not be helpful in understanding evidence or a fact at issue here, and thus his qualification as an expert in this case fails under Rule 702(a), and his testimony is excluded.

### E. Robert Bowdoin

Mr. Bowdoin is an electrician offered to give expert testimony on the potential for rewiring one or more classrooms as part of a proposed accommodation aimed at eliminating Wi-Fi exposure in one or more classrooms. The Defendants seek to exclude him because the portion of his testimony that relates to the potential for wiring one or more classrooms for Ethernet (in order to remove the necessity for Wi-Fi) is not in dispute, while any portions of his testimony that go beyond the potential for physical rewiring to address the impact to curriculum delivery or compatibility with the Fay School's current equipment is either beyond his expertise, or would be based on insufficient facts and data. The Court concurs that Mr. Bowdoin would be unable to reliably assess the impact to the classroom, and does not appear to have considered that many of the School's laptops are not designed to use Ethernet. The testimony Mr. Bowdoin is qualified to offer will not be helpful to the Court or a jury, and his testimony is therefore excluded under Rule 702(a).

## Motion for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that the court shall grant summary judgment if the moving party shows, based on the materials in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A factual dispute precludes summary judgment if it is both "genuine" and "material." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). For a fact to be "genuine," the "evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, must be sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995) (citation omitted). A fact is "material" when it might affect the outcome of the suit under the applicable law. *Id.*

When considering a motion for summary judgment, the Court construes the record in the light most favorable to the nonmoving party and makes all reasonable inferences in favor thereof. *Sensing v. Outback Steakhouse of Florida*, LLC, 575 F.3d 145, 153 (1st Cir. 2009). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact within the record. *Id.* at 152. "The test is whether, as to each essential element, there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* (quoting *DeNovellis*, 124 F.3d 298, 306 (1st Cir. 1997)) (citation omitted). A trial judge acts well within his authority on a summary judgment motion in assessing the reasonableness of the inferences that might be drawn from the circumstantial evidence. *Ricci v. Alternative Energy, Inc.*, 211 F.3d 157 (1st Cir. 2000).

"[N]either 'conclusory allegations, improbable inferences, and unsupported speculation,' nor '[b]rash conjecture coupled with earnest hope that something concrete will materialize, is []sufficient to block summary judgment.'" *Crawford v. Lamantia*, 34 F.3d 28, 31 (1st Cir. 1994)

(quoting *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990); *Dow v. United Bhd. of Carpenters*, 1 F.3d 56, 58 (1st Cir.1993)).

*A. Jurisdiction*

Defendants assert that all of Plaintiffs' claims fail for lack of jurisdiction because they are preempted by the exclusive jurisdiction of the Federal Communications Commission ("FCC"). Specifically, Defendants claim that the heart of this case is whether or not electromagnetic radiation in the radio frequency portion of the spectrum ("RF") are the cause of harm to Plaintiff G, and argue that, as Congress has tasked the FCC with establishing safe limits for such signal strengths, the issue before the Court lies within the exclusive domain of FCC rule making, and is not subject to review by District Courts. The Defendants highlight that other courts have consistently denied challenges to the FCC's safety limit, and further argue that even if the Plaintiffs don't directly challenge the FCC limits, their suit is a collateral attack on FCC guidelines.

Congress created the FCC to regulate "communication by wire and radio so as to make available, so far as possible, to all the people of the United States, without discrimination … wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communications, and for the purpose of securing a more effective execution of this policy by centralizing authority…." 47 U.S.C. § 151. However, with respect to low level RF impact on rare individuals who might be hypersensitive to RF radiation, as clarified in *Cellular Phone Taskforce*, the FCC found it "impracticable" to "evaluate the significance of studies purporting to show biological effects," and that this was "especially true for such controversial issues as non-thermal effects and whether certain individuals might be 'hypersensitive' or 'electrosensitive.'" *Cellular Phone Taskforce v. F.C.C.*, 205 F.3d 82, 90 (2d

Cir. 2000) (quoting *Procedures for Reviewing Requests for Relief from State and Local Regulations Pursuant to Section 332(c)(7)(B)(v) of the Communications Act of 1934*, 12 F.C.C. Rcd. 13494, at 31, 1997 WL 522796 (1997)). The Court went on to note that "[t]he FCC concluded that requiring exposure to be kept as low as reasonably achievable in the face of scientific uncertainty would be inconsistent with its mandate to balance between the need to protect the public and workers from exposure to potentially harmful RF electromagnetic fields and the requirement that industry be allowed to provide telecommunications services to the public in the most efficient and practical manner possible." *Cellular Phone Taskforce*, 205 F.3d at 92 (internal quotations omitted). The FCC thus *considered* risks to those with unusual sensitivity to electromagnetic radiation in the regulated spectrum and *declined* to craft regulation for such matters based on a lack of scientific consensus. Rather than precluding the possibility that a few individuals might be particularly sensitive to RF emissions below the established threshold, the FCC actually leaves the door open on this issue.

Defendants' argument that this suit represents an illegitimate collateral attack on the FCC's regulatory powers is without merit. When a plaintiff seeks accommodation under the ADA for an unusual sensitivity to RF, they no more attack the FCC's general regulation of RF than a person seeking an accommodation for a peanut allergy attacks or undermines the FDA's general powers to regulate the peanut butter industry.

Defendants also assert that the claim premised on the Americans with Disabilities Act is preempted by the Telecommunications Act of 1996 ("TCA"), specifically 47 U.S.C. § 255(f). This provision states that "[n]othing in this section shall be construed to authorize any private right of action to enforce any requirement *of this section* or any regulation thereunder. The Commission shall have exclusive jurisdiction with respect to any complaint *under this section*." 47 U.S.C. §

255(f) (emphasis added). However, Section 255, entitled "Access by persons with disabilities," is clearly directed toward telecommunications providers and manufacturers of telecommunications equipment, and mandates that these entities ensure that equipment and services are "accessible" to disabled individuals. Thus, the provision Defendants cite is inapposite here.

Moreover, the TCA contains explicit language that narrows the reach of the statute. Section 414 provides that "nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies," which indicates that Congress intended that the rest of Chapter 5 of Title 47 would not abrogate provisions of other federal statutes.

Finally, Defendants contend the Court should defer to the FCC under the doctrine of primary jurisdiction. The doctrine of primary jurisdiction, "informed by principles of deference to agency decisionmaking, gives effect to the eminently sensible notion that 'in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over.'" *Com. of Mass. v. Blackstone Valley Elec. Co.*, 67 F.3d 981, 992 (1st Cir. 1995) (quoting *United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 64, 77 S.Ct. 161, 165 (1956)). In determining whether deference of a matter to an agency under primary jurisdiction doctrine is appropriate, the court considers

> (1) whether the agency determination lies at the heart of the task assigned the agency by Congress; (2) whether agency expertise is required to unravel intricate, technical facts; and (3) whether, though perhaps not determinative, the agency determination would materially aid the court.

*Blackstone*, 67 F.3d at 992.

The safety or otherwise of RF radiation clearly does lie at the heart of the tasks assigned to FCC by Congress in 47 U.S.C. § 151, and it is likely true that FCC is better placed than this Court

to determine the extent and nature of non-thermal effects of RF emissions to people generally, and to those who might be particularly sensitive to them. However, the FCC has previously decided that there was insufficient evidence to form a rule within their broad mandate to balance safety and commerce, and has, as yet, not updated that guidance. Moreover, given the balancing function assigned to the FCC under 47 U.S.C. § 151, the agency's determination will not materially aid the Court here, where the matter is not the regulation of technology, but the mitigation of the impact of technology on a very small subset of the population that may have an unusual affliction mediated by RF radiation.

In considering the motion for summary judgment, the Court can avoid the need to evaluate the highly technical questions raised by the parties in great depth. As the Court provisionally accepts the expert opinion of Dr. Carpenter offered by the Plaintiff as to general causation, the Court thereby allows, for the sake of argument, that EHS is a genuine, albeit rare, affliction. Given that the FCC has declined to regulate RFs with respect to biological (non-thermal) effects, especially any impact to those that might be hypersensitive, the ADA provides a legitimate remedy to any unusual harm that might be caused to a small subset of individuals exposed to something that is generally, genuinely, and legitimately accepted as safe for the wider population. To be clear, this Court declines to determine whether or not Wi-Fi or other RF sources below the FCC energy safety threshold do or do not have deleterious impact on hypersensitive individuals. It suffices here for the Court to note that the FCC has acknowledged the possibility and controversy concerning EHS, and declined to regulate on that issue, while a qualified expert has testified that EHS is a real but rare condition. The Court accepts that it is *possible* that EHS is a genuine phenomenon and that, absent a technical determination to the contrary, or other clarification of the

scope, nature, and impact of EHS in relation to regulated emissions by the FCC, that jurisdiction to consider this matter as a potential disability under the ADA is not preempted here.

B. *Count I – Failure to make reasonable accommodation in violation of the ADA, 42 U.S.C. § 12101*

Defendants assert that Plaintiffs cannot prove that the school's Wi-Fi is the cause of G's symptoms, and thus summary judgment is appropriate. Plaintiffs do not dispute that they have "the burden of establishing, through expert testimony, general and specific causation." *Milward*, 820 F.3d at 471. In order to prove causation, the Plaintiffs followed the approach of seeking to establish that Wi-Fi can cause such symptoms (general causation) and that, in this case, it actually did cause G's symptoms (specific causation).

With regard to general causation, a genuine dispute exists as to whether Wi-Fi can cause EHS. Accepting Dr. Carpenter's expert report on its face, he concludes that Wi-Fi can cause EHS, and thus his expert opinion furnishes enough for Plaintiffs' claim to survive summary judgment as to the issue of general causation.

As to specific causation, however, the Defendants have met their burden in demonstrating the absence of a genuine issue of fact as to this element because, considering all the evidence on the record in the light most favorable to the Plaintiffs, and making all reasonable inferences in favor of the Plaintiffs, there is simply insufficient evidence to permit a logical conclusion that G suffers from EHS caused by Wi-Fi.

A diagnosis is a medical hypothesis as to what might be the cause of a complaint; a hypothesis to be tested by therapy or empiric observation of the patient's progress, but not establishing a certainty, or even necessarily a likelihood. Dr. Herbert helps to frame the uncertainty associated

with G's EHS diagnosis when she testifies that G's symptoms are consistent with those reported by other alleged EHS sufferers, but acknowledges that the breadth of symptoms associated is broad and inconsistent. Dr. Herbert testifies that G suffered from oxidative stress, an established result of RF exposure in animal studies, and a plausible explanation for some of G's symptoms, but points out that many other environmental causes could also result in oxidative stress. The Plaintiffs then invite us to take a logical leap and accept Dr. Herbert's carefully framed conclusions as sufficient to prove that Fay's Wi-Fi is the cause of G's afflictions. Dr. Herbert's opinion concludes only that it is plausible that G suffers from EHS: G's symptoms don't rule out EHS, but she also notes that many other environmental phenomena could account for them. Dr. Herbert was thus unable to bridge the logical gap to make a firm assertion that Wi-Fi was the cause of G's symptoms, and thus on the basis of the record, neither can a jury.

Taking all the evidence on the record in the light most favorable to the plaintiff, there is insufficient evidence to show specific Wi-Fi-mediated causation. There is sufficient circumstantial evidence for a reasonable jury to find that something at the Fay school was impacting G, and this *might* be Wi-Fi, but it is impossible to conclude that the evidence on the record would allow a reasonable jury to find that a causal link has been proved without "unsupported speculation" or "brash conjecture." *Crawford*, 34 F.3d at 31. It would be unreasonable for a jury to fall into the logical trap of determining that evidence of correlation is sufficient to prove specific causation of an environmental sensitivity as alleged in this case. Absent any legal basis to establish that G has a disability that the Fay School could accommodate, it is not possible to establish what a reasonable accommodation beyond the Wi-Fi mitigation efforts

already found ineffective would be.  Summary judgment on the primary ADA claim (Count I) is therefore granted in favor of the Defendants.

### C.  *Count II – Retaliation in violation of the ADA, 42 U.S.C. § 12203*

A plaintiff's retaliation claim "does not depend on the success of her disability claim."  *Jones v. Walgreen Co.*, 679 F.3d 9, 20 (1st Cir. 2012) (citing *Colón–Fontánez v. Municipality of San Juan*, 660 F.3d 17, 36 (1st Cir.2011); *Carreras v. Sajo, García & Partners*, 596 F.3d 25, 35–36 (1st Cir.2010)).  Claims alleging retaliation in violation of the ADA are evaluated under the burden-shifting framework outlined in *McDonnell-Douglas Corp v. Green*, 411 U.S. 792 (1973). To establish a *prima facie* case of retaliation, the Plaintiffs must prove that they, (1) "engaged in protected conduct"; (2) there was an adverse action taken against them; and (3) "there was a causal connection between the protected conduct and the adverse action."  *Jones*, 679 F.3d at 21 n.7 (internal quotations omitted).  Once a plaintiff has established his *prima facie* case of retaliation, the defendant is then required to provide a rationale that shows that the allegedly retaliatory activity was in fact taken for legitimate non-retaliatory reasons, thus shifting the burden back to the plaintiff, who is then required to show that this rationale was a pretext for retaliation.  *McDonnell Douglas*, 411 U.S. at 793.

Plaintiffs claim that the Defendants retaliated against their family in various ways as a result of their good faith efforts to seek accommodation for a disability that they believe impacted a major life activity (schooling) of G.  Generally, the Plaintiffs claim that the Fay School reacted in a "derisive" and "hostile manner" due to their "annoyance that G's parents had raised a disability claim." Docket No. 122 at 3.  The Plaintiffs illustrate their allegations of derision and hostility with selected quotations from the School's correspondence that could certainly be read as disingenuous,

and that do demonstrate a few instances of immaturity of tone that shows the School's staff in a poor light, such as the email entitled "Rabbit ears and Aluminum Foil" sent by a School staff member referencing G's mother. However, as none were actually directed to the Plaintiffs or their family members, the Court cannot recognize them as reprisals simply because they were rude.

Plaintiffs further allege that G's mother was removed from committee service with the Parents' Association due to the consequences of the defamatory statements made concerning G's parents by the President of the Board of Trustees in his response to their anti-Wi-Fi activism. While the Court accepts that the Board of Trustees and the Parents' Association are instrumentalities of the Defendants, the email to which G's parents take offense was sent before the Plaintiffs claimed that G suffered from EHS. The email cannot be read as a retaliation because it occurred before any protected activity, and is not considered further.

The Plaintiffs also assert that the School's refusal of their request to allow G to listen remotely or to listen to recordings of classes was retaliatory. The School articulated a non-retaliatory rationale for this decision: such an arrangement is contrary to the School's practice of requiring class attendance, no medical documentation was provided to support that request, and an independent medical evaluation of G concluded that G should "attend school regularly." Docket No. 96, p. 35. Plaintiffs make no showing in their Opposition that this rationale was a pretext for retaliation. Likewise, the Plaintiffs' allegations that the School's request for independent medical examinations and the dispute over G's carrying a concealed dosimeter in school constituted retaliation were addressed by the Defendants, who provided a non-retaliatory rationale for these actions,[2] however, Plaintiffs failed to articulate any argument that the rationale provided was a

---

[2] Specifically, the School asserts that its request for further medical evaluations was reasonable and non-retaliatory because Dr. Hubbuch had provided only a "preliminary diagnosis" to the School at that point. With regard to the dispute over G's carrying a dosimeter while in class, the School asserted that the Handbook rules make plain that

mere pretext for reprisal. Accordingly, Plaintiffs have failed to meet their burden as to these specific instances of alleged retaliatory conduct.

Finally, the Plaintiffs contend that the School's refusal to allow G to participate in after-school athletics during the period that he was studying at home to avoid allegedly school-related headaches was also retaliatory, as was the omission of G's brother from the written program and verbal presentation at a dinner celebrating his transition from 8th grade. The Plaintiffs have established that they were seeking an accommodation for an alleged disability, an activity protected under the ADA. Plaintiffs have also established sufficient unrebutted facts to show that adverse actions were taken against them with regards to the School's refusal to allow G to participate in athletic activities and that G's brother was omitted from the 8th grade transition program. As the School's refusal to allow G to participate in athletics is directly related to the nexus of the case, it appears that these actions were taken as a consequence of the School's response to the protected activity. The omission of G's brother from 8th grade graduation dinner program appears to go beyond a mere snub, and because there is no suggestion that any other child was excluded, taking into account the nature of the dispute between the Plaintiffs and the Defendants, and also noting that *no explanation has been offered by the Defendants*, the Court concludes that it was sufficiently likely that it was motivated by animus against the Plaintiffs to survive as a *prima facie* allegation of retaliation.

Although the Defendants attack the Plaintiffs' entire retaliation argument on the grounds that the predicate ADA claim was not made in good faith, the Court cannot accept that argument. In reading the record in the light most favorable to the non-moving party, the Court concludes that this was a good-faith ADA claim. Even if the Court were to assume that the Plaintiffs deluded

_____

students may not have or use electronic devices in class, and that any disciplinary action was therefore not retaliatory. Docket No. 96 at p.32-34.

themselves into believing that their son suffered from EHS as a result of their long-term general concerns about the safety of Wi-Fi, this does not preclude the likelihood that the ADA claims were made in good faith, and none of the speculative attacks on the motivation of the Plaintiffs articulated throughout the Defendants' briefs achieves the standard required for the Court to find to the contrary on a motion for summary judgment.

Each of the two residual events comprise an allegation of retaliation, and neither of them are rebutted by the Defendants with a legitimate non-retaliatory rationale, despite the fact that the Plaintiffs reiterated these allegations in their Opposition. Docket No. 122, pgs. 2-7, 40. The Court notes that the Defendants are well aware of the parties' obligations with respect to the burden-shifting framework, having briefed it themselves. Docket No. 96, p. 29. Having failed to assert any non-retaliatory rationale for prohibiting G from participating in athletics and omitting his brother from the 8th grade program, under the *McDonnell-Douglas* burden-shifting framework, the Court is left to assume that the Defendants have no defense. The Defendants' motion for summary judgment is thus denied as to Count II.

### D. Count III- Breach of Contract (against Fay School and Gustavson)

The Plaintiffs claim that the Defendants breached a contract memorialized by the School's Handbook, while the Defendants argue that the Handbook terms that form the basis of the Plaintiff's allegations are not contractual in nature. In considering whether student handbook provisions are or are not contractual, courts have found that a student's reasonable expectations under handbook provisions are contractually enforceable. *See, e.g., Cloud v. Trustees of Boston Univ.*, 720 F.2d 721, 724-25 (citing *Lyons v. Salve Regina College*, 565 F.2d 200, 202 (1st Cir. 1977)). However, where a handbook contains generalized representations that are aspirational or

too vague to form a certain and definite promise, such provisions are not contractually enforceable. *See Morris v. Brandeis Univ.*, 60 Mass. App. Ct. 1119, *3 n.6 (2004); *Shin v. Massachusetts Inst. of Tech.*, 2005 WL 1869101, at *7 (Mass. Super. June 27, 2005); *DMP v. Fay Sch. ex rel. Bd. of Trustees*, 933 F. Supp. 2d 214, 223 (D. Mass. 2013).

In *Morris*, a commitment to treat students with "fairness and beneficence" was too insufficiently defined to form an enforceable contract term. *Morris*, 60 Mass. App. Ct. at *3 n.6. Similarly, in *Shin*, a promise by MIT to make clinicians available to "care for your physical and psychological needs" was too open ended to form a basis for a breach of contract claims. *Shin*, 2005 WL 1869101 at *7. In contrast, in considering a previous edition of the same handbook in dispute here in *DMP*, this Court found that provisions outlining a specific sequence of disciplinary procedures were sufficiently specific to be contractual. *DMP*, 933 F. Supp. 2d. at 224-25.

Plaintiffs suggest that the Handbook entitles them to a reasonable expectation as to performance of its terms. Specifically, Plaintiffs allege the school failed to fulfill its commitments to "recognize[], respect[], and celebrate[] the full range of human diversity," to treat student health as a "core value," to "help when students are in physical need," to "recognize and celebrate… disabilities," respect individual differences, ensure that "all community members feel supported," and to not discriminate in affording all students the rights, privileges, programs and activities enjoyed by students in general. Docket No. 62-4. Plaintiffs argue that because the school was not sufficiently "forthcoming" in meeting these commitments, and that because it met the parents' concerns for their child's alleged disability with "derision", the Defendants breached the contractual provisions contained in the Handbook. However, Plaintiffs have failed to point to any specific provisions that are contractual in the definite sense articulated in *DMP*. Rather, the provisions that they do point to are aspirational and indefinite in the same sense as the generalized

representations in *Morris* and *Shin*. None of the Handbook provisions that the Plaintiffs suggest were breached are sufficiently definite or certain to form a contractual obligation, and thus Plaintiffs' claim for breach of contract fails. The Defendants' motion for summary judgment on Count III is granted.

### E. *Count IV – Misrepresentation (against Fay School and Gustavson)*

To prevail on a claim for misrepresentation, a plaintiff must show that a defendant

> (1) made a false representation of a material fact; (2) with knowledge of its falsity; (3) for the purpose of inducing [the plaintiff] to act thereon; and (4) that he reasonably relied upon the representation as true and acted upon it (5) to his damage.

*Robert Reiser & Co. v. Scriven*, 130 F.Supp.3d 488, 493-94. The Plaintiffs claim that they relied on the Defendants assertions concerning the standards of conduct to be expected from the school administration as outlined in the Handbook, and that they were harmed by their assumption that the Fay School and its staff would comport themselves in accordance with the standards laid out in the Handbook. The Defendants assert that the Plaintiffs arguments with respect to misrepresentation merely reprise their breach of contract claims. In this the Defendants are mistaken. While Plaintiffs' breach of contract claim, as discussed above, focused on specific provisions in the Handbook which they mistakenly believed were contractual, their misrepresentation claim is broader and encompasses the promises in the Handbook as a whole, as well as certain specific promises that the Plaintiffs see as particularly relevant to their situation. Complaint at 24. The Defendants also argue that "the School never misrepresented any fact," which from the context, the Court takes to mean any fact represented in the Handbook, further claiming that misrepresentation claims cannot be based on statements that are "vague, optimistic,

and kind of general rosy affirmations." Docket No. 125 at 19.  However, when considering the Handbook as a whole, despite the fact that the Handbook is genuinely packed with assertions that are indeed "vague, optimistic and generally rosy affirmations," there are concrete, definite statements with respect to behavior at the School that are not aspirational or forward looking, but rather purport to represent the School as it is.  Specifically, the Handbook states that "[h]onesty, respect, responsibility, empathy and kindness inform our conduct" and that "[t]he development of manners, civility, and integrity are hallmarks of our school."  It is no stretch to conclude that a jury might find that the School has not acted with empathy, kindness, civility, or integrity, and that the representations in the Handbook were thus materially false in this case.  However, there is nothing in the record that supports a finding that these statements were made with knowledge of their falsity, and thus the Defendants' motion is granted with respect to Count IV as to Defendant Fay School.

As to the claim of misrepresentation made individually against the headmaster, Mr. Gustavson, there is likewise insufficient evidence to support Plaintiffs' claim.  To pierce the corporate veil, Plaintiffs must show that an officer of a corporation has personal liability for the corporation's tort by virtue of participating in *and benefiting from* the action in question.  *See Jones v. Experian Info. Solutions, Inc.*, 141 F. Supp. 3d 159, 162 (D. Mass. 2015) (emphasis added).  While the Plaintiffs have clearly alleged Mr. Gustavson's participation in the misrepresentations, they have never suggested or provided any evidence with regard to how he might have benefitted from his actions

in this regard.  Accordingly, summary judgement is granted in favor of Defendant Gustavson with respect to Count IV.

F.   *Count V – Negligence (against Fay School and Gustavson)*

As discussed extensively above, the Plaintiffs failed to produce sufficient evidence to prove that G suffers from EHS caused by Wi-Fi, or was harmed in any way by the School's Wi-Fi system, so Plaintiffs' negligence claim fails on that basis.  However, it should also be noted that Defendants correctly argue that assuring that a device is operating within the federally established safety limits as the School did in this case, while it might not satisfy the requirements of the ADA, does fulfill an ordinary duty of care where a Defendant's special needs have not been established.  *See, e.g., Farina v. Nokia*, 625 F.3d 97, 133-34 (3d Cir. 2010) (dismissing claims relating to cell phones that complied with FCC's emission safety thresholds).

## Conclusion

For the reasons set forth above, Defendants' motion to exclude the Plaintiffs' experts (Docket No. 58) is ***granted*** with regards to Dr. Jeanne Hubbuch, Dr. Karl Maret, and Mr. Robert Bowdoin, and is ***denied*** with respect to Dr. David Carpenter and Dr. Martha Herbert. Defendants' motion for summary judgment (Docket No. 95) is ***granted*** on Counts I, III, IV and V, and is ***denied*** as to Count II.


**SO ORDERED.**

***/s/ Timothy S. Hillman***
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**